UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| GSCP VI EDGEMARC HOLDINGS, L.L.C., | : Civ. A. No. _____ |
| GSCP VI PARALLEL EDGEMARC HOLDINGS, | : |
| L.L.C., WSEP AND BRIDGE 2012 EDGEMARC | : |
| HOLDINGS, L.L.C., AND EM HOLDCO LLC, | : |
| | : **NOTICE OF REMOVAL** |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| ETC NORTHEAST PIPELINE, LLC, | : |
| | : |
| Defendant. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Defendant ETC Northeast Pipeline, LLC ("ETC"), by its attorneys, hereby files this Notice of Removal (the "Notice of Removal") pursuant to 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to be referred to the United Stated Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") pursuant to that certain Amended Standing Order of Reference dated January 31, 2012, and thereafter for ultimate transfer to the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), to be heard in connection with those certain related bankruptcy cases pending as *In re EdgeMarc Energy Holdings, LLC et al.*, jointly administered as case no. 19-11104 (the "Delaware Bankruptcy Cases"). The grounds for removal include:

1.     Upon information and belief, Plaintiffs filed their complaint (the "Complaint") in the Supreme Court of the State of New York, County of New York, Index No. 652906/2019 (the "NY State Court Action") on or about May 14, 2019. A copy of the Complaint is attached hereto

as **Exhibit A**, and all other pleadings on file in the NY State Court Action are attached as **Exhibits B – E**.

2.      On May 15, 2019 (the "Petition Date"), EdgeMarc Energy Holdings, LLC ("EdgeMarc") and eight affiliated debtors (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the Delaware Bankruptcy Court, which initiated the Delaware Bankruptcy Cases. The Delaware Bankruptcy Cases are presently pending with the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge presiding.

3.      The Complaint alleges that Plaintiffs have invested approximately $850 million in EdgeMarc, Complaint, ¶ 1, and that ETC committed to construct a pipeline system that would allow Debtor EdgeMarc and its subsidiaries to bring its product, natural gas, to market. *Id.* The Complaint further alleges that the Debtors are not now producing natural gas, that ETC is at fault, and that Plaintiffs "have thus suffered hundreds of millions of dollars in losses and may lose their entire investment" in Debtor EdgeMarc. *Id.*

4.      Section 1452 of Title 28 provides, in part, that a party may remove any claim or cause of action in a civil action to the district court if such district court has jurisdiction pursuant to section 1334 of Title 28.  In turn, Section 1334(b) of Title 28 provides, in pertinent part, that a district court's jurisdiction extends to those civil proceedings that "arise under," "arise in" or are "related to" a case filed under the Bankruptcy Code.

5.      The NY State Court Action is subject to removal pursuant to the jurisdiction of the United States District Courts over civil proceedings arising in, arising under, or related to cases under 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). 28 U.S.C. §§ 1334(b) and 1452.

6. "In the Second Circuit . . . 'related to' bankruptcy jurisdiction exists in any civil action where the outcome 'might have any conceivable effect on [a bankruptcy] estate." *In re Residential Capital, LLC*, 488 B.R. 565, 572 (Bankr. S.D.N.Y. 2013) (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992)). "Certainty, or even likelihood, is not required" to have a "conceivable effect" on a bankruptcy estate. *Id.* (citing *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007)). The test of a "conceivable effect" is met "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995). The law is essentially the same in the Third Circuit. *See Superior Contracting Gp. Inc. v. Rachmale (In re LTC Hldgs., Inc.)*, 587 B.R. 25, 36 n. 58 (describing the "conceivable effect" test and citing *Celotex* and *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1985)).

7. Plaintiffs' Complaint arises in, arises under, or otherwise is related to the Bankruptcy Cases and is therefore removable under 28 U.S.C. § 1452, because, *inter alia*:

    a. The Complaint pleads damages based upon alleged breaches by ETC of a certain Amended and Restated Gas Gathering and Processing Agreement ("GPA"), and two Amended and Restated Individual Transaction Confirmations ("ITC's"), all being contracts by and between Debtor EdgeMarc Pennsylvania, LLC ("EdgeMarc Pennsylvania") and ETC, *not Plaintiffs*. *See* Complaint, ¶¶ 92-95. Nevertheless, by the Complaint, Plaintiffs seek to adjudicate important and material rights, claims and liabilities of Debtor EdgeMarc Pennsylvania under the GPA and the ITCs.

    b. Among other things, the Complaint seeks adjudication of ETC's compliance with the terms of its agreements with Debtor EdgeMarc Pennsylvania, namely whether ETC constructed the Revolution System pipeline according to required standards.

    c. Furthermore, the Complaint hinges on Plaintiffs' allegations that the landslide that damaged the Revolution System was not a force majeure event, which is a critical—if not dispositive—issue in the Debtors' litigation with ETC.

d. A determination in this litigation that the ITCs were not properly terminated will give rise to a damages claim in favor of ETC against the Debtors.

e. The Debtors are currently running a court supervised sale process in their Bankruptcy Cases. Any sale of the Debtors' assets may require the assumption and assignment of the GPA and ITCs to a successful buyer. The outcome of this litigation, namely, adjudicating alleged defaults (whether committed by EdgeMarc Pennsylvania or ETC), rights, claims and terminations of such contracts will impact the Debtors' sale process.

f. Litigation already exists between ETC and Debtor EdgeMarc Pennsylvania in state court in Pennsylvania (the "PA State Court Action") to resolve disputes of fact and law that are inextricably intertwined with those causes of action Plaintiffs pleaded in the NY State Court Action. The NY State Court Action is removed so that a single court decides all of these interrelated disputes. *See DeAngelis v. Corzine*, 501 B.R. 155, 159 (S.D.N.Y 2012) (removal of causes of action that "are, in sum and substance, an echo" of other complaints before the court "renders removal the most efficient and equitable result."). Copies of the PA State Court Action complaint and counterclaims are attached hereto as **Exhibits F & G.** Contemporaneously with this Notice of Removal, or shortly hereafter, ETC intends to remove the PA State Court Action and seek the transfer of same to the Delaware Bankruptcy Court.

g. The Complaint seeks a determination of whether statements and representations made to Debtor EdgeMarc (the same statements made to Plaintiffs) were negligent. Therefore, the Complaint seeks to adjudicate potential claims by estate of Debtor EdgeMarc against ETC. Complaint, ¶ 38 ("The Equity Owners *and EdgeMarc* pursued the Pennsylvania option after receiving assurances from Energy Transfer…") (emphasis added). *See also* Complaint, ¶ 52 ("Gatherer shall deliver a notice…to Sponsors *and Shipper* [EdgeMarc]…") (emphasis added).

h. Plaintiffs plead that ETC has caused harm and damages to the Plaintiffs *and* Debtor EdgeMarc. *See* Complaint, ¶ 13. Plaintiffs plead that the alleged damages occurred because "EdgeMarc has *been* unable to satisfy the volume requirements of its 'take or pay' natural gas delivery contracts." *See* Complaint, ¶ 13. Plaintiffs plead that ETC "has damaged the value of the [Plaintiffs'] investment in EdgeMarc." *See* Complaint, ¶ 89. Therefore, the claims pleaded are derivative of the rights of the Debtors under the GPA and ITCs, and alleged harm to the Debtors, and thus represent assets of the Debtors' estates.

i. Plaintiffs plead that acts and conduct of ETC "compounded the harm to EdgeMarc and the Equity Owners," asserting claims that arise from alleged harm to the Debtors, and then derivatively, to the Plaintiffs. *See* Complaint, ¶¶ 78-84.

j. Any outcome of the litigation may give rise to claims of res judicata, collateral estoppel, or other theories of estoppel either defensively, in favor of ETC against the Debtors', or offensively, in favor of the Debtors, against ETC.

k. The outcome of this litigation may impair rights of the Debtors' estates to investigate, and if warranted, bring claims against the Plaintiffs for their acts and conduct, prior to the commencement of the Debtors' Chapter 11 Cases. The Plaintiffs are the controlling shareholders of the Debtors and the Debtors' Board of Directors, and had complete control of the Debtors' actions pre-bankruptcy. As pleaded in the Complaint, Debtor EdgeMarc Pennsylvania decided to terminate the GPA and ITCs, thereby shutting off 50% of its revenue generating ability at a time when its liquidity situation was critical. Complaint, ¶¶ 78-84. Additionally, agreement that a "force majeure" occurred GPA and ITCs would have alleviated any obligation of EdgeMarc for demand fees under the GPA and ITCs. However, by choosing to terminate the ITCs, the Debtors' dire financial situation was further exacerbated at a time when no reasonable business judgement would warrant doing so. By contrast, the termination of the ITCs preserved the ability of the Plaintiffs to bring their claims and causes of action as outlined in the Complaint.[1] The Plaintiffs' involvement in these decisions is a potential claim of the Debtors' estates that could be impacted by the outcome of this litigation.

8.    As a result, ETC removes the NY State Court Action to this Court under 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027 pursuant to the jurisdiction of this Court under 28 U.S.C. § 1334(b), as a civil proceeding arising under Title 11, or arising in or related to cases under Title 11, namely, the Delaware Bankruptcy Cases.

9.    Matters "arising under" or "arising in" bankruptcy cases are core proceedings. *See* 28 U.S.C. § 157(b)(1). The NY State Court Action is within the Bankruptcy Court's "core" jurisdiction within the meaning of 28 U.S.C. § 157(b)(1) and (2), because it seeks a

---

[1] Absent a termination of the ITCs, the Gathering System would be deemed to have been built by the Guaranteed In-Service Date and any claims that ETC's statements to the Plaintiffs were false or misleading would evaporate.

determination of the value of Plaintiffs' interests in the Debtors. *See* 28 U.S.C. § 157(b)(2)(B). Resolution of the disputes described in the complaint may involve estate claims and / or counterclaims. *See* 28 U.S.C. § 157(b)(2)(C). The NY State Court Action further affects the administration of the estate and seeks to adjust the debtor-creditor and debtor-equity security holder relationship. 28 U.S.C. § 157(b)(2)(A), (O).

10.     Even if the NY State Court Action is not a core proceeding, it is indisputably *related to* the Bankruptcy Cases, and thus, removal to this Court is proper.

11.      ETC was served with a copy of the Plaintiffs' Summons and Complaint in the NY State Court Action on or about May 15, 2019. This Notice of Removal is filed within 90 days after the Petition Date as required by Bankruptcy Rule 9027(a)(2). This Notice of Removal is timely under Bankruptcy Rule 9027 and 28 U.S.C. § 1452(a).

