38. Among other things, Plaintiff executed Transaction Confirmation #9532-202 to purchase line fill gas, such that the Revolution System was not merely In-Service and ready for use—it was actually placed in commercial use.

39. The following day, September 10, Plaintiff sent Defendant written notice confirming that the Revolution System was placed into commercial service the previous day.

40. Accordingly, the first day of the month following September 9, 2018, is October 1, 2018—the In-Service Date under ITC 101.

**D. The Landslide**

41. On September 10, 2018, after the Revolution System went into commercial service on September 9, a landslide occurred causing "an event of Force Majeure."

42. Based on that Force Majeure, Plaintiff notified Defendant of the Force Majeure and advised that it would provide additional information "regarding the resumption of service under the ITC."

**E. Plaintiff's Continued Service**

43. Despite the landslide, Plaintiff continued to provide gas gathering and processing services.

44. In particular, the landslide only affected a relatively short portion of the HPGP—a subpart of the Revolution System.

45. Plaintiff incurred significant expense to install a bypass of the affected portion of the system, allowing Plaintiff to connect the HPGP into another of its nearby gathering pipelines, which enabled Plaintiff to continue to provide Defendant with gathering services to a third party's processing facility. Therefore, the HPGP remained partially operational, and Defendant

continued to deliver gas under ITC 101. Service under ITC 102 was not affected by the event of Force Majeure and continued without interruption.

46. Between September 9, 2018 and January 31, 2019, Defendant delivered significant volumes of Gas to Plaintiff on the Revolution System, following the terms of ITC 101 and ITC 102.

## F. Defendant's Default

47. Although Defendant continued to take advantage of the services Plaintiff provides under the ITCs, Defendant has refused to pay for those services.

48. Namely, Defendant has refused to pay $400,215.51 for services under ITC 101 from September through November. Additionally, payment for services rendered in December is due ten (10) days from the date of invoice, which were provided to Defendant on February 1, 2019.

49. So on January 17, 2019, Plaintiff sent notices of default regarding Defendant's "outstanding and unpaid invoices."

50. Defendant's default also triggered additional obligations under ITC 101. Namely, under ITC 101, in the event of default, Defendant is required to "provide additional Credit Support within fifteen (15) business days . . . . The additional Credit Support shall be the lesser of: (1) four (4) months of Fees due from Shipper or (ii) the number of months remaining in either or both ITCs.

51. This additional Credit Support equated to $7,378,800 that Defendant was required to obtain and maintain, and which Defendant has not obtained.

## G. Defendant Acknowledges ITC 101 and 102 are Enforceable

52. On January 22, 2019, in response to Plaintiff's default Notices, Defendant wrote that it "will pay the amounts identified in the ITC-102 Notice related to *services actually performed and properly invoiced under ITC-102.*"

53. Defendant disputed errors in the invoices for ITC 101, but never alleged the ITCs were unenforceable.

## H. Defendant Reneges on ITCs 101 and 102

54. On January 29, 2019, Plaintiff followed up on Defendant's past-due invoices. Plaintiff disagreed with Defendant's claimed "errors" in the invoices and advised that Defendant's "refusals to pay the Past Due Invoices . . . are in bad faith and constitute ongoing Events of Default."

55. Only then, after months of continued service under the ITCs and its own acknowledgement of the ITCs enforceability, did Defendant concoct a new excuse. Later, on January 29, 2019, Defendant wrote alleging that ITC 101 and ITC 102 "shall be and hereby [are] terminated effective January 29, 2019."

## I. Defendant Seeks to Deliver Gas

56. Despite its contention that the ITCs are unenforceable, Defendant continues to seek to deliver gas to Plaintiff.

57. Defendant contends that it has "nominated" to deliver gas under the Base Agreement alone.

58. But the Base Agreement cannot operate alone, and without an enforceable ITC, Plaintiff has the right to shut off Defendant's gas services.

## V. CAUSES OF ACTION
### COUNT I: DECLARATORY JUDGMENT

59. Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as if the same were set forth more fully herein at length.

60. Plaintiff and Defendant have a dispute regarding their rights and obligations under the Base Agreement and ITCs.

61. Plaintiff will show that under the plain language of ITC 101, it satisfied the Guaranteed In-Service Date and, therefore, that the ITCs remain in full force and effect.

62. Defendant has expressly taken the contrary position—that the ITCs are not enforceable and that Plaintiff did not meet the Guaranteed In-Service Date.

WHEREFORE, Plaintiff seeks a judgment: (1) declaring that the Base Agreement, along with ITCs 101 and 102, are valid and enforceable contracts; (2) declaring that the In-Service Date was October 1, 2018, and (3) awarding such costs and other relief as the Court deems just.

### COUNT II: BREACH OF CONTRACT

63. Plaintiff incorporates by reference Paragraphs 1 through 62 of this Complaint as if the same were set forth more fully herein at length.

64. Plaintiff and Defendant simultaneously entered into and executed the Base Agreement and ITCs, which constitute a valid, binding and enforceable contract. Plaintiff has performed its obligations under the Agreement, and all conditions precedent to recovery have been satisfied or performed.

65. Without justification or excuse, Defendant has willfully and intentionally breached its obligations under the Agreement by failing to pay amounts owed and repudiating the ITCs.

66. Defendant's breach of its contractual obligations has or will proximately cause damage to Plaintiff, for which Plaintiff seeks judgment against Defendant.

---

WHEREFORE, Plaintiff requests damages, including direct lost profits, in excess of the arbitration jurisdictional limits of the Court, including pre- and post-judgment interest (as provided for by contract, statute, and the Court's equitable discretion), costs, and requests such further relief as the Court may deem appropriate.

## COUNT III:  UNJUST ENRICHMENT

67. Plaintiff incorporates by reference Paragraphs 1 through 66 of this Complaint as if the same were set forth more fully herein at length.

68. Defendant obtained a benefit from Plaintiff, because Plaintiff provided gas gathering and processing services to Defendant.

69. Defendant has not compensated Plaintiff for the benefit that it has received, and it is unjust for Plaintiff to have obtained and to retain such benefit.

70. Plaintiff suffered damages as a result of Defendant's unjust enrichment.

WHEREFORE, Plaintiff requests damages in excess of the arbitration jurisdictional limits of the Court, including pre- and post-judgment interest, costs, and requests such further relief as the Court may deem appropriate.

## VI. JURY DEMAND

71. Plaintiff requests that all issues of fact be tried before a jury.

## VII.    RELIEF REQUESTED

Plaintiff requests that this Court, upon final hearing, enter judgment against the Defendant for the following relief:

(1)    Monetary damages in excess of the arbitration jurisdictional limits of the Court, including actual direct damages, in an amount to be determined at trial;

(2)    Pre-judgment and post-judgment interest;

---

(3)     Equitable relief, including a preliminary and permanent injunction;

(4)     Declaratory relief;

(5)     Costs of suit incurred herein; and

(6)     Such other and further relief in law or in equity to which Plaintiff may be justly
entitled.

Respectfully submitted,

Stuart H. Sostmann, Esquire
Gregory P. Graham, Esquire
MARSHALL DENNEHEY WARNER COLEMAN
& GOGGIN
501 Grant Street, Floor 7
Pittsburgh, PA 15219
412-803-1140- phone
412-803-1188- fax

**ATTORNEYS FOR PLAINTIFF**

*EXECUTION VERSION*

**AMENDED AND RESTATED**

**GATHERING AND PROCESSING AGREEMENT**

**BETWEEN**

**EM Energy Pennsylvania, LLC**

**AND**

**ETC Northeast Pipeline, LLC**

**DATED November 13, 2017**

**CONTRACT NO. 9532-100**



EXHIBIT

A

tabbies

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | SCOPE OF AGREEMENT/TENDER OF GAS | 8 |
| 3. | GATHERING AND PROCESSING FEES | 9 |
| 4. | COMMITTED RESERVES AND SHIPPER'S RESERVATIONS | 9 |
| 5. | PROCESSING | 9 |
| 6. | QUANTITY | 12 |
| 7. | QUALITY | 15 |
| 8. | MEASUREMENT | 17 |
| 9. | BILLING | 20 |
| 10. | WARRANTY | 20 |
| 11. | POSSESSION OF GAS | 20 |
| 12. | TAXES AND ROYALTIES | 21 |
| 13. | REMEDIES/LIABILITY | 21 |
| 14. | CREDIT ASSURANCE | 21 |
| 15. | NOTICES | 22 |
| 16. | FORCE MAJEURE | 24 |
| 17. | TERM AND TERMINATION | 25 |
| 18. | REPRESENTATIONS AND WARRANTIES | 26 |
| 19. | MISCELLANEOUS | 27 |

Case 19-50266-JTD   Doc 1-11   Filed 06/06/19   Page 9 of 60 94

*EXECUTION VERSION*

## AMENDED AND RESTATED
## GATHERING AND PROCESSING AGREEMENT

ETC Northeast Pipeline, LLC, a Delaware limited liability corporation ("Gatherer"), and EM Energy Pennsylvania, LLC, a Delaware limited liability corporation ("Shipper") enter into this Amended and Restated Gathering and Processing Agreement (together with all Transactions, collectively, this "Agreement") effective as of November 13, 2017 (the "Effective Date").