12.     No previous notice of removal has been filed in this or any other court.

13.     Pursuant to 28 U.S.C. § 1452(a), assignment to the United States District Court for the Southern District of New York is proper because the Plaintiffs filed the NY State Court Action in the Supreme Court of the State of New York, County of New York. As a mechanical matter, it is necessary to remove to the District Court in the jurisdiction where the state court action is pending, for transfer to the court where the bankruptcy matter is pending.

14.     Pursuant to Bankruptcy Rule 9027, the Notice of Removal is accompanied by a copy of all process and pleadings filed in the NY State Court Action, with the exception of any discovery material, and are attached hereto as Exhibits A through E.

15.     Pursuant to Bankruptcy Rule 9027(a)(1), ETC hereby consents to entry of final orders or judgment by the Delaware Bankruptcy Court.

16.     Upon the filing of this Notice of Removal in the United States District Court for the Southern District of New York, written notice of removal will be given to Plaintiffs and to the New York County Supreme Court. ETC will promptly serve on Plaintiffs and file with the New York County Supreme Court a Notice of Filing of Notice of Removal to Federal Court pursuant to Rule 9027.

**WHEREFORE**, ETC requests that upon receipt of this removed action, the United States District Court for the Southern District of New York, refer this action to the United States Bankruptcy Court for the Southern District of New York, and thereafter transfer this matter to

the United States Bankruptcy Court for the District of Delaware. A separate motion to transfer venue will be filed.

Dated: June 4, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

                                       */s/ Beth E. Levine*
                                       Laura Davis Jones (*pro hac vice* application to be filed)
                                       Beth E. Levine.
                                       PACHULSKI STANG ZIEHL & JONES LLP
                                       780 Third Avenue, 34th Floor
                                       New York, NY 10017
                                       Telephone:  (212) 561-7700
                                       Facsimile:  (212) 561-7777
                                       Email: ljones@pszjlaw.com
                                               blevine@pszjlaw.com


                                       and

                                       Michael P. Lynn (*pro hac vice* application to be filed)
                                       Chris Patton
                                       John Adams (*pro hac vice* application to be filed)
                                       LYNN PINKER COX & HURST, L.L.P.
                                       2100 Ross Avenue, Suite 2700
                                       Dallas, Texas  75201
                                       Telephone:  (214) 981-3800
                                       Facsimile:  (214) 981-3839
                                       Email:  mlynn@lynnllp.com
                                               cpatton@lynnllp.com
                                               jadams@lynnllp.com

                                       *Counsel to ETC Northeast Pipeline, LLC*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GSCP VI EDGEMARC HOLDINGS, L.L.C.,　　　:　　Index No.
GSCP VI PARALLEL EDGEMARC HOLDINGS,　 :
L.L.C., WSEP AND BRIDGE 2012 EDGEMARC　 :
HOLDINGS, L.L.C., and EM HOLDCO LLC,　　:　　**COMPLAINT**
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　 :
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　- against -　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　:
ETC NORTHEAST PIPELINE, LLC,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　　　　:
　　　　　　　　　　　　　　　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

　　　　Plaintiffs GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings,

L.L.C., WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C., and EM Holdco LLC (together, the

"Equity Owners"), by and through their attorneys, allege upon knowledge as to themselves and

their conduct and otherwise upon information and belief as follows:

### NATURE OF THE CASE

　　　　1.　　　　The Equity Owners have invested approximately $850 million in EdgeMarc

Energy Holdings, LLC ("EdgeMarc"), an oil and gas exploration and production company based

in Pennsylvania.  Defendant ETC Northeast Pipeline, LLC ("Energy Transfer"), a midstream

energy company that designs, builds and operates natural gas pipeline systems, committed to

construct and operate a pipeline system that would allow EdgeMarc to bring its product —

natural gas — to market.  But contrary to Energy Transfer's representations, the pipeline system

that Energy Transfer built, referred to as the Revolution System, was so flawed and rife with

problems that it ruptured, causing an explosion and high-intensity flash fire.  EdgeMarc's natural

gas in Pennsylvania is now "shut in" — in other words, trapped in the wells and not flowing to

Case 19-50269-CSS  Doc 1  Filed 06/06/19  Page 11 of 60

purchasers.  The Equity Owners have thus suffered hundreds of millions of dollars in losses and may lose their entire investment.

2.      The current contractual relationship between the Equity Owners and Energy Transfer goes back to November 2017.  In November 2017, at Energy Transfer's insistence, the Equity Owners committed to invest an additional $150 million in EdgeMarc to allow the company to further develop its natural gas properties in Butler County, Pennsylvania.  The Equity Owners would make $50 million available in November 2017, and agreed to invest an additional $100 million in 2018.  At the same time, Energy Transfer agreed to construct and operate a "Gathering System" that would gather EdgeMarc's raw natural gas, compress and dehydrate it, transport it to a processing plant owned by Energy Transfer, and then deliver pipeline-quality natural gas to the interstate pipeline system.

3.      Energy Transfer induced the Equity Owners to invest more capital in EdgeMarc by assuring the Equity Owners that the Gathering System would be ready and operational by July 1, 2018.  The first $50 million was made available right away given that assurance.  In addition, under the Equity Commitment Agreements entered into in November 2017 among the Equity Owners, Energy Transfer and EdgeMarc, the Equity Owners agreed to invest an additional $100 million in 2018, *but only* after Energy Transfer provided written certifications stating whether the Gathering System would be complete, functional, and capable of being put into commercial service by July 1, 2018.

4.      The Equity Owners bargained to receive certifications from Energy Transfer, called "Project Status Notices."  Each Project Status Notice had to "contain a written certification of Gatherer [*i.e.*, Energy Transfer] that, as of the date of such Project Status Notice, either (i) there is no Project Delay or (ii) there is a Project Delay and the number of days that

2

Gatherer anticipates the In-Service Date to be delayed as a result of such Project Delay."

"Project Delay" was defined as "any delay in the development, construction, or completion of

the Gathering System . . . that will delay the In-Service Date" — the date the Revolution System

was to be "completed and placed in commercial service" — "beyond July 1, 2018."

     5.      In justifiable reliance on three separate Project Status Notices from Energy

Transfer, each certifying that "there is *no Project Delay*," the Equity Owners funded the

$100 million of new equity financing in three equal installments on or around February 1, March

15 and April 30, 2018.  It is now apparent, however, that none of the Project Status Notices was

accurate.  In fact, due to design and/or construction flaws in the system, the pipeline segment of

the Gathering System was not stable or capable of safely transporting natural gas.  Thus, at every

stage, there was necessarily Project Delay.

     6.      The pipeline system was so poorly designed and/or constructed that on

September 10, 2018, following a rainstorm, a segment of the pipeline ruptured in connection

with a landslide, causing an explosion.  The explosion and resulting fire destroyed property,

damaged power lines and forced the evacuation of nearby residents.  But rather than

acknowledge its failures, mere hours after the explosion and fire, Energy Transfer sent two self-

serving notices to EdgeMarc's Pennsylvania subsidiary.  The first claimed that the Revolution

System had been placed into commercial service *the day before* — on September 9.  The second

asserted that the events of September 10 constituted a "Force Majeure" and that this supposed act

of God rendered Energy Transfer unable to transport EdgeMarc's gas.

     7.      Both of Energy Transfer's post-explosion notices were false.  Contrary to the

in-service notice, the pipeline system was not capable of performing its intended functions and

never delivered a single molecule of EdgeMarc's natural gas in commercial service.  And,

3

Case 19-50269-CSS Doc 1 Filed 06/06/19 Page 13 of 60

contrary to Energy Transfer's Force Majeure notice, the system's failure was not the result of circumstances beyond Energy Transfer's reasonable control. Rather, the system failed because of its flawed design and/or construction.

8.  Since the explosion and fire of September 10, 2018, the truth regarding Energy Transfer's conduct has begun to emerge. Energy Transfer's permitting documents confirm that, before the landslide, Energy Transfer described the surrounding area as including "a 'slip' landslide area" and "dangerous and unstable hillslope terrain." From November 2017 through February 2018, the Beaver County Conservation District, acting under delegated authority from the Pennsylvania Department of Environmental Protection ("DEP"), cited Energy Transfer at least six times for failing to implement and maintain appropriate practices to minimize the risk of accelerated erosion and sedimentation along the Revolution System. And after the explosion and fire, geotechnical engineers determined that at the incident site "the slope is generally too steep to be permanently stabilized using solely earthwork measures" and that additional "mechanical means such as retaining structures/walls, piles, ground anchors, etc." were required.

9.  The DEP also inspected the area of the pipeline rupture just days after it occurred and found that Energy Transfer "failed to take all necessary measures to prevent accelerated erosion" and that the measures taken by Energy Transfer to prevent erosion were "improperly installed, maintained, and failed." Later inspections by the DEP have revealed landslides, "slope failures" and "land cracks" along the pipeline. In total, since the explosion and fire, the DEP has cited Energy Transfer for more than *780 violations* concerning the Revolution System.

10.  On October 29, 2018, the DEP ordered Energy Transfer to fix the problems it caused, but Energy Transfer did not do so. As the DEP reported, its order required Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all

4

other earth moving activities associated with the Revolution Pipeline." But months later, Energy Transfer still had not complied. The DEP reported in a February 8, 2019 press release: "Multiple inspections by DEP staff, most recently in January 2019, found that ET had not fulfilled the terms of the order and was not progressing toward compliance."

11.    As a result, the DEP issued an extraordinary sanction. It suspended review of *all* permit applications and amendments under Pennsylvania's Clean Streams Law for construction of the Revolution System, and informed Energy Transfer that it would be withholding the issuance of *all* clean water permits for *all* of Energy Transfer's corporate affiliates in Pennsylvania, regardless of the project. This permit hold is to stay in place until Energy Transfer "demonstrates to the satisfaction of the Department that its unlawful conduct has been corrected" — a standard that Energy Transfer has not satisfied to this day.

12.    Energy Transfer's conduct has led the Governor of Pennsylvania to rebuke the company publicly: "There has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities." And the Chairman and CEO of Energy Transfer's corporate parent admitted that "we've made some mistake[s] that we're not proud of" in Pennsylvania and "we're going to take our medicine and fix those mistakes."