## WITNESSETH

WHEREAS, Shipper and Gatherer are parties to that certain Gathering and Processing Agreement, dated April 17, 2015 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restate the Original Agreement, on the terms and conditions set forth herein;

WHEREAS, Shipper owns or controls quantities of Gas produced from certain oil and gas properties located in the State of Pennsylvania, for which Shipper will require gathering and processing services; and

WHEREAS, Gatherer desires to gather and process Shipper's Gas, and Shipper desires for Gatherer to gather and process such Gas from specified points of receipt.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows.

## ARTICLE I
## DEFINITIONS

1.1     Specific Defined Terms.  As used throughout this Agreement including the Exhibits hereto, the following capitalized terms shall have the meanings ascribed below.

"Adequate Assurance of Performance" has the meaning set forth in Section 14.1.

"Affiliate" and "Affiliates" means, with respect to any relevant Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or under common control with such relevant Person.  For purposes of this definition, the term "control" (including its derivatives and similar terms) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the relevant Person, whether through the ownership or control of voting interest, by contract or otherwise. Notwithstanding the foregoing, Shipper has informed Gatherer that its indirect and controlling owners, funds managed by the Merchant Banking Division of Goldman Sachs  and Ontario

Teachers Pension Plan, and their respective Affiliates (collectively, "Sponsors") (i) are engaged in the business of and invest in multiple companies that are, among other things, both engaged in the business of and invest in exploring for, producing, gathering, transporting, treating and/or processing oil and/or gas (a "Portfolio Company" and collectively the "Portfolio Companies"), (ii) that Sponsors may have a direct or indirect interest in some or all of such Portfolio Companies, and (iii) that such Portfolio Companies operate and engage in the oil and gas exploration, production, gathering, transportation, and treatment business independently from Seller. As such, Gatherer acknowledges and agrees that for purposes of this Agreement, Sponsors and any Portfolio Company shall not be considered an Affiliate of Shipper.

"Agreement" shall have the meaning set forth in the Preamble.

"Area of Dedication" means the area shown on Appendix 1 of any ITC.

"Btu" means the amount of energy required to raise the temperature of one pound of pure water one degree Fahrenheit (1°F) from fifty-nine degrees Fahrenheit (59°F) to sixty degrees Fahrenheit (60°F).

"Business Day" means any day except Saturday, Sunday or Federal Reserve Bank holidays.

"C3+" means all Plant Products other than ethane.

"CCT" shall mean Central Clock Time and is defined as current time in the Central Time Zone taking into consideration the seasonal changes back and forth between Daylight Savings and Standard time.

"Committed Reserves" means Shipper's Interest and any other area that the Parties may in the future mutually agree to add to this Agreement.

"Component Plant Products" is defined in Section 5.2, sub-paragraph 3.

"Component Recovery Factor" means the fixed percentage of each Component Plant Product deemed to be recovered at the Plant pursuant to this Agreement and listed in the applicable ITC.

"Condensate" means any hydrocarbon produced from a well which is measured and delivered into the Gathering System at a Receipt Point as Gas but during transportation in the Gathering System experiences a phase change to a liquid state and is subsequently recovered as a liquid.

"Contract Year" means the 365 consecutive Days (or 366 consecutive Days if Contract Year includes a leap year (February 29)) beginning on the first Day of the Month subsequent to the Initial Delivery Date, or if the Initial Delivery Date occurs on the first Day of a Month, then such first Day, and each of the anniversaries thereafter.

2

"Day" means a period of twenty-four (24) consecutive hours, beginning at 9:00 a.m. CCT on any calendar Day.

"Delivery Point(s)" means the point(s) identified in the applicable ITC at which Gatherer is to deliver, and Shipper or Shipper's market is to receive, the Residue Gas.

"Downstream Transporter" means any pipeline directly connected downstream of the Delivery Point(s).

"Effective Date" shall have the meaning set forth in the Preamble.

"Ethane Delivery Point" has the meaning set forth in Section 5.3.

"Event of Default" or "Default" means the occurrence of any of the following events, circumstances or conditions: (i) failure by either Party to materially perform or comply with any material agreement, covenant, obligation or other provision contained in this Agreement when either (A) such failure has not been cured within the greater of a reasonable period of time or thirty (30) Days; in each case, following the Party in Default receiving written notice thereof from the Party not in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's failure to perform), or (B) an effort to remedy such failure has not been commenced within such period following such written notice and continued to be diligently prosecuted, with such measures reasonably expected to cure any such Default; (ii) the entry of any Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; (iii) the material inaccuracy or breach of any representation or warranty contained herein when such failure either has not been cured within the greater of a reasonable period of time or thirty (30) Days following receipt of written notice thereof by the Party in Default, or (iv) failure to pay any amounts owed pursuant to this Agreement within thirty (30) Days after the applicable due date, other than amounts disputed in good faith pursuant to the provisions of Section 9.2.

"Firm" or "Firm Service" as used herein means that the gathering and processing of Gas up to the Shipper's Reserved Capacity is not subject to a prior claim by another shipper or class of shipper or service.

"FL&U" means the combination of Fuel, Lost and Unaccounted for Gas, and Condensate.

"Fuel" is that quantity of Gas, in MMBtu, used by Gatherer for fuel in the provision of services such as gathering, conditioning, treating, dehydrating and/or compressing the Gas on the Gathering System.

"Force Majeure" shall have the meaning set forth in Section 16.1.

3

"Gas" means methane and other gaseous hydrocarbons, including gaseous combustible, noncombustible, and inert elements, compounds, components or mixtures thereof and liquefiable hydrocarbons in the vapor stream produced at the wellhead, including gas separated or flashed from oil or condensate after production.

"Gas Imbalance Account" means the record of the cumulative variance between the volume of Gas delivered at the Delivery Point(s) for Shipper's account and the volume of Gas received at the Receipt Point(s) (less any FL&U and PTR).

"Gathering and Processing Fee(s)" shall have the meaning set forth in Section 3.1.

"Gathering System" means the existing Gas gathering pipeline system owned and operated by Gatherer or an Affiliate of Gatherer and/or the Gas gathering pipeline system to be constructed by Gatherer, as described in the applicable ITC.

"Gross Heating Value" means the number of Btu's liberated by the complete combustion, at constant pressure, of one (1) cubic foot of Gas at a base temperature of sixty degrees Fahrenheit (60°F.) and a referenced pressure base of fourteen and seventy-three hundredths (14.73) Psia with air of the same temperature and pressure of the Gas, after products of combustion are cooled to the initial temperature of the Gas, and after the water of the combustion is condensed to the liquid state. The Gross Heating Value of the Gas shall be corrected for the water vapor content of Gas being delivered provided, however, that if the water vapor content of the Gas is seven (7) pounds or less per one million (1,000,000) cubic feet, the Gas shall be assumed to be dry and no correction shall be made.

"Individual Transaction Confirmation" or "ITC" means an effective and unexpired agreement between Gatherer and Shipper documented by written means, evidencing the specific terms of a Transaction, which may be in any form adequate at law, but which shall be subject to the terms and conditions of this Agreement.

"Initial Delivery Date" means the first date on which Shipper delivers any Gas to Gatherer at the Receipt Point(s) pursuant to the applicable ITC.

"Inlet Volume" is defined in Section 5.2, sub-paragraph 1.

"Interruptible" or "Interruptible Service" as used herein means that Gatherer, in its sole and unfettered discretion, shall have the right to interrupt, curtail or suspend the receipt, gathering, processing or delivery of Gas hereunder at any time and from time to time without any liability to Shipper by reason thereof, subject to Section 6.7.

"Laws" mean any laws, rules, regulations, decrees and orders of the United States of America and all other governmental bodies, agencies or other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended or enacted.

4

"Loss" or "Losses" means, unless specifically provided otherwise, all claims, including, but not limited to, those for bodily injury or death, personal injury, illness, disease, maintenance, cure, loss of parental or spousal consortium, loss of support, wrongful death, property damage and wrongful termination of employment, damages, liabilities, losses, demands, liens, encumbrances, fines, penalties, costs for removal of wreck/debris, causes of action of any kind (including actions in rem or in personam), obligations, costs, judgments, interest and awards (including payment of reasonable attorneys' fees and costs of litigation) or amounts, of any kind or character (except punitive or exemplary damages), whether under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties, breach of representation or warranty (expressed or implied), under any theory of tort, contract, breach of contract (including any Losses which arise by reason of indemnification or assumption of liability contained in other contracts entered into by Gatherer or Shipper) arising out of, or incident to or in connection with the Agreement or the performance of work, services or operations contemplated under the Agreement.