13.    Despite those statements, nothing has been done to remedy the severe harm that Energy Transfer has caused to the Equity Owners and to EdgeMarc. As a result of Energy Transfer's failure to deliver accurate Project Status Notices and the indefinite delay in construction and completion of the Gathering System, the Equity Owners have been deprived of the capital that they invested on the expectation that the system would be completed and in service. They and EdgeMarc have also suffered significant additional damages. As described below, EdgeMarc has been unable to satisfy the volume requirements of its "take or pay" natural

5

gas delivery contracts with the major interstate pipeline operators because the Gathering System

— which was supposed to deliver EdgeMarc's natural gas to the interstate pipeline system — is

still not in service.  Failure to satisfy those volume requirements has cost EdgeMarc more than a

million dollars every month.

14.     As a result of these recent events, the Equity Owners have suffered substantial

losses.  This action seeks redress from Energy Transfer for its conduct and damages in an amount

to be determined at trial.

### PARTIES

15.     Plaintiff GSCP VI EdgeMarc Holdings, L.L.C. is a Delaware limited liability

company with its principal place of business in New York County, New York.

16.     Plaintiff GSCP VI Parallel EdgeMarc Holdings, L.L.C. is a Delaware limited

liability company with its principal place of business in New York County, New York.

17.     Plaintiff WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. is a Delaware

limited liability company with its principal place of business in New York County, New York.

18.     Plaintiffs GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc

Holdings, L.L.C., and WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. are affiliated with

investment funds managed by Goldman Sachs & Co. LLC ("Goldman Sachs").

19.     Plaintiff EM Holdco LLC is a Delaware limited liability company with its

principal place of business in Toronto, Ontario, Canada.  Its equity is held directly or indirectly

by the Ontario Teachers' Pension Plan Board.

20.     EM Holdco LLC, GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel

EdgeMarc Holdings, L.L.C., and WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C. together

own approximately 99% of the equity in EdgeMarc.

6

21.     Defendant Energy Transfer is a Delaware limited liability company with a place of business in Wexford, Pennsylvania.  Energy Transfer is an indirect subsidiary of Energy Transfer LP.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction of this dispute pursuant to Article VI, Section 7 of the New York Constitution.

23.     This Court has personal jurisdiction over Energy Transfer pursuant to CPLR § 302(a)(1) and GOL § 5-1402(1).

24.     Venue is proper in New York County pursuant to CPLR § 503(a) and (c).  Three of the plaintiffs maintain their principal office in New York County.

25.     Energy Transfer irrevocably consented to the exclusive jurisdiction of courts in New York County, New York, for any suit, action or other proceeding arising out of the Equity Commitment Agreements or any transaction contemplated therein.  Energy Transfer has irrevocably and unconditionally waived any objection to the laying of venue of this action in a court in New York County.

## FACTUAL BACKGROUND

**A.     EdgeMarc's Natural Gas Operations**

26.     EdgeMarc is an oil and gas exploration and production company that extracts natural gas from the Appalachian Basin.  EdgeMarc was formed in December 2011 through a collaboration between the Equity Owners affiliated with Goldman Sachs and five experienced oil and gas executives.  The Equity Owners have invested approximately $850 million in EdgeMarc to date.

7

Case 19-50269-CSS Doc 1 Filed 06/06/19 Page 17 of 60

27.     Since its founding, EdgeMarc has acquired lease interests in over 39,000 acres in Pennsylvania and Ohio for the purpose of extracting natural gas from the reserves in the Marcellus and Utica Shales.  It has drilled over 75 wells and in the past has produced over 100 million cubic feet of natural gas equivalent (mmcfe) per day.

28.     The Pennsylvania wells are located in Butler County, Pennsylvania, approximately 50 miles northeast of Pittsburgh.  They are owned and operated through EdgeMarc's wholly owned subsidiary, EM Energy Pennsylvania, LLC ("EdgeMarc Pennsylvania").  EdgeMarc's Ohio assets, based primarily in Monroe County, in the eastern portion of Ohio, are owned and operated by EM Energy Ohio, LLC ("EdgeMarc Ohio").

**B.     EdgeMarc's Long Haul Contracts**

29.     To deliver its natural gas to purchasers outside of Pennsylvania and Ohio, EdgeMarc entered into long-haul delivery contracts with operators of major interstate natural gas pipelines.  Those interstate pipelines reach potential purchasers nationally and sometimes internationally.

30.     Between 2014 and 2018, EdgeMarc entered into delivery contracts with three long-haul interstate pipeline operators:  Rover Pipeline LLC ("Rover"), an affiliate of Energy Transfer's corporate parent, Energy Transfer LP; Rockies Express Pipeline, LLC; and Texas Gas Transmission, LLC (the "Long Haul Contracts").  The Long Haul Contracts are "take or pay" contracts, under which the shipper of natural gas (here, EdgeMarc) contracts for reserved capacity on the operator's interstate pipeline, and is charged for that capacity regardless of whether or not it actually delivers any natural gas to the pipeline.

8

31.     Under the Long Haul Contracts, EdgeMarc is obligated to pay millions of dollars every month for its reserved capacity on the interstate pipelines.  The most significant of these Long Haul Contracts is with Rover.

**C.      EdgeMarc's Original Agreements with Energy Transfer**

32.     Shortly after its formation in December 2011, EdgeMarc began exploring for natural gas in Pennsylvania.  As EdgeMarc's main expertise is in oil and gas exploration, not pipeline construction, it contracted with Energy Transfer, whose corporate parent, Energy Transfer LP, was one of the largest pipeline operators in the United States and was going to operate three of the major interstate pipelines in the Marcellus and Utica Shales area:  Rover, Mariner West, and Mariner East.

33.     On April 17, 2015, Energy Transfer and EdgeMarc Pennsylvania entered into a Gathering and Processing Agreement and two Individual Transaction Confirmations (the "2015 Agreements").  Under those agreements, Energy Transfer contracted with EdgeMarc Pennsylvania to gather, process and transport natural gas produced from EdgeMarc properties in Butler County, Pennsylvania using a gathering system that Energy Transfer was to construct, own and operate.  The 2015 Agreements had a scheduled term of at least twenty years.

34.     By 2016, however, a sustained downturn had occurred in the oil and gas market. As a result, the 2015 Agreements were no longer profitable and EdgeMarc anticipated that it would no longer be economical to perform under them.

35.     EdgeMarc and the Equity Owners determined that they had at least two viable paths forward.  EdgeMarc could abandon its Pennsylvania assets and focus on developing its assets in Monroe County, Ohio, which were owned by EdgeMarc Ohio.  Alternatively, it could

9

renegotiate the rates and volume commitments in the agreements with Energy Transfer and focus on the wells in Butler County, Pennsylvania instead.

36.     If EdgeMarc pursued the Ohio option, it would purchase additional acreage in Monroe County to generate the natural gas volumes necessary to meet its obligations under the Long Haul Contracts. Although EdgeMarc Pennsylvania would still be bound by its uneconomical arrangement with Energy Transfer in this scenario, Energy Transfer's agreements were with EdgeMarc Pennsylvania, not the rest of EdgeMarc. Thus, Energy Transfer's recourse if EdgeMarc Pennsylvania did not perform was limited to the assets of EdgeMarc Pennsylvania.

37.     Although this Ohio option was promising and would have preserved substantial equity value, EdgeMarc and its Equity Owners decided to defer further development in Ohio in favor of renegotiated agreements with Energy Transfer in Butler County, Pennsylvania. Under this scenario — assuming Energy Transfer performed the renegotiated agreements as promised — EdgeMarc and the Equity Owners could profitably develop the Butler County assets and would still have the option of developing the Monroe County assets in the future.

38.     The Equity Owners and EdgeMarc pursued the Pennsylvania option after receiving assurances from Energy Transfer that it would be able to construct and place the Gathering System into commercial service by July 1, 2018. These assurances included representations by one of Energy Transfer's lead negotiators to representatives of EdgeMarc and the Equity Owners at in-person meetings at Energy Transfer's Wexford, Pennsylvania offices on August 23 and 24, 2017. At those meetings, Energy Transfer stated that its pipeline system would be complete by January 2018 and that it would be ready to be put in service by July 1, 2018.

10

39.     All parties knew that, absent completion of the Gathering System by July 1, 2018,

EdgeMarc would be at risk on its Long Haul Contract with Rover, since it was expected that

EdgeMarc would start incurring significant fees on that contract around that time. If EdgeMarc's

gas did not make it to the Rover interstate pipeline by that time, it would incur substantial losses

on the Rover and other Long Haul Contracts. Energy Transfer's timely completion of the

Gathering System was thus a principal point of focus during the 2017 renegotiation.

**D.     The 2017 Amended Agreements Between EdgeMarc Pennsylvania and Energy Transfer**

40.     As a result of the 2017 renegotiation among EdgeMarc, Energy Transfer and the

Equity Owners, on November 13, 2017, Energy Transfer and EdgeMarc Pennsylvania entered

into an Amended and Restated Gathering and Processing Agreement ("GPA") and two Amended

and Restated Individual Transaction Confirmations, which were to run co-terminously

("ITC-101" and "ITC-102") (together, the "2017 Amendments").

41.     Under the GPA and ITC-101, Energy Transfer agreed to: (i) ship and process

specified quantities of EdgeMarc Pennsylvania's natural gas (known as "Shipper's Reserved

Capacity" or "SRC"); (ii) market and sell, on behalf of EdgeMarc Pennsylvania, natural gas

liquids, such as propane and butane, processed by Energy Transfer from the "wet" natural gas

extracted by EdgeMarc Pennsylvania; and (iii) deliver pipeline-quality natural gas for EdgeMarc

Pennsylvania to the interstate natural gas pipeline system. To do this, Energy Transfer agreed to

construct and operate a "Gathering System" that would receive EdgeMarc Pennsylvania's natural

gas from certain "Receipt Points" in Butler County, Pennsylvania, and deliver that gas to the

"Delivery Point," which was defined specifically as the "inlet flange of the measurement

facilities of Rover Pipeline, LLC, located at or near the tailgate of" Energy Transfer's Revolution

I cryogenic processing plant (the "Plant") in Washington County, Pennsylvania.