"Lost and Unaccounted for Gas" or "L&U" means that volume of Gas, in MMBtu, received by Gatherer which is released and/or lost through piping, equipment, or operations, which cannot be accounted for, or is vented, all on the Gathering System.

"MAOP" means maximum allowable operating pressure.

"Mcf" means one thousand (1,000) cubic feet of Gas measured at a base temperature of sixty degrees Fahrenheit (60°F), and at a pressure base of fourteen and seventy-three one-hundredths (14.73) pounds per square inch absolute.

"MMBtu" shall mean one million (1,000,000) Btu.

"Month" means a period beginning at 9:00 a.m. CCT on the first Day of the calendar Month and ending at 9:00 a.m. CCT on the first Day of the next succeeding calendar month.

"New Taxes" means (i) any Taxes enacted and effective after the Effective Date, including that portion of any Taxes or New Taxes that constitutes an increase, or (ii) any Laws, or interpretations thereof, enacted and effective after the Effective Date resulting in the application of any Taxes to a new or different class of parties.

"NGL" or "Natural Gas Liquids" means the demethanized mix of liquefiable hydrocarbons and nonhydrocarbon substances that are condensed or absorbed from, or separated out of natural gas, including ethane, propane, isobutane, normal butane, natural gasoline (pentanes and heavier hydrocarbons) and only those limited quantities of methane and carbon dioxide incidentally recovered with the hydrocarbons.  References to Plant Products in this Agreement shall be considered references to Natural Gas Liquids.

"Non-Specification Gas" shall have the meaning set forth in Section 7.3.

5

"Party" means, individually, either Gatherer or Shipper, collectively referred to as the "Parties".

"Person" or "Persons" means any individual or entity, including, without limitation, any corporation, limited liability company, joint stock company, general or limited partnership, or government authority (including any agency or administrative group thereof).

"Plant" means the turbo-expander, cryogenic Gas processing facilities identified in the applicable ITC, from time to time utilized by Gatherer or Gatherer's nominee for the purpose of processing Gas delivered from the Gathering System, whether such facilities consist of one (1) or more turbo-expander, cryogenic Gas processing facilities, or portions thereof, and recovering a raw unfractionated liquid hydrocarbon mix.

"Plant Products" is defined in Section 5.2, sub-paragraph 2.

"Plant Product Shrinkage" is defined in Section 5.2, sub-paragraph 5.

"Plant Thermal Reduction" or "PTR" means the sum of the Plant Product Shrinkage and allocated process fuel and losses, in MMBtu.

"Primary Term" has the meaning set forth in Section 17.1.

"Psia" means pounds per square inch absolute.

"Psig" means pounds per square inch gauge.

"Quality Specifications" means the Gas quality specifications set forth in Section 7.1.

"Receipt Point(s)" means the point(s) identified in the applicable ITC at which Shipper is to deliver, and Gatherer is to receive, Gas into the Gathering System.

"Residue Gas" is defined in Section 5.2, sub-paragraph 6.

"Retention Volume" means the quantity of Gas, if any, stated in MMBtus that is retained by Gatherer without compensation to Shipper.

"Shipper's Daily Deliverability of Gas" means the Gas which is physically produced by Shipper from wells completed within the Committed Reserves, subject only to Shipper's Reservations.

"Shipper's Interest" means all interests that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires, or has the right to market in gas, oil and/or other hydrocarbon reserves in under or attributable to the Subject Leases in the Area of Dedication, together with any pool, communitized area or unit, and all interests in any wells, whether now existing or drilled hereafter, on or completed within any such Subject Leases, or within any such pool, communitized area or unit, even though Shipper's Interest may be incorrectly or

6

incompletely stated, all as the same shall be enlarged by the discharge of any burdens or by the removal of any charges or encumbrances to which any of same may be subject as of the Effective Date, and any and all replacements, renewals and extensions or amendments of any of the same.

"Shipper's Reserved Capacity" or "SRC" means the portion of the aggregate daily gathering and processing capacity reserved for Shipper for Firm Service in the Gathering System and the Plant.

"Stated Rate" means, for any date, an annual rate of interest (compounded daily) equal to the lesser of (a) two percent (2%) over the per annum rate of interest announced as the "prime rate" for commercial loans posted from time to time by Citibank, N.A. (New York, New York office) or its successor or a mutually agreed substitute bank, or (b) the maximum lawful interest rate then in effect under applicable law.

"Subject Leases" means all leaseholds, royalties, overriding royalties, other non-expense bearing accounts, carried interests, fee interests or other real property interests located within the Area of Dedication.

"Taxes" means, to the extent assessed against the Gathering System or the services provided by Gatherer hereunder, any or all ad valorem, property, severance, production, extraction, first use, conservation, Btu or energy, gathering, transport, pipeline, processing, utility, gross receipts, Gas or oil revenue, Gas, NGL or oil import, privilege, sales, use, consumption, excise, lease, transaction, and other or new taxes, governmental charges, licenses, fees, permits, and assessments, or increases therein, other than taxes based on or assessed against net income or net worth.

"Temporary Release Period" has the meaning set forth in Section 16.6.

"Theoretical Gallons" is defined in Section 5.2, sub-paragraph 4.

"Thermal Content" means the product of a volume of Gas and the Gross Heating Value of such Gas, adjusted to a same pressure base of 14.73 p.s.i.a., and expressed in dekatherm or MMBtu.

"Transaction" means any agreement (including that set forth in an Individual Transaction Confirmation) and any amendment, modification, or supplement thereof made subject to and in accordance herewith for the gathering and processing of Gas or provision of other services to be performed hereunder.

1.2    Other Defined Terms.  Other capitalized terms used in this Agreement and not defined in Section 1.1 above shall have the meanings ascribed to them throughout this Agreement.

7

## ARTICLE II
## SCOPE OF AGREEMENT/TENDER OF GAS

2.1     Scope of Agreement. Gatherer and Shipper from time to time during the term hereof may, but are not obligated to, enter into Transactions for the gathering and processing of Gas to which this Agreement shall apply. Each Transaction shall be effectuated and evidenced as set forth in this Article 2 and shall constitute a part of this Agreement and all Transactions, together with this Agreement, shall constitute a single integrated agreement. Each Transaction shall be construed as one with this Agreement, and any express and irreconcilable conflict between any term contained in this Agreement and any term contained in an Individual Transaction Confirmation shall be resolved in favor of the Individual Transaction Confirmation.

2.2     Tender of Committed Reserves and Gathering Services. In accordance with Article IV, Shipper shall tender to Gatherer at the Receipt Point(s) one hundred percent (100%) of Shipper's Daily Deliverability of Gas during the term of this Agreement. Gatherer shall accept at the Receipt Point(s) all Gas that Shipper delivers to such Receipt Point(s) up to the SRC, and shall redeliver all such Gas (less FL&U and PTR) at the Delivery Point(s). Shipper agrees to comply with Gatherer's (or its Affiliates') scheduling procedures set forth in Section 6.4 hereof. In addition, Gatherer shall accept at the Receipt Point(s) quantities of Gas above the SRC on an Interruptible basis.

2.3     Facilities. Except as set forth in an Individual Transaction Confirmation, Gatherer shall not be obligated to add to or modify its facilities or expand the capacity of the Gathering System or Plant in any manner in order to provide services to Shipper, including, but not limited to providing conditioning, treating, dehydration, compression, processing, or other services or associated facilities in order to receive Gas at an existing or new Receipt Point(s). Shipper may request, in writing, that Gatherer expand facilities or add new Receipt Point(s) or Delivery Point(s) or provide additional services. Gatherer shall determine, in its sole discretion, whether it will construct the facilities necessary to provide such requested services. In the event Gatherer agrees to provide such services, then Gatherer shall have the right to re-determine the fees to be charged hereunder and/or to establish the fees for such additional services; provided that any such fees shall be mutually agreed upon by Gatherer and Shipper prior to going into effect. Shipper shall install and operate or cause the installation and operation of all facilities necessary to deliver Shipper's Gas to Gatherer at the Receipt Point(s).

2.4     Allocations. Shipper recognizes that quantities of Gas are delivered through the Delivery Point(s) for third parties, and therefore, the scheduling of Gas under this Agreement may involve the allocation of Gas deliveries. As between Gatherer and Shipper, Gatherer will determine the allocation for all Gas deliveries hereunder.