11

42.     As set forth in ITC-101, Energy Transfer agreed that the "Gathering System to be constructed, owned and operated" by Energy Transfer "will be capable of (i) gathering the SRC from the Receipt Points upstream of the Galaxy Central Delivery Point ('Galaxy CDP') for delivery to the Galaxy Compressor Station ('LP-Galaxy Gathering'), (ii) compressing and dehydrating the SRC at the Galaxy Compressor Station ('Galaxy Compression'), (iii) gathering, via [Energy Transfer's] high pressure gas pipeline ('HPGP'), the SRC from the Galaxy Compressor Station to the Plant ('HP Gathering') and (iv) gathering Residue Gas from the Plant for delivery to the Delivery Point."

43.     In return, EdgeMarc Pennsylvania agreed that Energy Transfer would exclusively gather, process and transport all of its gas production within a dedicated area (primarily in Butler County, Pennsylvania) in exchange for set fees, and committed to spend an additional $150 million "toward the acquisition, exploration, drilling, completion, production and build out of necessary infrastructure" for the purpose of producing gas from that dedicated area to then be gathered, processed and transported by Energy Transfer.

44.     EdgeMarc Pennsylvania's obligations under ITC-101 to tender its gas and pay Energy Transfer fees to gather, process and transport that gas started on the later of July 1, 2018 or the "In-Service Date."  The "In-Service Date" was defined as the "first Day of the Month following the Day on which the LP-Galaxy Gathering (other than laterals to the Sculptor Receipt Point and the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are *completed and placed in commercial service*" (emphasis added).

45.     ITC-101 also provided a "Guaranteed In-Service Date" of January 1, 2019 and a termination right related to that date.  If the In-Service Date did not occur by the Guaranteed In-Service Date, "irrespective of any outstanding or intervening declarations of Force Majeure,

12

then Shipper [*i.e.*, EdgeMarc Pennsylvania] may terminate this ITC upon written notice to Gatherer [*i.e.*, Energy Transfer] within thirty (30) Days of the Guaranteed In-Service Date, and neither Party shall have further obligation to the other hereunder."

46.     The GPA included a Force Majeure provision, which generally excused both Parties' performance — unless the agreement specified otherwise — if performance was hindered, delayed or prevented by "causes, conditions, events or circumstances which are beyond the reasonable control of the Party claiming Force Majeure." The Party claiming Force Majeure was required to "use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure," and no Party was entitled to the benefits of the Force Majeure provision to the extent that they "failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch." The GPA further obligated Energy Transfer to "remedy any Force Majeure event and any other cause of curtailment or suspension with all reasonable dispatch, and in such a manner as to minimize any adverse impact on [EdgeMarc Pennsylvania]."

47.     The GPA also included other provisions governing Energy Transfer's conduct. For example, in Section 19.14, the Compliance with Laws provision, the Parties (including Energy Transfer) agreed to "act in accordance with" any and all "laws, rules, regulations, decrees and orders of the United States of America and all other governmental bodies, agencies or other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations. . . ."

48.     Energy Transfer thus agreed to comply with any and all applicable laws and regulations governing pipeline construction. For example, by virtue of Section 19.14, Energy Transfer committed to comply with Pennsylvania regulations that require the use of appropriate

13

practices "to minimize the potential for accelerated erosion and sedimentation," the protection of

work sites "from accelerated erosion and sedimentation," and the use of construction

specifications and details that resist sliding and other movement.  25 Pa. Code § 102.4 (erosion

and sediment control requirements); 25 Pa. Code § 102.22 (site stabilization); 25 Pa. Code

§ 102.8(f)(6) (erosion management plans); 25 Pa. Code § 102.1 (defining stabilization).  Energy

Transfer also agreed to comply with federal regulations, also incorporated into Pennsylvania law,

which require that for certain regulated pipelines a pipeline "operator must take *all practicable

steps* to protect each [regulated pipeline] from washouts, floods, unstable soil, landslides, or

other hazards that may cause the pipeline to move or to sustain abnormal loads."  49 C.F.R.

§ 192.317 (emphasis added); 58 P.S. § 801.302 (adopting federal pipeline safety laws).

**E.    The Equity Commitment Agreements**

49.    As part of the 2017 renegotiation, in which Energy Transfer agreed to reduce the

fees it would charge EdgeMarc Pennsylvania to flow gas on the Gathering System as well as

EdgeMarc Pennsylvania's volume requirements, Energy Transfer demanded that the Equity

Owners and EdgeMarc contribute a total of $150 million to EdgeMarc Pennsylvania to support

EdgeMarc Pennsylvania's operations in Butler County, drill new wells there and thereby ensure

that gas (and revenues) would flow through Energy Transfer's pipeline system.  This required the

Equity Owners to agree that EdgeMarc could draw on and invest $50 million of previously

committed equity, and to commit $100 million of new equity to EdgeMarc.  Energy Transfer

knew that without agreement from the Equity Owners, this additional funding would not be

made available.  A key Energy Transfer negotiator was explicit during the negotiations about the

importance Energy Transfer placed on this additional funding:  "our number one priority in re-

14

structuring these agreements is ensuring that the sponsors invest an additional $100 million and EM invests an additional $50 million in Butler."

50.    The new equity commitments of $100 million were documented in agreements among the Equity Owners, Energy Transfer and EdgeMarc — an agreement for the Equity Owner affiliated with the Ontario Teachers' Pension Plan Board and an agreement for the Equity Owners affiliated with Goldman Sachs (the "Equity Commitment Agreements").

51.    Section 2 of the Equity Commitment Agreements set forth the "Commitment Timeline."  The Equity Owners would make three equal payments totaling $100 million on specified "Commitment Dates," so long as the conditions to funding were satisfied and there was no "Project Delay."  Section 2(a) provided:

> (a)    Each Sponsor's [*i.e.*, Equity Owner's] Total Commitment shall be funded in three equal tranches on [February 1, 2018; March 15, 2018; and April 30, 2018] (each funding, a "Commitment" and each funding date, as may be extended pursuant to this Section 2, a "Commitment Date"); *provided, however*, that (i) if Gatherer [*i.e.*, Energy Transfer] delivers a Project Status Notice (as defined below) to Sponsors and Shipper [*i.e.*, EdgeMarc Pennsylvania], prior to an applicable Commitment Date (as may be extended pursuant to clause (ii) below for an unsatisfied condition in Section 3), in which Gatherer notifies Sponsors and Shipper that there has occurred any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018 (each such delay, a "Project Delay"), then (A) such Commitment Date shall be extended day-for-day by the number of days the In-Service Date is anticipated to be delayed as set forth in such Project Status Notice and (B) each subsequent Commitment Date shall be extended by a corresponding number of days and (ii) if one or more of the conditions set forth in Section 3 is not satisfied as of the applicable Commitment Date (as may be extended pursuant to clause (i) above for a Project Delay), then (A) such Commitment Date shall be extended until the date that is 10 business days following the date on which all such conditions are satisfied and (B) each subsequent Commitment Date shall be extended by a corresponding number of days. Notwithstanding the foregoing, each

15

Sponsor may, in its sole discretion, fund any Commitment prior to its applicable Commitment Date.[1]

52.     Energy Transfer was required under Section 2(b) to provide the Equity Owners and EdgeMarc Pennsylvania with a Project Status Notice prior to each Commitment Date certifying whether there had occurred a Project Delay, as well as prompt notice of any event reasonably likely to cause a delay in the In-Service Date.  Specifically, Section 2(b) provided:

> (b)     Gatherer shall deliver a notice (a "Project Status Notice") to Sponsors and Shipper no earlier than 10 business days, and no later than five (5) business days, prior to each Commitment Date, which Project Status Notice shall contain a written certification of Gatherer that, as of the date of such Project Status Notice, either (i) there is no Project Delay or (ii) there is a Project Delay and the number of days that Gatherer anticipates the In-Service Date to be delayed as a result of such Project Delay. Without limiting the foregoing, Gatherer shall promptly notify Sponsors and Shipper as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date.

53.     Accordingly, Section 2 imposed two independent contractual obligations on Energy Transfer.  *First*, it required Energy Transfer to provide the Equity Owners and EdgeMarc Pennsylvania with a Project Status Notice, prior to each of the Equity Owners' funding obligations, certifying whether "there has occurred any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018."  And *second*, "[w]ithout limiting the foregoing," it required Energy Transfer to "promptly notify [the Equity Owners] and [EdgeMarc Pennsylvania] as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date."

---

[1]     Excerpts from the Equity Commitment Agreements are taken from the Equity Commitment Agreement executed by the Equity Owners affiliated with Goldman Sachs, which is substantively identical for purposes of these excerpts to the Equity Commitment Agreement executed by the Equity Owner affiliated with the Ontario Teachers' Pension Plan Board.

54.     In addition to Energy Transfer's covenants in Section 2, the Equity Owners'

obligations to fund each Commitment were also subject to the satisfaction of two conditions set

forth in Section 3 of the Equity Commitment Agreements.  Section 3 provided:

> Conditions.  The obligation of each Sponsor to fund each
> Commitment on a Commitment Date shall be subject to the satisfaction of
> each of the following conditions as of such Commitment Date: (i) in respect
> of any Commitment, no notices of Force Majeure have been issued and not
> withdrawn and (ii) Gatherer shall not have committed any material breach
> of this letter agreement (including, for the avoidance of doubt, with respect
> to Gatherer's obligation to timely deliver a Project Status Notice in advance
> of each Commitment Date pursuant to Section 2(b)) or any of the GPA,
> ITC-101 or ITC-102 or if Gatherer shall have committed any such material
> breach, such material breach shall have been cured in all respects on or prior
> to the applicable Commitment Date. Notwithstanding anything herein to the
> contrary, each Sponsor's sole and exclusive remedy for the failure of any of
> the conditions set forth in this Section 3 to be satisfied prior to the applicable
> Commitment Date shall be limited to the delay in making the applicable
> Commitment(s) described in Section 2 and the termination rights set forth
> in Section 12.

55.     Thus, if either of the conditions in Section 3 were not satisfied as of a

Commitment Date, the Equity Owners' funding obligations on such Commitment Date were

"extended until the date that is 10 business days following the date on which all such conditions

are satisfied" and their funding obligations on each subsequent Commitment Date were similarly

extended by a corresponding number of days.

56.     Under Section 12, the Equity Commitment Agreements terminated automatically

upon the earliest to occur of a number of events, including payment in full of the Equity Owners'

Commitments, and January 1, 2019.