8

## ARTICLE III
## GATHERING AND PROCESSING FEES

3.1     Gathering and Processing Fee(s).  The gathering and processing fee(s) to be paid by Shipper to Gatherer for the quantities of Gas delivered by Shipper and received, gathered and processed by Gatherer hereunder shall be as set forth on the Individual Transaction Confirmation (the "Gathering and Processing Fee(s)").

3.2     FL&U.  In addition to the Gathering and Processing Fees, Shipper shall convey to Gatherer at the Receipt Point(s) Shipper's pro rata share of FL&U.  Title to the FL&U shall vest in Gatherer at the Receipt Point(s) at no cost to Gatherer.

## ARTICLE IV
## DEDICATION

4.1     Dedication of Committed Reserves.  For the term of any applicable Individual Transaction Confirmation, and subject to the provisions hereof, Shipper hereby exclusively dedicates and commits to Gatherer for gathering and/or other services hereunder (or shall cause to be dedicated and committed to Gatherer for gathering and/or other services hereunder) as a covenant running with the land, all of the Committed Reserves.  During the term of this Agreement, Shipper agrees not to disconnect or split-connect any wells from Gatherer's HPGP. Notwithstanding anything to the contrary, unless such dedication is otherwise waived or released in writing by Gatherer hereunder, any attempted assignment or transfer (in whole or in part, including any farmout agreement or other similar or related arrangement) of any or all of the Committed Reserves or rights thereto shall constitute a Default by Shipper hereunder and be null and void unless such assignment or transfer includes an express provision stating that (a) such assignment or transfer is made subject to the terms of this commitment and this Agreement, and (b) the assignee or transferee agrees to become a party to, and bound by, the terms and conditions set forth in this Agreement, such that all of the Committed Reserves remain dedicated to this Agreement for the term hereof.  Shipper does hereby grant, bargain, sell, convey, transfer, assign and deliver unto Gatherer such real property interest in the Subject Leases necessary to create a covenant running with the land, including without limitation the rights of ingress and egress on and over the Subject Leases, and the dedication of Committed Reserves provided for herein shall be a covenant running with the land and burdening the Subject Leases.

4.2     Shipper's Reservations.  Shipper hereby expressly reserves the following rights and reasonable quantities of Gas to satisfy same ("Shipper's Reservations"):

(a)     The right to use Gas, as a reasonably prudent operator, prior to delivery to Gatherer for the following purposes:

      (1)     For fuel used above ground in the development and operation of the Committed Reserves; and

9

(2)     For delivery to the "lessor" from whom the Subject Leases were obtained that Gas which such lessors are entitled to receive in kind from the Committed Reserves under the terms of the Subject Leases; and

(3)     For fuel used in the operation of the facilities which Shipper may install in order to deliver Gas hereunder in accordance with the terms hereof.

(4)     The right to engage in swaps and trades of undeveloped acreage but only with prior written consent of Gatherer, which shall not be unreasonably conditioned, delayed or withheld.

(b)     The right to pool or unitize the Subject Leases (or any portion thereof) with other lands and leases.  In the event of pooling or unitization, this Agreement will cover Shipper's interest in the pool or unit and the Gas attributable thereto.

(c)     The right to separate the Gas using only mechanical, ambient temperature equipment located at surface production facilities on the Subject Leases.

## ARTICLE V
## PROCESSING

5.1     Shipper does hereby grant, assign and convey to Gatherer all of its rights to process or cause to be processed for the removal and recovery of all components other than methane, all of the Gas received at the Receipt Point(s).

5.2     For all purposes, unless the context of this Agreement requires otherwise, the following definitions shall be applicable:

(1)     "Inlet Volume" shall mean the volume in Mcf of Gas received at a particular Receipt Point less Fuel and L&U, in Mcf.

(2)     "Plant Products" shall mean the unfractionated liquid hydrocarbon mix consisting of (i) ethane, (ii) propane, (iii) iso-butane, (iv) normal butane, and (v) pentanes plus; adsorbed, absorbed or condensed in the Plant from Gas delivered to Gatherer.

(3)     "Component Plant Products" shall mean (i) ethane, (ii) propane, (iii) iso-butane, (iv) normal butane, and (v) pentanes plus (including iso-pentane, normal pentane and hydrocarbon components of higher molecular weight) for the purposes of settlement and allocation hereunder.

(4)     "Theoretical Gallons" of a particular Component Plant Product shall mean the result obtained by multiplying the particular Component Plant Product content of a particular Gas stream (expressed in gallons per Mcf) by the Inlet Volume (in Mcf) of that particular stream delivered for processing (the result being expressed in gallons).

(5)     "Plant Product Shrinkage" shall mean the heating value equivalent of the Component Plant Products.

10

(6)    "Residue Gas" shall mean that portion of Inlet Volume remaining after deducting Condensate, Plant Product Shrinkage, and allocated process fuel and losses (including electricity cost). Process fuel and losses will be calculated as the difference between the Plant inlet quantities and all outlet quantities. The Plant outlet quantities, which shall include all Plant fuel, shall equal the total of all quantities (in MMBtu) of Gas exiting the Plant plus the heating value equivalent (in MMBtu) of all Plant Products actually recovered in the Plant. The Plant inlet quantities shall equal the total of all quantities (in MMBtus) of Gas entering the Plant at the Plant inlet meter. Shipper's allocated process fuel and losses (including electricity cost) shall be based on a percentage, the numerator of which is the Inlet Volume and the denominator of which is the total Plant inlet quantities, in MMBtu.





## ARTICLE VI
## QUANTITY

6.1     During the term of this Agreement, Gatherer shall have the right to take and receive one hundred percent (100%) of Shipper's Daily Deliverability of Gas.

6.2     Gatherer agrees to take and Shipper agrees to deliver Gas hereunder in accordance with all applicable Laws including, but not limited to, the rules promulgated by any duly constituted state or federal governmental authority, regulatory body or commission having jurisdiction or control over the Parties, its respective facilities or Gas supply, this Agreement, the gathering or processing of Gas hereunder, or any of the provisions hereof (the "Commission") governing the determination of Gas market demand and procedures for the establishment and allocation of allowables and for ratable nominations and takes of Gas from the applicable field(s). The Parties expressly recognize that Gatherer's obligations to take Gas pursuant to the Commission rules or otherwise shall be subject to Force Majeure.

6.3     Subject to the terms, conditions and limitations contained herein and in the ITC, Shipper agrees to deliver, or cause to be delivered, to the Receipt Point(s), and Gatherer agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of Shipper's Gas as set forth in any Individual Transaction Confirmation, and scheduled in accordance with this Section 6. However, except as otherwise provided herein, in no event shall Shipper tender volumes of Gas for gathering and/or processing services hereunder on any Day in excess of the Scheduled Quantity (defined in Section 6.4). Subject to the terms, conditions and limitations contained herein, Shipper agrees to accept, or cause to be accepted, at the Delivery Point(s), and Gatherer agrees to gather, process and redeliver, or cause to be gathered, processed and redelivered, on a Firm basis the Scheduled Quantity. The Scheduled Quantity at the Delivery Point(s) shall be a quantity of Gas equal to the remainder of the Scheduled Quantity at the Receipt Point(s) less Shipper's pro rata share of FL&U and PTR. The maximum quantity of Gas that Gatherer is obligated to receive hereunder at the Receipt Point(s) and deliver hereunder at the Delivery Point(s) during any given hour of any Day is 1/24 of Shipper's Scheduled Quantity at an instantaneous standard volumetric flow rate at any point in time during the hour. Any variation in flow rate or the Scheduled Quantity will be confirmed in writing via fax or email by Gatherer, with an acknowledgment returned to Gatherer by Shipper.

6.4     Scheduling of receipts and deliveries of Gas between the Receipt Point(s) and Delivery Point(s) shall be in accordance with the Gatherer's nomination and scheduling procedures and with the nomination and scheduling procedures of the Downstream Transporter. Shipper shall submit Nominations (as defined below) for the gathering of Gas hereunder to Gatherer via Gatherer's Web-based online nomination system. No later than three (3) Business Days prior to the end of each Month, Shipper shall provide to Gatherer in writing the quantity of Gas (expressed in MMBtu) Shipper expects to make available and deliver at each Receipt Point and receive at the Delivery Point(s) each Day of the following Month (the "Nominations"). Should Shipper desire to change any of the Nominations during such Month, Shipper will use reasonable efforts to notify Gatherer by no later than 8:30 a.m. CCT on the Business Day prior to the Day of the scheduled flow of the capacity and path that the Shipper plans to utilize. The

13

deadline for submitting Nominations is 11:30 a.m. CCT the Business Day prior to the Day of the scheduled flow. Any initial Nomination received after the deadline of 11:30 a.m. CCT on the Business Day prior to the flow Day will be scheduled by Gatherer in its discretion. Gatherer may, in its discretion, allow intraday Nomination changes at the Receipt Point(s) and the Delivery Point(s). Gas shall be delivered by Gatherer to the Delivery Point(s) in accordance with confirmation by the Downstream Transporter of the Nomination and/or changes to the Nomination (the "Scheduled Quantity").