**F.     Energy Transfer Certifies That There Are No Project Delays and, in Reliance on
Those Certifications, the Equity Owners Invest $100 Million More in EdgeMarc**

57.     On January 18, 2018, in advance of the first scheduled Commitment Date, Energy

Transfer provided a Project Status Notice to the Equity Owners and EdgeMarc Pennsylvania

17

certifying that "there is no Project Delay." In reliance on the Project Status Notice, on or around February 1, 2018, the Equity Owners funded their first $33.33 million Commitment. Those funds were then made available to EdgeMarc Pennsylvania.

58. On March 2, 2018 and April 16, 2018, in advance of the second and third scheduled Commitment Dates, respectively, Energy Transfer certified twice more to the Equity Owners and EdgeMarc Pennsylvania that "there is no Project Delay." In reliance on these two Project Status Notices, the Equity Owners funded their second and third Commitments on or around March 15, 2018 and April 30, 2018, respectively. Each of these Commitments was for $33.33 million and those funds too were made available to EdgeMarc Pennsylvania.

59. During this time, Energy Transfer also never notified the Equity Owners that it knew of "any event reasonably likely to cause a delay in the In-Service Date."

60. Thus, with Energy Transfer having certified three times, without qualification, that "there is no Project Delay" — *i.e.*, there had not "occurred any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018" — the Equity Owners fully satisfied their $100 million funding obligations under the Equity Commitment Agreements.

61. At no point before the pipeline ruptured and failed on September 10, 2018 were the Equity Owners informed by Energy Transfer that there were any material design or construction flaws in the Gathering System.

**G. Energy Transfer's Pipeline Ruptures, Causing an Explosion and Flash Fire**

62. On the morning of September 10, 2018, following a heavy rainstorm related to Tropical Storm Gordon, a slope traversed by a segment of Energy Transfer's pipeline in Beaver County, Pennsylvania, failed in a landslide. The pipeline ruptured and began to leak gas,

18

ultimately causing an explosion and flash fire (the "Pipeline Explosion"). Fire resulting from the explosion destroyed property, damaged power lines, and forced the evacuation of nearby residents.

63. Energy Transfer has taken the position that the pipeline's failure was the result of a "Force Majeure" and that its failure to perform under the GPA and ITC-101 was thereafter excused. But neither the storm that precipitated the landslide nor the resulting explosion and fire was a Force Majeure. Properly engineered natural gas pipeline systems are designed and constructed to account for location-specific slope and soil conditions and historical weather data and are made to withstand heavy rainstorms. The fact that Energy Transfer's pipeline failed after this rainfall, given the location-specific slope and soil conditions and historical weather data for rain intensities in this area, is clear evidence of design and/or construction errors and omissions.

64. Indeed, Energy Transfer's pipeline failed during a rainstorm with peak hourly and daily rain intensities that were lower than intensities that had previously occurred near the rupture area. In nearby Pittsburgh, Hurricane Ivan in 2004 delivered nearly twice the peak daily precipitation experienced in September 2018. And historical rainfall levels in the area indicate that rain intensities like those experienced before the pipeline system failed are within the range that Energy Transfer would be expected to have designed and constructed its pipeline to withstand. Data published by the United States Geological Survey, a scientific agency of the United States government, designates the area in Western Pennsylvania where the Pipeline Explosion occurred as one of the areas in the United States with a high incidence of landslides.

65. Given that neither the weather conditions nor the slope and soil conditions were unforeseeable, the Gathering System was destined for failure, with serious risks to life safety. The fact that Energy Transfer's pipeline collapsed when subjected to this rainstorm shows that

the pipeline suffered from design and/or construction failures, and thus was not compliant with applicable law, capable of gathering and transporting EdgeMarc Pennsylvania's gas, or ready for commercial service.

66.     Since the Pipeline Explosion, important facts regarding Energy Transfer's conduct have begun to emerge.  Energy Transfer's permitting documents confirm that Energy Transfer knew, since 2015, that the area near the Pipeline Explosion "included a 'slip' landslide area" with "dangerous and unstable hillslope terrain."  And from November 2017 through February 2018, the Beaver County Conservation District, acting under delegated authority from the DEP, cited Energy Transfer at least six times for failing to implement and maintain appropriate practices to minimize the risk of accelerated erosion and sedimentation along the Revolution System.

67.     In a Consent Order and Agreement, issued on June 28, 2018, the DEP concluded that Energy Transfer had violated Pennsylvania's Dam Safety and Encroachments Act, Clean Streams Law, dam safety and water management regulations, and erosion and sediment control regulations.  Energy Transfer agreed to pay a $145,250 civil penalty and to implement certain restoration plans to resolve the violations.

68.     Post-explosion inspections by the DEP have cited Energy Transfer for more than ***780 violations*** concerning the Revolution System.  These citations include:  over 70 violations for "fail[ing] to design, implement and maintain" appropriate erosion and sediment control practices to minimize the potential for accelerated erosion and sedimentation; over 60 violations relating to the "[c]onstruction, installation, use, maintenance, repair and removal of oil and gas gathering pipelines"; over 70 violations for conducting earth disturbance activities without implementing and maintaining appropriate erosion and sediment control practices; and over 70

20

violations for "fail[ing] to temporarily stabilize the site to protect it from accelerated erosion and sedimentation."

69.     The post-explosion inspections by the DEP have revealed further serious issues along the Revolution System, including numerous landslides, "slope failures" and "land cracks." On multiple occasions, the DEP's inspectors reported that the inspected "area remains unstable and the roadside slope is continuing to fail."

70.     Geotechnical engineers engaged by Energy Transfer's parent company also reported serious issues after the explosion.  After multiple days of site visits and observations of the conditions that existed on the slope impacted by the landslide, those engineers from Terracon Consultants, Inc. ("Terracon") concluded in a September 20, 2018 report that "the slope is generally too steep to be permanently stabilized using solely earthwork measures and that stabilization of the slope will require mechanical means such as retaining structures/walls, piles, ground anchors, etc."  The Terracon engineers thus recommended a geotechnical investigation be undertaken, a slope stabilization plan be developed and that Energy Transfer "regrad[e] the entire slope area when conditions allow."

71.     On October 29, 2018, the DEP issued an order that, as the DEP reported, required Energy Transfer to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution Pipeline."  But on February 8, 2019, the DEP reported that "[m]ultiple inspections by DEP staff, most recently in January 2019, found that ET had not fulfilled the terms of the order and was not progressing toward compliance."  As a result, the DEP issued a permit hold suspending all reviews of clean water permit applications and amendments for Energy Transfer and its affiliates, which would

21

continue until Energy Transfer "demonstrates to the satisfaction of the Department that its

unlawful conduct has been corrected." The hold apparently continues to this day.

72.     Energy Transfer's conduct led the Governor of Pennsylvania, Tom Wolf, to issue

a statement condemning Energy Transfer:

> **The Department of Environmental Protection has acted swiftly and decisively to hold this operator accountable to the conditions of its permits**. The permit bar by the Department of Environmental Protection is the latest step my Administration has taken to ensure pipeline operators and builders are accountable for the work they do in Pennsylvania. **There has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities.** This is not how we strive to do business in Pennsylvania, and **it will not be tolerated** (emphasis added).

73.     And on a February 21, 2019 earnings call with investors, the Chairman and CEO

of Energy Transfer LP, Kelcy Warren, admitted:

> **We made some mistakes and specifically, now we'd like to talk about Pennsylvania, and we're going to take our medicine and fix those mistakes** and complete good projects from this point forward, not insinuate that everything we've done has been bad, **it's just we've made some mistake[s] that we're not proud of**. So you'll see that improve, and when we don't make those mistakes again that our costs are going to improve and the predictability of those costs are likewise going to improve (emphasis added).

74.     In addition to the DEP, it has been publicly reported that the Pennsylvania Public

Utility Commission, the agency charged with enforcing pipeline safety standards, also is actively

investigating Energy Transfer's Revolution System. As noted above, federal pipeline safety

regulations, adopted as Pennsylvania law, require that for certain regulated pipelines a pipeline

"operator must take *all practicable steps* to protect each [regulated pipeline] from washouts,

floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to

sustain abnormal loads." 49 C.F.R. § 192.317 (emphasis added); *see* 58 P.S. § 801.302 (adopting

federal pipeline safety laws). The pipeline segment of the Revolution System where the rupture

22

occurred is subject to these regulations because it is located in a relatively high population-density area.[2]

75.     Finally, on April 29, 2019, another team of geotechnical engineers and earth scientists hired by Energy Transfer submitted the first phase of a Permanent Slope Stabilization Plan required under the DEP's October 29, 2018 order.  In preparing that plan, GeoEngineers, Inc. evaluated 38 slope failure sites identified by Energy Transfer along the Revolution System and found that 8 of those sites — including the site of the Pipeline Explosion — included "relatively deep failure surfaces and/or complex geological/slope conditions that require subsurface exploration using mechanized drilling equipment and detailed engineering analyses to develop permanent stabilization plans."  Because of the additional mechanized drilling work and detailed engineering analysis required at the site of the Pipeline Explosion, the plan states that stabilization plans for the site "will be provided at a later date."  For 12 additional sites where slope failures had been identified, the plan recommended the implementation of slope stabilization strategies that were not in place, including slope reconstruction and cellular confinement systems, among others.

76.     Given all of these facts, it has become clear that the Project Status Notices provided to the Equity Owners were not accurate or complete.  The Gathering System — in particular its pipeline component — was not, and was not capable of being, in commercial

---

[2]     Pipeline safety regulations classify locations into four classes, Class 1 through Class 4, generally corresponding to the population density around the pipeline.  The area of the Revolution System where the rupture occurred is located in a Class 3 area, which is the second-most dense area.  Pipelines in Class 3 areas generally are subject to stricter regulations because of the greater consequences of any safety issues.

service by July 1, 2018, or even by the Guaranteed In-Service Date of January 1, 2019. The

system was seriously flawed, non-compliant with applicable law and indefinitely delayed.

77.     It is also now clear that, as of each of the Commitment Dates, Energy Transfer

had committed material, uncured breaches of the GPA because Energy Transfer had violated an

array of state and federal laws and regulations. Because of those uncured breaches of the GPA,

as well as Energy Transfer's material breaches of the Equity Commitment Agreements, the

conditions precedent to funding in the Equity Commitment Agreements had not occurred on the

Commitment Dates. Despite its peculiar knowledge of the relevant facts, Energy Transfer did

not disclose either the flaws in its pipeline system or its systemic violations of Pennsylvania and

federal law. The Equity Owners thus funded their Commitments even though the conditions to

doing so were not satisfied.