      6.5    Any variance between the volume of Gas delivered at the Delivery Point(s) for Shipper's account and the volume of Gas received at the Receipt Point(s) (less any FL&U and PTR) the "Imbalance" will be recorded in a Gas Imbalance Account. If the absolute volume in the Gas Imbalance Account is greater than a plus or minus MMBtu tolerance specified in any Individual Transaction Confirmation ("Cumulative Operational Imbalance Tolerance"), then, at Gatherer's election, Shipper shall pay Gatherer an amount equal to a dollar value specified in each Individual Transaction Confirmation multiplied by the quantity in the Gas Imbalance Account exceeding the Cumulative Operational Imbalance Tolerance for each Month such event occurs, ("Cumulative Operational Imbalance Fee"). Any physical flow adjustments will be made as agreed to by Gatherer (which shall be confirmed in writing via fax or email by Gatherer, with an acknowledgment to be returned to Gatherer by Shipper) to adequately control imbalance levels. The daily and cumulative Imbalance(s) will be determined at the end of each Gas Day. Gatherer may assist Shipper in managing the Imbalance and may, at any time and from time to time, request that Shipper change its Nominations at the Delivery Point(s) or, with notice to Shipper, restrict, interrupt, or reduce its receipts or deliveries of Gas at the Receipt Point(s) or Delivery Point(s), and direct Shipper to make adjustments in its receipts or deliveries, in order to maintain a daily, hourly and monthly balance or to correct an Imbalance. If Shipper fails or refuses to follow any such request from Gatherer, Gatherer may, without liability hereunder, cease accepting or delivering Gas under this Agreement until the conditions causing the Imbalance are corrected. Notwithstanding the foregoing, in the event that Gatherer is assessed a cash out penalty by the Downstream Transporter, which is attributable to Shipper, Shipper shall reimburse Gatherer for the actual amount of such cash out penalty.

      6.6    It is recognized that in order for Gatherer to efficiently and safely operate its Gathering System and Plant, it is essential that Gas received into the Gathering System be made available to Gatherer under as uniform operating conditions as possible. Commensurate with good production and operating practices, and in accordance with proper conservation measures, Shipper agrees to deliver Gas, or cause it to be delivered, to Gatherer at such rates of flow as Gatherer, in the sole exercise of its reasonable judgment, may from time to time request. Gatherer agrees to give Shipper reasonable notice in the event Gatherer desires at any time to increase or decrease the quantity of Gas tendered by Shipper at any Receipt Point. For safety reasons, or to maintain the operational integrity of the Gathering System or Plant, Gatherer may, at any time, with reasonable notice to Shipper, interrupt or reduce, in whole or in part, its receipt, gathering of Gas and/or the provision of processing or other services hereunder or delivery of Shipper's Gas, all without incurring any liability of any kind to Shipper or to others.

14



**ARTICLE VII**
**QUALITY**





16



## ARTICLE VIII
## MEASUREMENT



17



18



19



## ARTICLE IX
## BILLING

9.1     Gatherer's Statement.  Gatherer shall render a statement to Shipper on or about the twenty-fifth (25th) Day of each Month setting forth (a) the amount due Gatherer for all Gathering and Processing Fees incurred by Shipper for the services performed hereunder by Gatherer during the preceding Month, (b) the settlement quantity of Residue Gas returned to Shipper for that statement period, and (c) the dollar amount of the Plant Products purchased from Shipper for that statement period (the "Plant Product Value").   Such statement shall contain reasonably detailed information showing the determination of such Residue Gas and such Plant Product Value. The Parties agree that the Gathering and Processing Fees owed by Shipper to Gatherer hereunder for such Month may be deducted from the Plant Product Value owed to Shipper for such Month.  Gatherer shall (x) include with such statement an invoice for the difference between the total dollar amount of the Gathering and Processing Fees and the Plant Product Value if such Fees are greater than the Plant Product Value; or (y) if the Plant Product Value is greater than such Fees, Gatherer shall pay Shipper the difference by wire transfer on or before the tenth (10th) Day following the rendition of the statement.  If actual Gas or Plant Product quantities are not available, Gatherer may utilize a reasonable, good faith, estimated quantity based upon quantities received, gathered or extracted by Gatherer during the preceding Month.  As soon as the actual quantity becomes available, the estimate shall be adjusted and the adjustment shall be reflected in the subsequent Month's statement.  In the event such quantities are estimated for any period, corrected statements shall be rendered by Gatherer to Shipper and paid by Shipper or refunded or credited by Gatherer, as the case may be, in each instance in which the actual quantity received or delivered hereunder with respect to a Month shall be determined to be at variance with the estimated quantity theretofore made the basis of billing and payment hereunder.

9.2     Payment.  If the Gathering and Processing Fees on any statement are greater than the Plant Product Value on such statement, then Shipper shall pay Gatherer the amount due in the form of immediately available federal funds by wire or electronic fund transfer to the bank account specified on the statement, or any other mutually agreed upon method, on or before the tenth (10th) Day following the rendition of the statement described in Section 9.1 hereof. Payments by either Party due on a Saturday or a bank holiday shall be made on the preceding Business Day unless such holiday is Monday, in which case payment shall be made on the following Business Day; payments due on Sunday shall be made on the next Business Day.  The paying Party must tender a timely payment even if the statement includes an estimated receipt or delivery volume. Any payment shall not prejudice the right of the paying Party to an adjustment of any statement to which it has taken written exception, provided that such Party's exception

20

shall have been made within the time period set forth in Section 19.15 herein. If the paying Party fails to pay any statement in whole or in part when due, in addition to any other rights or remedies available to the Party to whom payment is due, interest at the Stated Rate shall accrue on all unpaid amounts. Notwithstanding the foregoing, if a legitimate good faith dispute arises between Shipper and Gatherer concerning a statement, the paying Party shall pay that portion of the statement not in dispute on or before such due date, and upon the ultimate determination of the disputed portion of the statement, the paying Party shall pay the remaining amount owed, if any, plus the interest accrued thereon at the Stated Rate from the due date. Any amounts refunded to a paying Party following resolution of any billing dispute shall accrue interest at the Stated Rate from the date of initial payment to the date of refund.

## ARTICLE X
## WARRANTY

10.1    Shipper's Warranty.  Shipper hereby represents and warrants that it has good and marketable title to, and full legal right and authority to deliver to Gatherer for gathering and processing hereunder, all Gas tendered by Shipper at the Receipt Point(s).  Shipper represents and warrants that such Gas shall, at the Receipt Point(s), be free and clear of any and all claims, royalties, liens, encumbrances, and applicable Taxes that are imposed upon production of such Gas and all other components of such Gas and/or upon removal of liquid hydrocarbons, and **SHIPPER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS** Gatherer from and against all Losses incurred by Gatherer on account of any such liens, encumbrances and claims.

10.2    Gatherer's Warranty.  Gatherer hereby represents and warrants that it has the full legal right and authority to gather and process for Shipper, all Gas tendered by Shipper at the Receipt Point(s) pursuant to this Agreement.  Gatherer represents and warrants that such Gas from the time of receipt at the Receipt Point(s) to the time of delivery at the Delivery Point(s) shall be free and clear of all liens, encumbrances and claims whatsoever, and **GATHERER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS** Shipper from and against all Losses incurred by Shipper on account of any such liens, encumbrances and claims.

## ARTICLE XI
## POSSESSION OF GAS

11.1    Party in Possession.  As between Parties hereto, Shipper shall control and possess the Gas affected by this Agreement at all times prior to and until delivery to Gatherer at the Receipt Point(s) and after redelivery by Gatherer to Shipper at the Delivery Point(s).  Gatherer shall control and possess the Gas affected by this Agreement at all times after delivery thereof by Shipper to Gatherer at the Receipt Point(s) and until redelivery by Gatherer to Shipper at the Delivery Point(s).

21

11.2    Responsibility and Liability. Except as otherwise set forth herein, the Party in control and possession of the Gas affected by this Agreement shall be responsible and pay for any and all Losses caused thereby and occurring while the Gas is in the possession and control of such Party.

## ARTICLE XII
## TAXES AND ROYALTIES

12.1    Shipper Taxes and Royalties. Shipper shall be responsible for all applicable Taxes, New Taxes and royalties of whatever kind on or with respect to the production, delivery and gathering or processing of Gas hereunder. Shipper shall indemnify, reimburse, defend and hold harmless Gatherer from and against any and all claims or Losses attributable to such Taxes, New Taxes and royalties.