**H.     Energy Transfer Compounds the Harm to EdgeMarc and the Equity Owners**

78.     Since the Pipeline Explosion, rather than promptly acknowledging its mistakes

and seeking to remedy the resulting harms, Energy Transfer has made the situation significantly

worse for EdgeMarc and its Equity Owners.

79.     A few hours after the explosion, Energy Transfer sent a notice to EdgeMarc

Pennsylvania claiming that the Revolution System had been placed into commercial service

*the day before* — on September 9. Then, Energy Transfer issued a notice to EdgeMarc

Pennsylvania asserting a "Force Majeure" — a "cause[], condition[], event[] or circumstance[]"

allegedly beyond its reasonable control — that rendered it unable to receive EdgeMarc

Pennsylvania's gas under ITC-101 for the foreseeable future.

80.     Neither of Energy Transfer's notices was accurate. The pipeline, which had not

delivered one molecule of EdgeMarc's natural gas to a commercial customer, was not capable of

24

performing its intended functions, let alone ready for or in "commercial service," as Energy

Transfer represented in its first notice. The Pipeline Explosion occurred at a time when Energy

Transfer was in the process of purging the pipeline of potential contaminants and packing it with

natural gas: part of a multi-step commissioning process before a pipeline is put in commercial

service. Moreover, the Delivery Point — the point at which the Gathering System connects to

Energy Transfer LP's affiliated interstate pipeline, Rover — was not, and could not have been, in

commercial service as of September 9, since Energy Transfer's application for authorization to

put the Delivery Point into service was not approved by the Federal Energy Regulatory

Commission, which regulates the Rover interstate pipeline, until September 27. The Force

Majeure notice also was inaccurate because the pipeline's failure was not the result of "causes,

conditions, events or circumstances" beyond Energy Transfer's reasonable control. Rather, the

pipeline system failed when exposed to heavy rain because of its flawed design and/or

construction.

81.     While Energy Transfer was trying to deflect blame for the failure of its pipeline

system, EdgeMarc and its Equity Owners were absorbing significant losses. Despite the

explosion, EdgeMarc remained committed to "take or pay" specified volumes of natural gas

under its Long Haul Contracts. But, as a result of the Pipeline Explosion, it could not deliver

natural gas from Butler County to the interstate pipelines and EdgeMarc incurred penalties on the

Long Haul Contracts of over a million dollars per month.

82.     On January 29, 2019, EdgeMarc Pennsylvania exercised its option to terminate

ITC-101 (and by operation of contract, ITC-102) on the ground that Energy Transfer failed to

meet the Guaranteed In-Service Date of January 1, 2019. On January 30, 2019, EdgeMarc

Pennsylvania notified Energy Transfer that it was invoking its rights under the GPA to have

25

Energy Transfer gather and transport a portion of its gas in Butler County to a third-party

processor.  Energy Transfer refused to accept this nomination of gas.

83.     On February 7, 2019, Energy Transfer sued EdgeMarc Pennsylvania in the Court

of Common Pleas of Allegheny County, Pennsylvania, seeking a declaratory judgment that

ITC-101 and ITC-102 were not validly terminated and for purported fees due under those

agreements.  EdgeMarc Pennsylvania brought counterclaims against Energy Transfer seeking

damages for Energy Transfer's breach of contract and a declaration that the ITC agreements were

properly terminated.  The claims and counterclaims remain pending.

84.     Although the Pipeline Explosion occurred over eight months ago, Energy Transfer

has failed to fix the problems with the Revolution System.  EdgeMarc's natural gas in

Pennsylvania remains shut in — a direct result of Energy Transfer's inability to flow EdgeMarc's

gas to the interstate pipeline system and its unwillingness to flow any of EdgeMarc's gas to an

available third-party processor.

**CLAIMS FOR RELIEF**

**COUNT I**

**Breach of Contract**

85.     The Equity Owners repeat and re-allege paragraphs 1 through 84 of this

Complaint as if fully set forth herein.

86.     As detailed above, Section 2 of the Equity Commitment Agreements required

Energy Transfer to provide the Equity Owners with Project Status Notices prior to each

Commitment Date certifying whether there had occurred a Project Delay — *i.e.*, whether "there

has occurred any delay in the development, construction, or completion of the Gathering System

described in ITC-101 that will delay the In-Service Date beyond July 1, 2018."

26

87.     Energy Transfer breached this contractual requirement on each of January 18, 2018, March 2, 2018, and April 16, 2018 by providing inaccurate Project Status Notices certifying that there was no Project Delay.

88.     Additionally, Section 2 of the Equity Commitment Agreements required Energy Transfer to "promptly notify" the Equity Owners "as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date." Energy Transfer breached this separate contractual requirement by failing to notify the Equity Owners of events that were reasonably likely to cause a delay in the In-Service Date.

89.     Through its contractual breaches, Energy Transfer has damaged the value of the Equity Owners' investment in EdgeMarc and has deprived the Equity Owners of the benefits of their contractual bargain, including, among other things, their $100 million in equity investments in 2018.

90.     As a result of Energy Transfer's breaches of the Equity Commitment Agreements, the Equity Owners are entitled to a judgment and damages in an amount to be determined at trial.

## COUNT II

### Unjust Enrichment

91.     The Equity Owners repeat and re-allege paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.     Under Section 3 of the Equity Commitment Agreements, the Equity Owners' obligations to fund each Commitment were subject to the satisfaction of two conditions as of each Commitment Date: *first*, that no notices of Force Majeure had been issued and not withdrawn; and *second*, that Energy Transfer had not committed any uncured material breach of the Equity Commitment Agreements, GPA or ITCs.

27

93.     Energy Transfer committed various uncured material breaches of the Equity Commitment Agreements, GPA and ITCs, which it did not disclose to the Equity Owners, who unwittingly provided $100 million in new funding despite the nonoccurrence of the required conditions precedent.

94.     As described above, Energy Transfer breached Section 2 of the Equity Commitment Agreements by (i) providing inaccurate Project Status Notices certifying that there was no Project Delay, and (ii) failing to promptly notify the Equity Owners of events that were reasonably likely to cause a delay in the In-Service Date.

95.     In addition, as also described above, Energy Transfer violated Section 19.14 of the GPA, in which it promised to act in accordance with all applicable laws and regulations, including pipeline safety regulations.  Because Energy Transfer's design and/or construction of the pipeline system did not comply with numerous laws and regulations, including 49 C.F.R. § 192.317, Energy Transfer was in material breach of the GPA at all relevant times.

96.     As a proximate result of Energy Transfer's conduct, the Equity Owners have suffered substantial damages, and Energy Transfer has been unjustly enriched, including through receiving benefits from the additional funding ultimately provided to EdgeMarc Pennsylvania, which ensured that gas (and revenues) would flow through Energy Transfer's Gathering System, without providing concomitant benefits to the Equity Owners.

97.     In the event that the Equity Owners are not awarded equivalent damages on their breach of contract claims, the Equity Owners have no adequate remedy at law.

## COUNT III

### Negligent Misrepresentation

98.     The Equity Owners repeat and re-allege paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     Energy Transfer had a duty to the Equity Owners to exercise due care and competence in its statements to the Equity Owners, because such statements were made in the course of Energy Transfer's business or in the course of transactions in which Energy Transfer had a pecuniary interest, and because such statements arose out of a special relationship of trust or confidence or Energy Transfer's unique or specialized knowledge.

100.    During the 2017 renegotiation, to induce the Equity Owners to make $50 million of capital available, Energy Transfer falsely and misleadingly assured the Equity Owners that the Gathering System would be completed and in commercial service by no later than July 1, 2018.

101.    On January 18, 2018, in order to induce the Equity Owners to fund the first scheduled $33.33 million Commitment, Energy Transfer falsely and misleadingly represented to the Equity Owners that "there is no Project Delay."

102.    On March 2, 2018, in order to induce the Equity Owners to fund the second scheduled $33.33 million Commitment, Energy Transfer falsely and misleadingly represented to the Equity Owners that "there is no Project Delay."

103.    On April 16, 2018, in order to induce the Equity Owners to fund the third scheduled $33.33 million Commitment, Energy Transfer falsely and misleadingly represented to the Equity Owners that "there is no Project Delay."

104.    When Energy Transfer made each of the foregoing statements, Energy Transfer knew or, if it had utilized due care, would have known that such statements were not accurate and were misleading.

105.    When Energy Transfer made each of the foregoing statements, Energy Transfer intended that the Equity Owners would rely on them, in order to induce the Equity Owners to invest in the development of EdgeMarc's assets in Butler County, Pennsylvania.  Energy Transfer had special expertise and superior knowledge regarding the construction of the Gathering System, and it knew that the Equity Owners were depending and relying upon Energy Transfer's engineering and pipeline expertise.  Energy Transfer also knew or should have known that its pipeline system suffered from design and/or construction failures, and would not be complete and capable of gathering and transporting EdgeMarc's gas in commercial service.

106.    The Equity Owners believed that each of the above representations made by Energy Transfer were true, justifiably relied upon them, and were induced by the representations to, among other things, provide at least $150 million in funding for the development of EdgeMarc's assets in Butler County, Pennsylvania.

107.    By reason of Energy Transfer's conduct, the Equity Owners have been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the following relief:

a.    Damages in an amount to be determined at trial;

b.    Pre-judgment and post-judgment interest;

c.    Costs and fees related to the bringing of this action; and

d.    Such further relief as the Court deems just and proper.

Dated:    New York, New York
          May 14, 2019

                              WACHTELL, LIPTON, ROSEN & KATZ

                              _Carrie Reilly_____

                              Emil A. Kleinhaus
                              Carrie M. Reilly
                              S. Christopher Szczerban
                              Shaun E. Werbelow
                              Michael H. Cassel

                              51 West 52nd Street
                              New York, NY 10019
                              Telephone: (212) 403-1000

                              EAKleinhaus@wlrk.com
                              CMReilly@wlrk.com
                              SCSzczerban@wlrk.com
                              SEWerbelow@wlrk.com
                              MHCassel@wlrk.com

                              *Attorneys for Plaintiffs GSCP VI EdgeMarc
                              Holdings, L.L.C., GSCP VI Parallel
                              EdgeMarc Holdings, L.L.C., WSEP and
                              Bridge 2012 EdgeMarc Holdings, L.L.C., and
                              EM Holdco LLC*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------- x

GSCP VI EDGEMARC HOLDINGS, L.L.C.,
GSCP VI PARALLEL EDGEMARC HOLDINGS,
L.L.C., WSEP AND BRIDGE 2012 EDGEMARC
HOLDINGS, L.L.C., and EM HOLDCO LLC,

      Plaintiffs,

  - against -

ETC NORTHEAST PIPELINE, LLC,

      Defendant.