## ARTICLE XIII
## REMEDIES/LIABILITY

13.1    Remedies. To the extent not limited or waived herein, with particularity in this Article XIII, each Party reserves to itself all rights, set-offs, counterclaims and other remedies and defenses to which such Party may be entitled arising from this Agreement. All payment obligations hereunder may be offset against each other or recouped.

13.2    LIMITATION OF LIABILITY. FOR BREACH OF ANY PROVISION FOR WHICH EXPRESS, SPECIFIC REMEDIES OR MEASURES OF DAMAGES ARE PROVIDED, SUCH REMEDIES OR DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDIES, THE OBLIGOR'S LIABILITY SHALL BE SO LIMITED, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED, INCLUDING THOSE ATTRIBUTABLE TO THE SOLE, JOINT OR CONCURRENT NEGLIGENCE OF OBLIGOR AND IRRESPECTIVE WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, EQUITY OR OTHERWISE. IF NO REMEDY OR MEASURE OF DAMAGES IS PROVIDED AND UNLESS OTHERWISE HEREIN STATED, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES, SUCH DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED. UNLESS OTHERWISE STATED HEREIN, NEITHER PARTY SHALL BE LIABLE FOR TREBLE, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, IN TORT, CONTRACT, UNDER ANY INDEMNITY OR OTHERWISE. THE PARTIES NEGATE ANY OBLIGATION, EXPRESSED OR IMPLIED AT LAW, REQUIRING THE USE OF BEST EFFORTS TO SUPPLY, DELIVER, TAKE OR MARKET THE GAS.

## ARTICLE XIV
## CREDIT ASSURANCE

14.1    All requirements to provide any "Adequate Assurance of Performance" shall be limited to that provided in an applicable ITC.

## ARTICLE XV
## NOTICES

15.1 <u>Notices</u>. Any notice, request, demand, or statement provided for in this Agreement, or any notice which a Party may desire to give to the other, shall be in writing, and shall be delivered by letter, facsimile or other documentary form. Notice by facsimile or hand delivery shall be deemed to have been received by the close of the Business Day on which it is transmitted or hand delivered (unless transmitted or hand delivered after close, in which case it shall be deemed received at the close of the next Business Day) or such earlier time confirmed by the receiving Party:

Gatherer:

**For Remittance:**
**By Wire Transfer:**
**La Grange Acquisition, L.P., for further credit to**
**ETC Northeast Pipeline, LLC**
Wells Fargo Bank N.A.
Acct. 2079900565328
Wire ABA # 121000248
ACH ABA # 053101561

**For Notices and Correspondence:**
**ETC Northeast Pipeline, LLC**
**Contract Administration**
800 East Sonterra Blvd. Ste 300
San Antonio, Texas 78258
Telephone (210)403-7300
FAX (210)403-7500

**For Accounting Matters:**
**ETC Northeast Pipeline, LLC**
800 East Sonterra Blvd. Ste 400
San Antonio, Texas 78258

Shipper:

**For Notices and Scheduling:**
**EM Energy Pennsylvania, LLC**
Attn: Director, Production Operations
1800 Main Street, STE 220
Canonsburg, PA 15317
Telephone: 412-564-1000

23

**For Invoices and Statements:**

**EM Energy Pennsylvania, LLC**
Attn: Accounting Department
1800 Main Street, STE 220
Canonsburg, PA 15317
Telephone: 412-564-1000

Such addresses and/or other contact information may from time to time be changed by sending appropriate notice thereof to the other Party in any manner provided in this Section 15.1.

## ARTICLE XVI
## FORCE MAJEURE

16.1 <u>Suspension of Obligations</u>. Unless expressly provided otherwise in this Agreement, no Party shall be liable to any other Party for failure to perform any of its obligations under this Agreement, other than to make payments due, to the extent that and for the period during which such performance is hindered, delayed or prevented by Force Majeure. For purposes of this Agreement, "<u>Force Majeure</u>" shall mean causes, conditions, events or circumstances which are beyond the reasonable control of the Party claiming Force Majeure. Such causes, conditions, events and circumstances shall include, without limitation, to the extent beyond the reasonable control of the Party claiming Force Majeure, acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, acts of nature, industrial disturbances, acts of the public enemy, acts of terrorism, sabotage, blockades, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, or blockages of lines of pipe not due to lack of maintenance, extraordinary operating conditions on Gatherer's, Shipper's or Shipper's facilities or on those of any Downstream Transporter or NGL pipeline, Force Majeure events on any Downstream Transporter or NGL pipeline, inability of any Party to obtain necessary machinery, materials, permits, refusal of one or more landowners to provide necessary easements or rights-of-way, freezing of any well or delivery facility, well blowout, cratering, the partial or entire failure of a well and the act, order, rule or regulation of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement, and any other causes whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension. Force Majeure does not include: mechanical failure or breakdown of electric generation plants, changes in market conditions or changes in demand for electricity at electric generation plants such as increases or decreases in electric generation that are required by any agency or body having such authority, or failure of upstream transportation prior to delivery hereunder at the Receipt Point(s). Notwithstanding anything herein to the contrary, no Party shall be entitled to the benefits of this Section 16.1 to the extent the event of Force Majeure is caused or affected by any or all of the following circumstances: (i) the Party claiming excuse failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch; or (ii) economic hardship,

24

to include, without limitation, Shipper's ability to sell its Gas at a higher or more advantageous price to a market not requiring the gathering or processing services contracted for herein.

16.2    Notice.  A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure shall give prompt written notice to that effect to the other Parties stating with reasonable particularity the circumstances underlying such Force Majeure and the obligations such Party is unable to carry out.

16.3    Resolution.  A Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure, shall give prompt written notice to the other Parties of the termination of such Force Majeure, and shall resume performance of any suspended obligation promptly after termination of such Force Majeure.  The decision to settle a strike or labor disturbance is at the sole discretion of the Party claiming Force Majeure due to such strike or labor disturbance.

16.4    Repairs and Maintenance.  Gatherer shall not be liable to Shipper for interruptions or curtailment of Shipper's Gas on the Gathering System or at the Plant as a result of maintenance, integrity testing, repairs or improvements to pipelines or other facilities.  Gatherer shall provide Shipper with notice of such interruptions or curtailments as far in advance as practicable, and shall use commercially reasonable efforts to limit the duration of same.



## ARTICLE XVII
## TERM AND TERMINATION

17.1    Effective Date and Term.  This Agreement shall govern any and all Transactions and shall be in effect for a term of twenty (20) year(s) from April 17, 2015 (the "Primary Term"). It shall then continue in effect from Month to Month thereafter (each such Month, the "Extended Term"), unless terminated by either Shipper or Gatherer upon thirty (30) Days prior written notice to the other Party prior to the end of the Primary Term or any Extended Term, as the case may be; *provided* that this Agreement shall continue to apply to all Transactions then in effect until all Transactions are completed.

17.2    Termination.  This Agreement may be terminated or canceled as follows and in no other manner:

25

(a)     By either Gatherer or Shipper, in the event of any uncured Default of the other Party, *provided* that the terminating Party is not itself in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's Default);

(b)     By the applicable Party pursuant to any provision of this Agreement expressly providing termination rights; or

(c)     By all of the Parties at any time upon mutual written agreement.

17.3    Rights and Obligations Upon Termination. Termination or cancellation of this Agreement shall not relieve the Parties from any obligation accruing or accrued prior to the date of such termination. Upon termination of this Agreement, the Parties shall retain all other rights and remedies available at law or in equity.

## ARTICLE XVIII
## REPRESENTATIONS AND WARRANTIES

18.1    Representations and Warranties. Each of Shipper and Gatherer represents and warrants to each other that on and as of the date hereof:

(a)     It is duly formed, validly existing and in good standing under the laws of its state of jurisdiction or formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b)     The execution and delivery of this Agreement by it have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c)     It has all the requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d)     The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreements pursuant to which it or its property is bound or, to its knowledge, any applicable Laws;

(e)     This Agreement is valid, binding and enforceable against it in accordance with its terms subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity); and

(f)     It is qualified to do business in the State(s) in which the Subject Leases, Receipt Point(s) and Delivery Point(s) are located.

26

## ARTICLE XIX
## MISCELLANEOUS

19.1    Entire Agreement. This Agreement constitutes the entire agreement between and among the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous (oral or written) negotiations, proposals, agreements and understandings.

19.2    Modifications. No modifications of the terms and provisions of this Agreement shall be or become effective except by the execution by each of the Parties of a supplementary written agreement.

19.3    Waiver. No waiver by any Party of any one or more Defaults by the other Party in performance of any provisions of this Agreement shall operate or be construed as a waiver of any future Default or Defaults, whether of a like or a different character.