------------------------------------- x

   :   Index No.
   :
   :
   :
   :   **SUMMONS**
   :
   :   Date Filed: May 14, 2019

TO THE ABOVE-NAMED DEFENDANT:

    YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorneys an answer to the complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after the service is complete if this summons is not personally delivered to you within the State of New York.  In case of your failure to appear or answer, judgment will be taken against you by default, in accordance with the complaint herein.

    Plaintiffs designate New York County as the place of venue.  Venue is properly based in this Court under CPLR § 503(a) and (c).  Defendant irrevocably consented to the exclusive jurisdiction of courts in New York County, New York for any suit, action or other proceeding arising out of the Equity Commitment Agreements (as referenced in the Complaint) or any transaction contemplated therein, and irrevocably and unconditionally waived any objection to the laying of venue of this action in a court in New York County.

Dated:  New York, New York
        May 14, 2019

TO:     ETC NORTHEAST PIPELINE, LLC
        6051 Wallace Road Ext., Suite 300
        Wexford, PA 15090
        Attention: Legal Department
        Facsimile: 878-332-2611

                                    WACHTELL, LIPTON, ROSEN & KATZ

                                    Carrie Reilly

                                    Emil A. Kleinhaus
                                    Carrie M. Reilly
                                    S. Christopher Szczerban
                                    Shaun E. Werbelow
                                    Michael H. Cassel

                                    51 West 52nd Street
                                    New York, NY 10019
                                    Telephone: (212) 403-1000

                                    EAKleinhaus@wlrk.com
                                    CMReilly@wlrk.com
                                    SCSzczerban@wlrk.com
                                    SEWerbelow@wlrk.com
                                    MHCassel@wlrk.com

                                    *Attorneys for Plaintiffs GSCP VI EdgeMarc
                                    Holdings, L.L.C., GSCP VI Parallel
                                    EdgeMarc Holdings, L.L.C., WSEP and
                                    Bridge 2012 EdgeMarc Holdings, L.L.C., and
                                    EM Holdco LLC*

# EXHIBIT C

# REQUEST FOR JUDICIAL INTERVENTION

**UCS-840  (7/2012)**

| | For Court Clerk Use Only: |
|---|---|
| **Supreme** _____ COURT, COUNTY OF_____ **New York** | IAS Entry Date |
| **Index No:** _____ **Date Index Issued:**_____ | Judge Assigned |
| | RJI Date |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

GSCP VI EDGEMARC HOLDINGS, L.L.C., GSCP VI PARALLEL EDGEMARC HOLDINGS, L.L.C.,
WSEP AND BRIDGE 2012 EDGEMARC HOLDINGS, L.L.C., and EM HOLDCO LLC,

**Plaintiff(s)/Petitioner(s)**

-against-

ETC NORTHEAST PIPELINE, LLC,

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING:  Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested

  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.**
  For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability:_____
  (specify)
- ○ Other Negligence:_____
  (specify)
- ○ Other Professional Malpractice:_____
  (specify)
- ○ Other Tort:_____
  (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution    [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other:_____
  (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ◉ Other Commercial: Contract, Unjust Enrichment, Negligent Misrepresentation
  (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**  How many properties does the application include? _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):    ○ Residential    ○ Commercial
  Property Address:_____
  Street Address        City        State        Zip

  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property:_____
  (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)    [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene:_____
  (specify)
- ○ Other Special Proceeding:_____
  (specify)

## STATUS OF ACTION OR PROCEEDING:  Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: 05/14/2019 |
| Has a summons and complaint or summons w/notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION:    Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion    Relief Sought: _____    Return Date: _____
- ○ Notice of Petition    Relief Sought: _____    Return Date: _____
- ○ Order to Show Cause    Relief Sought: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ◉ Other  (specify): Assignment to Commercial Division

## RELATED CASES:    List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## PARTIES:    For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant, 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | GSCP VI EdgeMarc Holdings, L.L.C., Last Name / First Name / Primary Role: Plaintiff / Secondary Role (if any): | Reilly Last Name    Carrie M. First Name / Wachtell, Lipton, Rosen & Katz Firm Name / 51 West 52nd Street Street Address  New York City  New York State  10019 Zip / +1 (212) 403-1000 Phone   Fax   CMReilly@WLRK.com e-mail | ○ YES  ◉ NO | |
| ☐ | GSCP VI Parallel EdgeMarc Holdings, L.L.C. Last Name / First Name / Primary Role: Plaintiff / Secondary Role (if any): | Reilly Last Name    Carrie M. First Name / Wachtell, Lipton, Rosen & Katz Firm Name / 51 West 52nd Street Street Address  New York City  New York State  10019 Zip / +1 (212) 403-1000 Phone   Fax   CM@WLRK.com e-mail | ○ YES  ◉ NO | |
| ☐ | WSEP and Bridge 2012 EdgeMarc Holdings Last Name / First Name / Primary Role: Plaintiff / Secondary Role (if any): | Reilly Last Name    Carrie M. First Name / Wachtell, Lipton, Rosen & Katz Firm Name / 51 West 52nd Street Street Address  New York City  New York State  10019 Zip / +1 (212) 403-1000 Phone   Fax   CMReilly@WLRK.com e-mail | ○ YES  ◉ NO | |
| ☐ | EM Holdco LLC Last Name / First Name / Primary Role: Plaintiff / Secondary Role (if any): | Reilly Last Name    Carrie M. First Name / Wachtell, Lipton, Rosen & Katz Firm Name / 51 West 52nd Street Street Address  New York City  New York State  10019 Zip / +1 (212) 403-1000 Phone   Fax   CMReilly@WLRK.com e-mail | ○ YES  ◉ NO | |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: 05/14/2019

_____
SIGNATURE

4397451
ATTORNEY REGISTRATION NUMBER

Carrie M. Reilly
PRINT OR TYPE NAME

[Print Form]

## Request for Judicial Intervention Addendum

UCS-840A (7/2012)

Print Form

**Supreme** _____ COURT, COUNTY OF _____ **New York** _____ Index No: _____

For use when additional space is needed to provide party or related case information.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant, 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | ETC Northeast Pipeline, LLC — *Last Name* / *First Name* / *Primary Role:* Defendant / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / 6051 Wallace Road Ext., Suite 300 *Street Address*, Wexford *City*, Pennsylvania *State*, 15090 *Zip* / +1 (412) 491-7464 *Phone* +1 (878) 332-2611 *Fax* *e-mail* | ○ YES ⦿ NO | |
| ☐ | *Last Name* / *First Name* / *Primary Role:* / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / *Street Address City State Zip* / *Phone Fax e-mail* | ○ YES ○ NO | |
| ☐ | *Last Name* / *First Name* / *Primary Role:* / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / *Street Address City State Zip* / *Phone Fax e-mail* | ○ YES ○ NO | |
| ☐ | *Last Name* / *First Name* / *Primary Role:* / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / *Street Address City State Zip* / *Phone Fax e-mail* | ○ YES ○ NO | |
| ☐ | *Last Name* / *First Name* / *Primary Role:* / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / *Street Address City State Zip* / *Phone Fax e-mail* | ○ YES ○ NO | |
| ☐ | *Last Name* / *First Name* / *Primary Role:* / *Secondary Role (if any):* | *Last Name* / *First Name* / *Firm Name* / *Street Address City State Zip* / *Phone Fax e-mail* | ○ YES ○ NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

# EXHIBIT D

INDEX NO. _____ Print Form

UCS-840C
3/2011

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF __New York_____
                                                                                                x

GSCP VI EDGEMARC HOLDINGS, L.L.C et al.

                                                          Plaintiff(s)/Petitioner(s)
-against-
ETC NORTHEAST PIPELINE, LLC

                                                          Defendant(s)/Respondent(s)
                                                                                                x

Index No. _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- [x] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)
- [ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)
- [ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only
- [ ] Shareholder derivative actions — without consideration of the monetary threshold
- [ ] Commercial class actions — without consideration of the monetary threshold
- [ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions
- [ ] Internal affairs of business organizations
- [ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters
- [ ] Environmental insurance coverage
- [ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)
- [ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold
- [ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ An amount to be determined at trial, at least $150,000,000 _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: __05/14/2019_____

_Carrie Reilly_

_____
                    **SIGNATURE**

**Carrie M. Reilly**
_____
                **PRINT OR TYPE NAME**

1 of 1

# **EXHIBIT E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GSCP VI EDGEMARC HOLDINGS, L.L.C., et al.,                    INDEX NUMBER: 652906/2019

                                                **Plaintiff**
                            **vs**

**ETC NORTHEAST PIPELINE, LLC,**

                                                **Defendant**

# AFFIDAVIT OF SERVICE

State of Delaware  }
County of New Castle }  ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of Delaware,

That on **05/15/2019** at **12:30 PM** at **251 Little Falls Drive, Wilmington, DE 19808**

deponent served **Summons and Complaint, Request for Judicial Intervention, Commercial Division Request for Judicial Intervention Addendum, Notice of Electronic Filing**

on **ETC Northeast Pipeline, LLC,** a domestic limited liability company, c/o Corporation Service Company, Registered Agent,

by delivering thereat a true copy of each to **Lynanne Gares (authorized to accept service)** personally.

Description of Person Served:
Gender : Female
Skin :  White
Hair : Brown
Age : 36 - 50 Yrs.
Height : 5' 4" - 5' 8"
Weight : 161-200 Lbs.
Other :

Sworn to before me this
15th day of May, 2019

                    DENORRIS ANGELO BRITT
                    NOTARY PUBLIC
                    STATE OF DELAWARE
NOTARY PUBLIC   My Commission Expires May 1, 2022              Kevin S. Dunn

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

1 of 1

# **EXHIBIT F**

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC

    Plaintiff,

    v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant.