19.4    No Third Party Beneficiaries. This Agreement is for the sole and exclusive benefit of the Parties hereto. Except as expressly provided herein to the contrary, nothing herein is intended to benefit any other Person not a Party hereto, and no such Person shall have any legal or equitable right, remedy or claim under this Agreement.

19.5    Assignment. Except as otherwise set forth herein, this Agreement is binding upon the successors or assigns of Gatherer and Shipper. Neither Party shall voluntarily or involuntarily, directly or indirectly, transfer or otherwise alienate any or all of its rights, title or interests under this Agreement to any other Person without the express prior written consent of the other Party, which consent shall not be unreasonably delayed or withheld; *provided, however*, that a Party may (without seeking the consent of the other Party) transfer or otherwise alienate any of its rights, title or interests under this Agreement in connection with (i) a transfer to an Affiliate which remains an Affiliate, and (ii) the granting of a pledge, mortgage, hypothecation, lien or other security interest and any transfer pursuant to or in settlement of any terms of provisions of any agreement creating any such security interest. Unless otherwise agreed to in writing by the other Party, and except for transfers pursuant to (ii) above, both the transferor and the transferee shall be jointly and severally responsible and primarily liable for the full and timely performance of all covenants, agreements and other obligations, and the timely payment and discharge of all liabilities, costs and other expenses arising (directly or indirectly) pursuant to this Agreement. Promptly upon transfer of all or any portion of its rights, title and interests in and to this Agreement, the transferor shall provide the other Party with a copy of such instrument. Any attempted transfer in violation of the terms of this Agreement of any rights, title and interests arising under this Agreement shall constitute a Default and be null and void and have no force or effect.

19.6    Confidentiality. The Parties agree that all information and data exchanged by them pursuant to or in connection with this Agreement shall be maintained in strict and absolute confidence for the term of this Agreement and one (1) year following its termination or cancellation except for disclosure (a) pursuant to the permitted sale, disposition or other transfer

27

(directly or indirectly) of a Party's rights and interests in and to this Agreement, (b) to lenders, accountants and other representatives of the disclosing Party with a need to know such information, (c) in conjunction with a merger, consolidation, share exchange or other form of statutory reorganization involving a Party, (d) as required to make disclosure in compliance with any applicable Law or (e) to a Party's officers, directors and personnel, as necessary to carry out such Party's obligations under the Agreement.

19.7    Exhibits and Schedules.    All exhibits, schedules and the like contained herein or attached hereto are integrally related to this Agreement and are hereby made a part of this Agreement for all purposes. Except as otherwise provided in Section 2.1 hereof, to the extent of any ambiguity, inconsistency or conflict between the body of this Agreement and any of the exhibits, schedules and the like attached hereto, the terms of the body of this Agreement shall prevail.

19.8    Choice of Law.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

19.9    Further Assurances.    Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purpose, the proper officers or directors of the Parties shall take or cause to be taken all such necessary actions.

19.10    Survival.    The provisions of this Agreement shall survive any expiration or termination thereof for so long as necessary to give effect to the intent of the Parties, but in no event to exceed any applicable statute of limitations.

19.11    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective as to such jurisdiction, to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision shall be interpreted to be only as broad as is enforceable.

19.12    Terminology.    Unless the context clearly requires otherwise, all personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Articles, sections and other titles or headings are for convenience only, shall neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof shall refer to the corresponding article, section or subdivision thereof of this Agreement

28

unless specific reference is made to such articles, sections or subdivisions of another document or instrument.

19.13 Counterparts.   This Agreement may be executed in multiple counterparts, including by electronic transmission, each of which, when so executed, shall be deemed an original, and all of which together shall constitute but one and the same instrument.

19.14 Compliance with Laws.   This Agreement and the performance of the obligations contemplated herein are and shall be subject to all valid applicable Laws. The Parties shall act in accordance with each such Law. The Parties will cooperate with respect to compliance with all governmental authorizations, including obtaining and maintaining all necessary regulatory authorizations or any reasonable exchange or provision of information needed for filing or reporting requirements.

19.15 Audit.   Each Party shall have the right to examine and audit, at its own expense, at reasonable times during regular business hours and upon reasonable notice, all books, records and charts of the any other Party to the extent necessary to verify the accuracy of any measurement and payment hereunder, and the related statements, computations, allocations and procedures provided for in the Agreement, for a period of two (2) years after the date of the statement in which such measurement, payment, computation, allocation or procedure is reflected; provided, however, that a formal audit of accounts shall not be made more often than every twelve (12) months and will not include any time period for which a prior audit hereunder was conducted. Any inaccuracy will be promptly corrected when discovered, but in no event later than six (6) months after such audit exceptions are received by the audited Party; provided, however, that no Party shall have the right to contest any such measurement or payment, or the related statement, computation, allocation or procedure, if the matter is not called to the attention of the other Party in writing within two (2) years after (a) the date upon which such measurement was conducted or such payment was made, or (b) the date of the related statement, computation, allocation or procedure containing the questioned inaccuracy. Any of such items not contested with specificity in writing within such time period shall conclusively be deemed to be accurate.

19.16 Termination of Original Agreement.   The Original Agreement is hereby terminated as of the Effective Date and superseded in its entirety by the terms and conditions of this Agreement.

[signature page next page]

29

*EXECUTION VERSION*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their respective duly authorized representatives effective as of the Effective Date.

**"GATHERER"**                          **"SHIPPER"**

**ETC NORTHEAST PIPELINE, LLC**          **EM ENERGY PENNSYLVANIA, LLC**

| | | | |
|---|---|---|---|
| **By:** | _____ | **By:** | |
| **Printed** | | **Printed** | |
| **Name:** | _____ | **Name:** | BRIAN H. MCWREIE |
| **Title:** | _____ | **Title:** | CFO |

*EXECUTION VERSION*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their respective duly authorized representatives effective as of the Effective Date.

**"GATHERER"**                                         **"SHIPPER"**

**ETC NORTHEAST PIPELINE, LLC**          **EM ENERGY PENNSYLVANIA, LLC**

| | | |
|---|---|---|
| **By:** | | **By:** |
| **Printed Name:** Mackie McCrea | | **Printed Name:** |
| **Title:** Chief Commercial Officer | | **Title:** |

*Execution Version*

**AMENDED AND RESTATED**
**INDIVIDUAL TRANSACTION CONFIRMATION**
**(Gatherer's Contract No. 9532-101)**
**TO**
**AMENDED AND RESTATED**
**GATHERING AND PROCESSING AGREEMENT**
**BETWEEN EM ENERGY PENNSYLVANIA, LLC**
**AND**
**ETC NORTHEAST PIPELINE, LLC**
**DATED NOVEMBER 13, 2017**

**THIS AMENDED AND RESTATED INDIVIDUAL TRANSACTION CONFIRMATION** (this "ITC") is entered into effective as of the 13th day of November, 2017 ("Effective Date"), by and between ETC Northeast Pipeline, LLC ("Gatherer") and EM Energy Pennsylvania, LLC ("Shipper"). This ITC constitutes part of and is subject to all of the terms and provisions of the Base Agreement (collectively, the "Agreement"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Base Agreement, unless otherwise defined herein. Any discrepancy or conflict between any term contained in the Base Agreement and any term contained in this ITC shall be resolved in favor of this ITC.

**WITNESSETH**:

**WHEREAS**, Gatherer and Shipper entered into that certain Individual Transaction Confirmation dated April 17, 2015 (Gatherer's Contract No. 9532-101), as amended pursuant to that First Amendment to Individual Transaction Confirmation dated August 1, 2015 (as so amended, the "Original ITC 101");



**WHEREAS**, in consideration of and in express reliance on, *inter alia*, the making of the Parent Commitment by Parent and the Equity Sponsor Commitment by the Equity Sponsors and Parent, Gatherer has agreed to amend and restate the Original ITC 101; and



EXHIBIT
*6*

**WHEREAS**, Gatherer and Shipper now desire to amend and restate the Original ITC 101, on the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows:

## AGREEMENT

**BASE AGREEMENT:** Amended and Restated Gathering and Processing Agreement dated November 13, 2017, Contract No. 9532-100.

**INDIVIDUAL TRANSACTION NUMBER:** 9532-101

**SHIPPER:** EM Energy Pennsylvania, LLC

**GATHERER:** ETC Northeast Pipeline, LLC

**GUARANTEED IN-SERVICE DATE**: January 1, 2019

**TERM:** This ITC shall become effective on the Effective Date, and continue until twenty years from the In-Service Date ("Primary Term") and thereafter continue in effect from Year to Year, until terminated by Shipper or Gatherer giving the other Party written notice no less than ninety days (90) Days prior to the end of the Primary Term or any such annual extension.