CIVIL DIVISION

No. GD-19-

**Code:** 180 Declaratory Judgment

**COMPLAINT IN CIVIL ACTION**

Filed on behalf of Plaintiff

Counsel of Record for this Party:

Stuart H. Sostmann, Esquire
Pa. I.D. No. 84065

Gregory P. Graham, Esquire
Pa. I.D. No. 317205

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

shsostmann@mdwcg.com
gpgraham@mdwcg.com

412-803-1140 – phone
412-803-1188 - fax

**JURY TRIAL DEMANDED**

---

**COMPLAINT**                                                                 Page 1

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC      CIVIL DIVISION

     Plaintiff,                 No. GD-19-

     v.

EM ENERGY PENNSYLVANIA, LLC

     Defendant.

## NOTICE TO DEFEND

**You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

ALLEGHENY COUNTY LAWYER REFERRAL SERVICE
Allegheny County Bar Association
Koppers Building, Suite 400
436 Seventh Avenue, 3rd Floor
Pittsburgh, PA 15219
(412) 261-55558

---

COMPLAINT                                 Page 2

IN THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA

| ETC NORTHEAST PIPELINE, LLC | § | CIVIL DIVISION |
|---|---|---|
| | § | |
| Plaintiff, | § | CIVIL COMPLAINT—Law & Equity |
| | § | |
| v. | § | |
| | § | Case No: GD- |
| EM ENERGY PENNSYLVANIA, LLC | § | |
| | § | Code: 180 Declaratory Judgment |
| Defendant. | § | |
| | § | |

## COMPLAINT IN CIVIL ACTION

AND NOW COMES ETC Northeast Pipeline, LLC, by and through its undersigned counsel, Stuart H. Sostmann, Esquire and Gregory P. Graham, Esquire and files the following Complaint in Civil Action ("Complaint"), and in support thereof avers as follows:

### I.   INTRODUCTION

1. Defendant EM Energy Pennsylvania, LLC ("Defendant") committed to deliver gas under two Individual Transaction Confirmations ("ITCs"). Yet Defendant now contends that the ITCs are unenforceable, because it contends Plaintiff ETC Northeast Pipeline, LLC ("Plaintiff") failed to meet its "Guaranteed In-Service Date."

2. Under ITC 101 (defined below), the "Guaranteed In-Service Date" was January 1, 2019. Specifically, Plaintiff agreed that by January 1, 2019, it would place specific facilities identified in ITC 101 (i.e., the "Revolution System") in commercial service, which it did.

3. On September 9, 2018, Plaintiff placed the Revolution System in commercial service.

4. On September 10, 2018, Plaintiff sent notice to Defendant that the Revolution System had been placed in commercial service on September 9, 2018.

5. Accordingly, under ITC 101, the "In-Service Date" was October 1, 2018, because ITC 101 defines the "In-Service Date" as the "first Day of the Month following the day on which the Revolution System is completed and placed in commercial service."

6. Nonetheless, Defendant sent notice purporting to terminate ITC 101 because Plaintiff allegedly failed to meet the Guaranteed In-Service Date. ITC 102 (defined below) is co-terminus with ITC 101, and therefore Defendant's notice also purported to terminate ITC 102.

7. Plaintiff now seeks declaratory relief for the Court to enter an order recognizing that both ITC 101 and 102 remain in effect.

## II. PARTIES

8. Plaintiff ETC Northeast Pipeline, LLC is a limited liability company organized under the laws of the State of Delaware with an office located at 6051 Wallace Road Ext., Suite 300, Wexford, Pennsylvania 15090. Energy Transfer LP, indirectly through subsidiaries, owns 100% of the membership interests of ETC Northeast Pipeline, LLC.

9. Energy Transfer LP ("Energy Transfer") is a publicly traded master limited partnership organized under the laws of the State of Delaware with its principal place of business located at 8111 Westchester Dr., Dallas, TX 75225.

10. A master limited partnership is a limited partnership wherein the limited partnership interests are traded on a securities exchange. A master limited partnership functions in the same capacity as a traditional limited partnership. Accordingly, for jurisdictional purposes, the citizenship of the master limited partnership is determined by the citizenship of the limited partners of the master limited partnership. The master limited partnership is considered a resident of each state in which its limited partners reside. Energy Transfer has in excess of two hundred million publicly traded master limited partnership units, and limited partners in every state. To remove this case to federal court under such circumstances would be bad faith.

11. Defendant EM Energy Pennsylvania, LLC is a Delaware limited liability company, with its principal office in Canonsburg, Pennsylvania. Defendant develops and operates oil and gas properties and related assets throughout the Appalachian region, including Pennsylvania, and has a place of business at 1800 Main St. Suite 220, Canonsburg, Pennsylvania 15317. Defendant may be served with process at *C T Corporation System 600 North 2nd Street Suite 401 Harrisburg, Pennsylvania 17101.*

## III. JURISDICTION, VENUE, AND GOVERNING LAW

12. Subject matter jurisdiction is proper in this Court under 42 Pa. C.S. § 931 because the action arises under the laws of the Commonwealth of Pennsylvania and is within the subject matter jurisdiction of this Court.

13. Subject matter jurisdiction exists in this case pursuant to the Declaratory Judgments Act, 42 Pa.C.S. Section 7531, et seq.

14. Pursuant to Declaratory Judgments Act, Plaintiff is entitled to a determination that ITC's 101 and 102 remain in force and are in full effect.

15. Pursuant to 42 Pa.C.S. §7537 this Honorable Court must grant Plaintiff declaratory relief because it will terminate any alleged uncertainty or controversy between the parties.

16. All parties with an interest in this Declaratory Judgment matter have been properly identified.

17. Venue in this Court is proper under Pennsylvania Rules of Civil Procedure 1006 & 2179, because Allegheny County is where Defendant regularly conducts business, where this cause of action arose, and where a transaction or occurrence took place out of which this cause of action arose.

18. The Gathering and Processing Agreement and the ITCs at issue in this case are governed by Pennsylvania law. (See Base Agreement attached as Exhibit "A" and ITCs' attached as

Exhibit "B". Exhibits "A" & "B" have been redacted to protect the dissemniation of Plaintiff's and Defendant's confidential and proprietary information).

## IV. FACTUAL BACKGROUND

### A. The Base Agreement

19. On November 13, 2017, the parties entered into an Amended and Restated Gathering and Processing Agreement (the "Base Agreement").

20. The Base Agreement expressly contemplates "Individual Transaction Confirmations" or "ITCs." The ITCs are "subject to the terms and conditions" of the Base Agreement. (Base Agreement at 4).

21. ITCs confirm transactions "for the gathering and processing of Gas or provision of other services to be performed" under the Base Agreement. (Base Agreement at 7).

22. The ITCs establish the "gathering and processing fee(s) . . . for the quantities of Gas . . . gathered and processed" under the Base Agreement. (Base Agreement at 9).

23. Plaintiff agreed "to accept or cause to be accepted on a Firm basis those daily quantities of [Defendant's] Gas as set forth in any Individual Transaction Confirmation." (Base Agreement at 13).

24. The Base Agreement and ITCs "constitute a single integrated agreement." (Base Agreement at 8).

### B. The ITCs

25. At the same time the parties entered into the Base Agreement (November 13, 2017), the parties also executed two Amended and Restated Individual Transaction Confirmations (individually, "ITC 101" and "ITC 102" and collectively, the "ITCs").

26. ITC 101 defines the "In-Service Date":

> The first Day of the Month following the Day on which the LP-Galaxy Gathering (other than laterals to the Sculptor Receipt Point and the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are completed and placed in commercial service shall be the "In-Service Date" hereunder.

(ITC 101 at 3).

27. ITC 101 further specifies that Defendant may terminate ITC 101 if the In-Service Date is

not on or before January 1, 2019:

> **FAILURE TO MEET GUARANTEED IN-SERVICE DATE**: If the In-Service Date shall not have occurred by the Guaranteed In-Service Date of January 1, 2019, irrespective of any outstanding or intervening declarations of Force Majeure, then Shipper may terminate this ITC upon written notice to Gatherer within thirty (30) Days of the Guaranteed In-Service Date, and neither Party shall have further obligation to the other hereunder.

(ITC 101 at 5).

28.    ITC 102 is "conterminous with" ITC 101. (ITC 102 at 2).

### C. The In-Service Date —October 1, 2018

29. Plaintiff completed primary construction of the Revolution System in the spring of 2018, and the Revolution System was mechanically complete and ready to be placed in commercial service on or about June 1, 2018 (the "Ready for Service Date").

30. Yet even though the Revolution System was complete on the Ready for Service Date, the Downstream Transporter into which Defendant is obligated to receive its Gas was not in service. So on the Ready for Service Date, Defendant could not fulfill its obligation under Section 6.3 of the Base Agreement to "accept, or cause to be accepted, at the Delivery Point(s)… the Scheduled Quantity" of Defendant's Gas.

31. Moreover, once the Revolution System was placed In Service, under ITC 101, Defendant must begin making payments for its reserved capacity on the Revolution System on a take-or-pay basis.

32. In a gesture of partnership and to build good will, Plaintiff did not tender the Revolution System for commercial service on the Ready for Service Date. That is, Plaintiff could have elected to place the Revolution System in commercial service on June 1, 2018, but instead waited for Defendant's Downstream Transporter to enter into service.

33. Because plaintiff elected to wait to place the Revolution System into commercial service, Defendant avoided paying millions of dollars of fees.

34. Then, on or about August 23, 2018, Defendant's Downstream Transporter announced that the Federal Energy Regulatory Commission had authorized it to begin service.

35. So with the Downstream Transporter in service, Plaintiff tendered the Revolution System for service to Defendant on or about September 6, 2018. Defendant, however, requested a few additional days for final preparation of its facilities upstream of the Revolution System.

36. On September 7, 2018, Plaintiff and Defendant entered into a letter agreement in which, among other things, the parties acknowledged and agreed that the "LP-Galaxy Gathering (other than lateral to the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point"—i.e. all facilities required to be constructed by Plaintiff to meet the Guaranteed In-Service Date—were complete and "ready to be placed into commercial service."

37. Thereafter, Plaintiff agreed to Defendant's request that it begin receiving Gas for commercial service on the Revolution System on September 9, 2018, and Defendant actually began delivering its Gas into the Revolution System for commercial service on September 9, 2018. As such, Plaintiff placed the Revolution System into commercial service on September 9, 2018.