**GATHERING SYSTEM:** The Gathering System to be constructed, owned and operated by Gatherer under this ITC is depicted in part on the map shown on Exhibit A hereto, as may be updated by mutual agreement of the Parties, and will be capable of (i) gathering the SRC from the Receipt Points upstream of the Galaxy Central Delivery Point ("Galaxy CDP") for delivery to the Galaxy Compressor Station ("LP-Galaxy Gathering"), (ii) compressing and dehydrating the SRC at the Galaxy Compressor Station ("Galaxy Compression"), (iii) gathering, via Gatherer's high pressure gas pipeline ("HPGP"), the SRC from the Galaxy Compressor Station to the Plant ("HP Gathering") and (iv) gathering Residue Gas from the Plant for delivery to the Delivery Point.

2



The first Day of the Month following the Day on which the LP-Galaxy Gathering (other than laterals to the Sculptor Receipt Point and the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are completed and placed in commercial service shall be the "In-Service Date" hereunder.



4



**FAILURE TO MEET GUARANTEED IN-SERVICE DATE**: If the In-Service Date shall not have occurred by the Guaranteed In-Service Date of January 1, 2019, irrespective of any outstanding or intervening declarations of Force Majeure, then Shipper may terminate this ITC upon written notice to Gatherer within thirty (30) Days of the Guaranteed In-Service Date, and neither Party shall have further obligation to the other hereunder.

**PLANT:** The Plant hereunder shall be Gatherer's Revolution I cryogenic processing plant capable of processing the SRC and located in Washington County, PA.

**RECEIPT POINTS:** The Receipt Points for all Gas delivered by Shipper hereunder shall be at the inlet flange of the master meters at the well pad sites, to be constructed and owned by Gatherer, identified in the table below, and each Receipt Point shall have a maximum daily delivery quantity as specified in the table:

5



**COMPONENT RECOVERY FACTORS:**







9



(A)    In conjunction with execution of the Original Agreement, the Original ITC 101 and Original ITC 102, Shipper provided to Gatherer initial credit support ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ When and as required pursuant to this section, Shipper shall provide Credit Support, including without limitation the Initial Credit Support, Incremental Credit Support (if any) and Additional Credit Support (if any), in one of the following forms, each of which shall constitute a form of reasonably satisfactory Credit Support:

    a.  A written Guaranty of payment from an Affiliate with credit satisfactory to Gatherer, but such guaranty of payment shall constitute an acceptable form of Credit Support only for as long as the credit of the Affiliate continues to be reasonably satisfactory to Gatherer;

    b.  An irrevocable letter of credit in a reasonably satisfactory form and from a Qualified Institution ("Qualified Institution" shall mean a major U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least $50 Billion U.S. Dollars and a credit rating of at least 'A-' by Standard & Poor's Ratings Services, or its successor, or a credit rating of at least 'A3' by Moody's Investors Service, or its successor, and is otherwise acceptable to Gatherer.); or

    c.  A prepayment or a deposit.

(B)    On an annual basis during the term of either ITC, Shipper shall provide its audited financial statements with footnotes and any other information requested by Gatherer to properly evaluate Shipper's financial condition.  In the event i) Shipper's financial condition has

10

deteriorated as compared to the FYE December 31, 2013 consolidated financial statements provided to Gatherer on September 22, 2014 such that Gatherer can reasonably substantiate grounds for insecurity, as evaluated by Gatherer on a non-discriminatory basis, based on consistent financial evaluation standards for determining the acceptability of Shipper's overall financial condition; or ii) Shipper experiences a material adverse change to its financial condition, which shall include only the following events: (a) qualified auditor's opinion relating to the financial statements which indicates significant uncertainty as to Shipper's ability to exist as a going concern; (b) adjudged litigation or final orders in a regulatory proceedings in State or Federal courts which is likely to cause a condition of insolvency, then Gatherer may hereby request incremental Credit Support in the amount of thirty (30) days of: (i) Gathering Demand Fee + (ii) Processing Demand Fee + (iii) T&F Demand Fee + (iv) Storage Demand Fee, all as escalated from time to time, (collectively, the "Fees") plus (v) any imbalance due to Gatherer from Shipper ("Incremental Credit Support"). The Incremental Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Incremental Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(C) Upon the occurrence of an Event of Default with respect to Shipper, then Shipper shall provide additional Credit Support to Gatherer within fifteen (15) business days of written demand to Shipper. The additional Credit Support shall be the lesser of: (i) four (4) months of Fees due from Shipper or ii) the number of months remaining in either or both ITCs ("Additional Credit Support"). Such Additional Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Additional Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(D) If Gatherer determines in its reasonable judgment that the Incremental Credit Support or Additional Credit Support is or are no longer required or the amounts of any such Credit Support can be reduced, Gatherer shall return any such excess Credit Support to Shipper within five (5) business days of its reasonable determination based upon Gatherer's annual assessment of the Shipper's financial statements which shall be conducted within sixty (60) calendar days of receipt of Shipper's annual audited financial statements; provided, however, upon the occurrence of an Event of Default with respect to Shipper pursuant to section (C) at any time during the term of either ITC, then Gatherer has the right to reinstate its requirement for Incremental Credit Support pursuant to section (B) and/or Additional Credit Support pursuant to section (C).

(E)     At any time while either or both ITCs is effective, if Gatherer determines that, as of such time, the issuer of any letter of credit in favor of Gatherer shall cease to be a Qualified Institution, then Gather may submit a written notice of such determination to Shipper (which notice shall provide Gatherer's basis for such determination), and within fifteen (15) business days after Shipper's receipt of such notice from Gatherer, Shipper shall deliver to Gatherer, and shall thereafter maintain, an irrevocable standby letter of credit in favor of Gatherer in a format acceptable to Gatherer and from a Qualified Institution.

11

(F) For any Credit Support in the form of an irrevocable standby letter of credit that is provided to Gatherer (any such letter of credit, "Shipper's Letter of Credit"), such Shipper's Letter of Credit shall permit partial draws and shall have an expiry date no sooner than twelve (12) calendar months after issuance thereof. With respect to any Shipper's Letter of Credit, Shipper shall furnish extensions or replacements of such letter of credit thirty (30) days prior to the expiration thereof, from time to time until the expiration of both ITCs. All extensions, amendments and replacements of any Shipper's Letter of Credit shall be delivered to Gatherer in the form of such outstanding Shipper's Letter of Credit, or in form otherwise satisfactory to Gatherer. Gatherer shall have the right to draw against any outstanding Shipper's Letter of Credit upon: (a) failure to make payment when due under either or both ITCs; or (b) the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit as provided herein. In the event of a draw in accordance with clause (a) of the preceding sentence, the proceeds of such draw shall be applied against any costs, expenses or damages incurred by Gatherer. In the event of a draw due to the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit, which draw may be in part or in whole, the proceeds of the draw shall be retained by Gatherer until Gatherer receives a replacement Shipper's Letter of Credit or until Gatherer does in fact incur any costs, expenses or damages as a result of a breach by Shipper of any of its obligations under either or both ITCs (in which event, such monies shall be applied against the same). If drawn in part or in whole, Shipper shall immediately thereafter provide a replacement Shipper's Letter of Credit in an amount equal to the amount drawn by Gatherer. Any draw made by Gatherer under an outstanding Shipper's Letter of Credit shall not relieve Shipper of any liabilities, deficiencies, costs, expenses or damages beyond what is drawn under such Shipper's Letter of Credit. Shipper's Letter of Credit (representing any undrawn portion thereof), to the extent it still remains, or any Credit Support in the form of cash deposit held by Gatherer shall be returned to Shipper on or before the thirtieth (30th) day after the later to occur of (i) the date on which both ITCs have terminated or expired and (ii) the date on which all of Shipper's performance and payment obligations under both ITCs (including, without limitation, any damages arising from either such agreement) have been fulfilled.

## ADDITIONAL COVENANTS, REPRESENTATIONS AND WARRANTIES:







14



**TERMINATION OF ORIGINAL ITC 101:** The Original ITC 101 is hereby terminated as of the Effective Date and superseded by the terms and conditions of this ITC.

[SIGNATURE PAGE FOLLOWS]

15

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

**ETC NORTHEAST PIPELINE, LLC**

By:_____

Name:_____

Title:_____

**SHIPPER**

**EM ENERGY PENNSYLVANIA, LLC**

By:_____

Name: BRIAN H. MCWEENE

Title: CEO

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**                              **SHIPPER**

**ETC NORTHEAST PIPELINE, LLC**      **EM ENERGY PENNSYLVANIA, LLC**

By: _____          By: _____
Name: Mackie McCrea                    Name: _____
Title: Chief Commercial Officer        Title: _____

Appendix 1

Area of Dedication



Area of Dedication

■ EdgeMarc Leasehold   ☐ Area of Dedication   Mark West Dedication

Exhibit A

The Gathering System

