Exhibit B

Sample Calculation of Fee Adder



Exhibit B



Exhibit C

Form of Parent Capital Contribution Letter

Exhibit D

Form of Sponsor Commitment Letter

*Execution Version*

## AMENDED AND RESTATED
## INDIVIDUAL TRANSACTION CONFIRMATION
### (Gatherer's Contract No. 9532-102)
### TO
## AMENDED AND RESTATED
## GATHERING AND PROCESSING AGREEMENT
## BETWEEN EM ENERGY PENNSYLVANIA, LLC
### AND
## ETC NORTHEAST PIPELINE, LLC
### DATED NOVEMBER 13, 2017

THIS **AMENDED AND RESTATED INDIVIDUAL TRANSACTION CONFIRMATION** (this "ITC") is entered into effective as of the 13th day of November, 2017 ("Effective Date"), by and between ETC Northeast Pipeline, LLC ("Gatherer") and EM Energy Pennsylvania, LLC ("Shipper"). This ITC constitutes part of and is subject to all of the terms and provisions of the Base Agreement (collectively, the "Agreement"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Base Agreement, unless otherwise defined herein. Any discrepancy or conflict between any term contained in the Base Agreement and any term contained in this ITC shall be resolved in favor of this ITC.

### WITNESSETH:

**WHEREAS**, Gatherer and Shipper entered into that certain Individual Transaction Confirmation dated April 17, 2015 (Gatherer's Contract No. 9532-102), as amended pursuant to that First Amendment to Individual Transaction Confirmation dated August 1, 2015 (as so amended, the "Original ITC 102");



**WHEREAS,** Gatherer and Shipper now desire to amend and restate the Original ITC 102, on the terms and conditions set forth herein.

**NOW, THEREFORE,** for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows:

**BASE AGREEMENT:** Amended and Restated Gathering and Processing Agreement dated November 13, 2017, Contract No. 9532-100.

**INDIVIDUAL TRANSACTION NUMBER:** 9532-102

**SHIPPER:** EM Energy Pennsylvania, LLC

**GATHERER:** ETC Northeast Pipeline, LLC

**TERM:** This Individual Transaction Confirmation shall be coterminous with that certain other Individual Transaction Confirmation between the Parties of even date herewith, ITC No. 9532-101 ("ITC 101").

**GATHERING SYSTEM:** The Gathering System to be constructed, owned and operated by Gatherer under this ITC is depicted in part on the map shown on Exhibit A hereto, as may be updated by mutual agreement of the Parties, and will be capable of (i) gathering the SRC from the Receipt Points upstream of the Constellation Compressor Station for delivery to the Constellation Delivery Point ("LP Gathering") and (ii) gathering the SRC from the Constellation Receipt Point to the Delivery Point ("HP Gathering").

The "Constellation Compressor Station" is owned and operated by Axip Energy Services, LP ("Axip"), and Shipper shall be responsible for the delivery of Gas from the inlet meter of the Constellation Compressor Station ("Constellation Delivery Point") to the inlet meter of the HP Gathering system ("Constellation Receipt Point"). Shipper shall cause Axip to deliver Gas to the Constellation Receipt Point against the operating pressures maintained in the HP Gathering system from time to time, which operating pressure shall not exceed 1300 Psig. Shipper shall be in control and possession of the Gas from the Constellation Delivery Point to the Constellation Receipt Point.



3



4





(A)     In conjunction with execution of the Original Agreement, the Original ITC 101 and Original ITC 102, Shipper provided to Gatherer initial credit support ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ When and as required pursuant to this section, Shipper shall provide Credit Support, including without limitation the Initial Credit Support, Incremental Credit Support (if any) and Additional Credit Support (if any), in one of the following forms, each of which shall constitute a form of reasonably satisfactory Credit Support:

   a. A written Guaranty of payment from an Affiliate with credit satisfactory to Gatherer, but such guaranty of payment shall constitute an acceptable form of Credit Support only for as long as the credit of the Affiliate continues to be reasonably satisfactory to Gatherer;

   b. An irrevocable letter of credit in a reasonably satisfactory form and from a Qualified Institution ("Qualified Institution" shall mean a major U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least $50 Billion U.S. Dollars and a credit rating of at least 'A-' by Standard & Poor's Ratings Services, or its

6

successor, or a credit rating of at least 'A3' by Moody's Investors Service, or its successor, and is otherwise acceptable to Gatherer.); or

c. A prepayment or a deposit.

(B)    On an annual basis during the term of either ITC, Shipper shall provide its audited financial statements with footnotes and any other information requested by Gatherer to properly evaluate Shipper's financial condition.    In the event i) Shipper's financial condition has deteriorated as compared to the FYE December 31, 2013 consolidated financial statements provided to Gatherer on September 22, 2014 such that Gatherer can reasonably substantiate grounds for insecurity, as evaluated by Gatherer on a non-discriminatory basis, based on consistent financial evaluation standards for determining the acceptability of Shipper's overall financial condition; or ii) Shipper experiences a material adverse change to its financial condition, which shall include only the following events: (a) qualified auditor's opinion relating to the financial statements which indicates significant uncertainty as to Shipper's ability to exist as a going concern; (b) adjudged litigation or final orders in a regulatory proceedings in State or Federal courts which is likely to cause a condition of insolvency, then Gatherer may hereby request incremental Credit Support in the amount of thirty (30) days of: (i) Gathering Demand Fee + (ii) Processing Demand Fee + (iii) T&F Demand Fee + (iv) Storage Demand Fee, all as escalated from time to time, (collectively, the "Fees") plus (v) any imbalance due to Gatherer from Shipper ("Incremental Credit Support"). The Incremental Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Incremental Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(C) Upon the occurrence of an Event of Default with respect to Shipper, then Shipper shall provide additional Credit Support to Gatherer within fifteen (15) business days of written demand to Shipper. The additional Credit Support shall be the lesser of: (i) four (4) months of Fees due from Shipper or ii) the number of months remaining in either or both ITCs ("Additional Credit Support"). Such Additional Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Additional Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(D) If Gatherer determines in its reasonable judgment that the Incremental Credit Support or Additional Credit Support is or are no longer required or the amounts of any such Credit Support can be reduced, Gatherer shall return any such excess Credit Support to Shipper within five (5) business days of its reasonable determination based upon Gatherer's annual assessment of the Shipper's financial statements which shall be conducted within sixty (60) calendar days of receipt of Shipper's annual audited financial statements; provided, however, upon the occurrence of an Event of Default with respect to Shipper pursuant to section (D) at any time during the term of either ITC, then Gatherer has the right to reinstate its requirement for Incremental Credit Support pursuant to section (B) and/or Additional Credit Support pursuant to section (C).

7

(E)    At any time while either or both ITCs is effective, if Gatherer determines that, as of such time, the issuer of any letter of credit in favor of Gatherer shall cease to be a Qualified Institution, then Gather may submit a written notice of such determination to Shipper (which notice shall provide Gatherer's basis for such determination), and within fifteen (15) business days after Shipper's receipt of such notice from Gatherer, Shipper shall deliver to Gatherer, and shall thereafter maintain, an irrevocable standby letter of credit in favor of Gatherer in a format acceptable to Gatherer and from a Qualified Institution.

(F) For any Credit Support in the form of an irrevocable standby letter of credit that is provided to Gatherer (any such letter of credit, "Shipper's Letter of Credit"), such Shipper's Letter of Credit shall permit partial draws and shall have an expiry date no sooner than twelve (12) calendar months after issuance thereof.  With respect to any Shipper's Letter of Credit, Shipper shall furnish extensions or replacements of such letter of credit thirty (30) days prior to the expiration thereof, from time to time until the expiration of both ITCs.  All extensions, amendments and replacements of any Shipper's Letter of Credit shall be delivered to Gatherer in the form of such outstanding Shipper's Letter of Credit, or in form otherwise satisfactory to Gatherer.  Gatherer shall have the right to draw against any outstanding Shipper's Letter of Credit upon: (a) failure to make payment when due under either or both ITCs; or (b) the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit as provided herein.  In the event of a draw in accordance with clause (a) of the preceding sentence, the proceeds of such draw shall be applied against any costs, expenses or damages incurred by Gatherer.  In the event of a draw due to the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit, which draw may be in part or in whole, the proceeds of the draw shall be retained by Gatherer until Gatherer receives a replacement Shipper's Letter of Credit or until Gatherer does in fact incur any costs, expenses or damages as a result of a breach by Shipper of any of its obligations under either or both ITCs (in which event, such monies shall be applied against the same).  If drawn in part or in whole, Shipper shall immediately thereafter provide a replacement Shipper's Letter of Credit in an amount equal to the amount drawn by Gatherer.  Any draw made by Gatherer under an outstanding Shipper's Letter of Credit shall not relieve Shipper of any liabilities, deficiencies, costs, expenses or damages beyond what is drawn under such Shipper's Letter of Credit.  Shipper's Letter of Credit (representing any undrawn portion thereof), to the extent it still remains, or any Credit Support in the form of cash deposit held by Gatherer shall be returned to Shipper on or before the thirtieth (30th) day after the later to occur of (i) the date on which both ITCs have terminated or expired and (ii) the date on which all of Shipper's performance and payment obligations under both ITCs (including, without limitation, any damages arising from either such agreement) have been fulfilled.

## ADDITIONAL COVENANTS, REPRESENTATIONS AND WARRANTIES:

8



9



10



**TERMINATION OF ORIGINAL ITC 102:** The Original ITC 102 is hereby terminated as of the Effective Date and superseded by the terms and conditions of this ITC.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

**ETC NORTHEAST PIPELINE, LLC**

By:_____
Name:_____
Title:_____

**SHIPPER**

**EM ENERGY PENNSYLVANIA, LLC**

By:_____
Name:__BRIAN H. MCCULOIE____
Title:____CFO_____

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

**SHIPPER**

ETC NORTHEAST PIPELINE, LLC

EM ENERGY PENNSYLVANIA, LLC

By: _____
Name: Markie McCrea
Title: Chief Commercial officer

By: _____
Name: _____
Title: _____

Appendix 1

Area of Dedication



Area of Dedication

Bluestone Plant

Revolution Cryo

■ EdgeMarc Leasehold    ▢ Area of Dedication    Mark West Dedication

Exhibit A

The Gathering System



Exhibit B

Form of Capital Contribution Letter

Exhibit C

Form of Sponsor Commitment Letter

## **VERIFICATION**

I, Alan G. Vaina, representative of ETC Northeast Pipeline, LLC being duly sworn according to law deposes and says that the facts set forth in the foregoing Complaint In Civil Action are true and correct to the best of my knowledge, information and belief. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

Representative of ETC Northeast Pipeline, LLC

Date: ___2 · 7 · 19___

# EXHIBIT G

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC

    Plaintiff and Counterclaim Defendant,

    v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant and Counterclaim Plaintiff.

CIVIL DIVISION

No.  GD-19-002052

**Code:** 180 Declaratory Judgment

**ANSWER, NEW MATTER, AND COUNTERCLAIMS**

Filed on behalf of Defendant and Counterclaim Plaintiff

Counsel of Record for this Party:

Megan S. Haines
PA ID No. 203590
McGuireWoods LLP
Tower Two Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
mhaines@mcguirewoods.com
412-667-7920

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice* forthcoming)

**NOTICE TO PLEAD**

**YOU ARE HEREBY NOTIFIED TO FILE A WRITTEN RESPONSE TO THE ENCLOSED NEW MATTER AND COUNTERCLAIMS WITHIN TWENTY (20) DAYS FROM SERVICE HEREOF OR A JUDGMENT MAY BE ENTERED AGAINST YOU**

By: **/s/ Megan S. Haines**
    **Counsel for Defendant**

**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC,

    Plaintiff and Counterclaim Defendant,

         v.

EM ENERGY PENNSYLVANIA, LLC,

    Defendant and Counterclaim Plaintiff.

CIVIL DIVISION

No.  GD-19-002052

## ANSWER, NEW MATTER, AND COUNTERCLAIMS

AND NOW, comes the Defendant, EM Energy Pennsylvania, LLC ("EdgeMarc"), by and through its counsel, McGuireWoods LLP and Davis Polk & Wardwell LLP, who responds to the Complaint of ETC Northeast Pipeline, LLC ("ETC") as follows:

### PRELIMINARY STATEMENT

On September 10, 2018, a segment of ETC's natural gas gathering and processing system ("Revolution System") located in Beaver County, Pennsylvania exploded ("Revolution Explosion").  Upon investigation, the Pennsylvania Department of Environmental Protection ("DEP") identified numerous violations of environmental regulations relating to erosion and sedimentation control, as well as earth stability, which resulted in a landslide and caused the Revolution Explosion.

DEP has repeatedly stated that ETC has failed to rectify the violations.  In October 2018, DEP issued a compliance order to resolve outstanding erosion and sedimentation issues and to stop all other earthwork associated with the Revolution System.  In light of ongoing compliance issues, on February 8, 2019, DEP took the rare step of invoking a permit block, suspending review of all clean water permit applications and other pending approvals for ETC, its parent, Energy Transfer LP ("Energy Transfer"), and their affiliates until further notice.  As Governor

1

Wolf summarized the same day, "[t]here has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities. This is not how we strive to do business in Pennsylvania, and it will not be tolerated."

EdgeMarc, an oil and gas exploration company with natural gas production in Western Pennsylvania, has been directly and continuously injured by ETC's failures of performance, including the Revolution Explosion. EdgeMarc had a contract with ETC for ETC: (1) to ship and process EdgeMarc's natural gas on the Revolution System; (2) to market and sell, on behalf of EdgeMarc, natural gas liquids (ethane and propane, principally) processed out of the natural gas for EdgeMarc by ETC; and (3) most importantly, to ultimately deliver, after gathering and processing, pipeline-quality natural gas for EdgeMarc from ETC's natural gas processing plant into the interstate natural gas pipeline system owned by ETC's affiliate, Rover Pipeline, LLC ("Rover"), via a natural gas lateral pipeline, also owned and operated by Rover. But after years of investment, *ETC never placed the Revolution System "in commercial service."* It was not "in commercial service" at the time of the Revolution Explosion, and it remains out of service to this day.

To make matters worse, ETC has taken every opportunity to use the Revolution Explosion to its benefit – contriving a post-explosion notice to EdgeMarc that ETC had finally placed the Revolution System "in commercial service" mere hours before the explosion, concocting a second post-explosion notice to EdgeMarc asserting that the Revolution Explosion was an "act of God" and cured its obligations under applicable contracts, fabricating invoices to EdgeMarc as if the Revolution Explosion had never happened, and demanding over $7.3 million in credit support based on these purported invoices.

As a result, this dispute is not about EdgeMarc's alleged failure to pay $400,000 for services not rendered. It is about ETC's own failure to perform under clear contracts between the parties, and millions of dollars of resulting damage that EdgeMarc has suffered, and continues to suffer, due to ETC's nonperformance.

**ANSWER**

## I.   INTRODUCTION[1]

1.   Denied. Paragraph 1 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 1 and respectfully refers the Court to (i) the Amended and Restated Gathering and Processing Agreement between EdgeMarc and ETC, dated November 13, 2017 (the "Gathering and Processing Agreement"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101), dated November 13, 2017 ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102), dated November 13, 2017 ("ITC-102"), (together, the "Agreements") for the contents of the Agreements. EdgeMarc denies any characterization of the Agreements.

2.   Denied. Paragraph 2 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that the "Guaranteed In-Service Date" was January 1, 2019. EdgeMarc otherwise denies the allegations in Paragraph 2, and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

---

[1] EdgeMarc incorporates certain headings contained in ETC's Complaint for the Court's convenience only. Their inclusion is not an admission of the contents thereof, which is expressly denied.

3.      Denied.  Paragraph 3 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies that the Revolution System was placed "in commercial service" on September 9, 2018 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

4.      Denied in part.  EdgeMarc denies the allegations in Paragraph 4, except that it admits that it received a notice from ETC on September 10, 2018.  EdgeMarc respectfully refers the Court to the notice for its contents.  EdgeMarc denies any characterization of the Agreements.

5.      Denied.  Paragraph 5 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 5 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

6.      Denied.  Paragraph 6 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that EdgeMarc sent a notice to ETC on January 29, 2019, otherwise denies the allegations in Paragraph 6, and respectfully refers the Court to the Agreements and the notice for their contents.  EdgeMarc denies any characterization of the Agreements.

7.      Denied.  Paragraph 7 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies that ETC is entitled to declaratory relief.

## II.    PARTIES

8.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.  Therefore, the allegations of Paragraph 8 are denied.

9.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.  Therefore, the allegations of Paragraph 9 are denied.

10.      Denied.  Paragraph 10 purports to state legal conclusions as to which no response is required.

11.      Denied in part.  EdgeMarc admits the allegations in the first sentence of Paragraph 11, admits that it has a place of business at 1800 Main Street, Suite 220, Canonsburg, Pennsylvania, and otherwise denies the allegations in Paragraph 11.

## III.    JURISDICTION, VENUE, AND GOVERNING LAW

12.      Paragraph 12 purports to state legal conclusions as to which no response is required.

13.      Paragraph 13 purports to state legal conclusions as to which no response is required.

14.      Paragraph 14 purports to state legal conclusions as to which no response is required.

15.      Paragraph 15 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 15. EdgeMarc specifically denies that ETC is entitled to relief under the Declaratory Judgments Act.

16.      Paragraph 16 purports to state legal conclusions as to which no response is required.

17.     Paragraph 17 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 17.

18.     Paragraph 18 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that redacted versions of the Agreements appear to be attached as Exhibits A and B to the Complaint. EdgeMarc otherwise denies the allegations in Paragraph 18 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

### IV.    FACTUAL BACKGROUND

19.     Admitted.

20.     Denied. Paragraph 20 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

21.     Denied. Paragraph 21 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

22.     Denied. Paragraph 22 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

23.     Denied. Paragraph 23 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

24.     Denied.  Paragraph 24 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

25.     Admitted.

26.     Paragraph 26 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that ETC has accurately quoted a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their contents.

27.     Paragraph 27 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that ETC has accurately quoted a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their contents.

28.     Paragraph 28 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

29.     Denied.  EdgeMarc denies the allegations in Paragraph 29.

30.     Denied.  EdgeMarc denies the allegations in Paragraph 30.

31.     Denied.  Paragraph 31 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 31 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

32.     Denied.  EdgeMarc denies the allegations in Paragraph 32.

33.     Denied.  EdgeMarc denies the allegations in Paragraph 33.

7

34.     Denied. EdgeMarc denies the allegations in Paragraph 34.

35.     Denied. Paragraph 35 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 35.

36.     Denied. The allegations of Paragraph 36 refer to a letter agreement, a document which speaks for itself. EdgeMarc respectfully refers the Court to the letter agreement for its contents and EdgeMarc denies any characterization thereof.

37.     Denied. EdgeMarc denies the allegations in Paragraph 37. EdgeMarc specifically denies that gas provided to ETC on September 9, 2018 was provided for "commercial service."

38.     Denied. The allegations in Paragraph 38 refer to a Transaction Confirmation, which speaks for itself. EdgeMarc refers the Court to the Transaction Confirmation for its contents and denies any characterization thereof. By way of further response, EdgeMarc denies the allegations in Paragraph 38.

39.     Denied in part. EdgeMarc denies the allegations in Paragraph 39, except that it admits that it received a notice from ETC on September 10, 2018.

40.     Denied. Paragraph 40 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 40 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

41.     Denied. Paragraph 41 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 41 and respectfully refers the Court to the Agreements for their contents.

42.     Denied.  EdgeMarc denies the allegations in Paragraph 42.

43.     Denied as stated.  EdgeMarc denies the allegations in Paragraph 43 as stated.

44.     Denied.  EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.     Denied.  EdgeMarc denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 45.  EdgeMarc otherwise denies the allegations in Paragraph 45 and respectfully refers the Court to the Agreements for their contents.

46.     Denied.  EdgeMarc denies the allegations in Paragraph 46.

47.     Denied.  EdgeMarc denies the allegations in Paragraph 47.

48.     Denied in part.  EdgeMarc admits that ETC purported to send it invoices under ITC-101 on February 1, 2019, and otherwise denies the allegations in Paragraph 48.

49.     Denied as stated.  EdgeMarc admits only that it received a notice from ETC on January 17, 2019.  EdgeMarc denies the remaining allegations of Paragraph 49.

50.     Denied.  Paragraph 50 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 50 and respectfully refers the Court to the Agreements for their contents.

51.     Denied.  Paragraph 51 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 51.

52.     Denied in part.  Paragraph 52 references a January 22, 2019 letter, which speaks for itself.  EdgeMarc refers the Court to the letter for its contents and denies any characterization

thereof.  By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019.  The remaining allegations are denied.

53.    Denied in part.  Paragraph 53 references a January 22, 2019 letter, which speaks for itself.  EdgeMarc refers the Court to the letter for its contents and denies any characterization thereof.  By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019.  The remaining allegations are denied.

54.    Paragraph 54 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits only that it received a letter from ETC on January 29, 2019.  The remaining allegations are denied.

55.    Denied in part.  EdgeMarc admits only that it sent ETC a letter on January 29, 2019.  The remaining allegations are denied.

56.    Denied in part.  Paragraph 56 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits only that it continues to be willing to perform its obligations under the Gathering and Processing Agreement. The remaining allegations are denied.

57.    Admitted.

58.    Denied.  Paragraph 58 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 58 and respectfully refers the Court to the Agreements for their contents.

## V.    CAUSES OF ACTION

### COUNT I:  DECLARATORY JUDGMENT

59.    EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

10

60.     Denied.  Paragraph 60 purports to state legal conclusions as to which no response is required.

61.     Denied.  Paragraph 61 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 61.

62.     Denied.  Paragraph 62 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits only that ETC did not meet the Guaranteed In-Service Date under ITC-101.  The remaining allegations are denied.

Answering the "WHEREFORE" clause following Paragraph 62, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

## COUNT II:  BREACH OF CONTRACT

63.     EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

64.     Denied.  Paragraph 64 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 64 and respectfully refers the Court to the Agreements for their contents.

65.     Denied.  Paragraph 65 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 65.

66.     Denied.  Paragraph 66 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 66.

Answering the "WHEREFORE" clause following Paragraph 66, EdgeMarc denies that ETC is entitled to any recovery or relief whatsoever.

## COUNT III:  UNJUST ENRICHMENT

67.    EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

68.    Denied.  Paragraph 68 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 68.

69.    Denied.  Paragraph 69 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 69.

70.    Denied.  Paragraph 70 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 70.

Answering the "WHEREFORE" clause following Paragraph 70, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

## VI.    JURY DEMAND

71.    No response to the ETC's jury demand in Paragraph 71 is required.  To the extent a response is required, EdgeMarc reserves the right to move to strike ETC's jury demand.

Answering the "Relief Requested" clause following Paragraph 71, EdgeMarc denies that ETC is entitled to any judgment, recovery or relief whatsoever.

12

## NEW MATTER

72. EdgeMarc asserts the following defenses without assuming the burden of any such defense that would otherwise rest on ETC, and with reservation of its right to amend or supplement its Answer and New Matter for any reason, including based upon evidence developed in discovery or otherwise.

73. The Complaint, and each claim for relief asserted therein, fails to state a claim upon which relief can be granted.

74. ETC's claims are precluded, in whole or in part, by the doctrine of unclean hands.

75. ETC's claims are barred, in whole or in part, because it has not suffered any injury or damages and/or suffered any recoverable damages.

76. Although EdgeMarc denies that ETC suffered any damages as alleged in the Complaint, any damages that may have been sustained were not caused by any actions or omissions by EdgeMarc.

77. ETC's claims are barred, in whole or in part, by ETC's failure to mitigate any damages incurred.

78. ETC's claims are barred, in whole or in part, by the doctrine of failure of consideration.

79. ETC's claims are barred, in whole or in part, because ETC materially breached the Agreements.

80. ETC's claims are barred, in whole or in part, to the extent that EdgeMarc's alleged actions were justified.

81. ETC's claims are barred, in whole or in part, by EdgeMarc's payment for all services actually received and properly invoiced.

13

82.    ETC's claims are barred, in whole or in part, by impossibility of performance.

83.    ETC's claims are barred, in whole or in part, by estoppel.

84.    EdgeMarc acted reasonably and in good faith at all times based on all relevant facts and circumstances known by it at the time it so acted.

WHEREFORE, having denied the material allegations against it, and having asserted its affirmative defenses to ETC's Complaint, EdgeMarc respectfully requests that the Court dismiss the Complaint, and award it costs and fees, as well as all other relief the Court deems just and proper.

## COUNTERCLAIMS

85.     EdgeMarc incorporates by reference the above responses and assertions as if set forth fully herein.

## I.     INTRODUCTION

86.     EdgeMarc, an oil and gas exploration company based in Pennsylvania, produces clean-burning natural gas from the Appalachian Basin.  To bring its natural gas to the market, EdgeMarc contracted with ETC, a subsidiary of Energy Transfer, to gather, process, and transport its gas.  As part of this agreement, ETC agreed to build and operate the Revolution System in western Pennsylvania, and EdgeMarc committed to ship and have its natural gas processed and delivered on this system.

87.     Despite the agreement, the Revolution System is not currently "in commercial service," nor has it ever been.  As a result, EdgeMarc is suffering substantial financial losses each and every day that ETC fails to gather, process, and transport EdgeMarc's gas.  Despite EdgeMarc's adherence to the terms of its agreements with ETC, EdgeMarc is now unable to transport its natural gas to the market for one main reason:  ETC failed to comply with pertinent environmental regulations and prudent pipeline construction guidelines.  The direct consequence of ETC's conduct – including its well-documented failures to undertake necessary erosion and sediment control measures – was a landslide during the buildout of the Revolution System, resulting in a segment of pipeline in Beaver County being displaced down a hill which caused a pipeline rupture and explosion on September 10, 2018.

88.     ETC's first instinct was to use the Revolution Explosion to its benefit.  Several hours after the Revolution Explosion, ETC claimed that the Revolution System was "in commercial service" as of the prior day, September 9, 2018.  That same day, ETC claimed that

the Revolution Explosion constituted a Force Majeure event – or an "act of God" – under the Agreements. The notices to EdgeMarc were prepared in such haste that one initially identified the wrong company and was only later corrected to identify EdgeMarc. (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

89. The Revolution Explosion was not an act of God. Indeed, ETC's compliance failures are well documented. For example, after the Revolution Explosion, inspectors from the DEP inspected portions of pipeline on the Revolution System, interviewed workers, and subpoenaed documents in an effort to determine whether ETC's parent, Energy Transfer, was meeting all of its permit obligations.[2] Three days after the Revolution Explosion, a DEP inspector stated that the measures that Energy Transfer took to prevent erosion were "improperly installed, maintained and failed."[3]

90. Shortly thereafter, on October 29, 2018, the DEP issued a Compliance Order ("October 2018 DEP Order") commanding ETC to stop all work on pipeline on the Revolution System, stabilize the area around the pipeline, repair erosion controls, and submit several plans outlining how to move forward. In the October 2018 DEP Order, the DEP concluded in no uncertain terms that ETC had "[f]ail[ed] to implement or maintain effective erosion and sediment control best management practices . . . , as required by [Pennsylvania Code], that minimize the potential for accelerated erosion and sedimentation . . . ." (Exhibit C (October 2018 DEP Order).)

---

[2] *See* Reid Frazier, *DEP orders ETP to fix Revolution Pipeline erosion problems*, WHYY (a partner of NPR and PBS) (Oct. 31, 2018), https://whyy.org/articles/dep-orders-etp-to-fix-revolution-pipeline-erosion-problems/.

[3] *See* Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*, PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

16

91.     The October 2018 DEP Order also found that ETC "[f]ail[ed] to provide

temporary stabilization, as required by [Pennsylvania Code], upon temporary cessation of earth

disturbance activities." Finally, the October 2018 DEP Order stated that ETC "has failed to

notify the Department of its inspection results and has failed to submit noncompliance reports."

Accordingly, the DEP required ETC to "report all inoperative or ineffective controls to the

Department . . . and provide a written noncompliance report within five (5) days." (Exhibit C

(October 2018 DEP Order).)

92.     Both before and after the October 2018 DEP Order, ETC racked up regulatory

violation after regulatory violation concerning its work on the Revolution System.  Between

September 13, 2018 and January 17, 2019, the DEP conducted site-level and primary facility-

level inspections on pipeline on the Revolution System.  In total, the inspections revealed that

ETC had committed around 200 "erosion and sediment control" violations, "site stabilization-

temporary stabilization" violations, and "general requirements" violations related to failure to

meet erosion and sediment control best management practices.[4]

93.     ETC failed to resolve the violations and satisfy the October 2018 DEP Order.  On

January 10, 2019, after several months of ongoing violations and a lack of remediation effort, the

DEP informed ETC in a letter that it was not in compliance with the October 2018 DEP Order.

The letter specifically stated that despite the Order, ETC has failed to, among other things,

"continuously implement and maintain [erosion and sediment control best management

practices]," and "temporarily stabilize all disturbed areas, including ongoing mass earth

movement" as required by the Order.  The DEP's letter also stated that ETC had failed to submit

---

[4] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/
searchResults_singleSite.aspx?SiteID=817832 (last visited February 17, 2019).

to the DEP an adequate "Temporary Stabilization Plan," an "Erosion and Sediment Control

Plan," and a "Post Construction Stormwater Management Plan" as required by the Order.

(Exhibit D (January 10, 2019 letter from DEP to ETC).)

94.     ETC's failure to take adequate erosion and sedimentation control measures is also

problematic because months prior to the September 2018 Revolution Explosion, ETC was on

notice that the area where the explosion occurred was problematic, as "[t]his stretch of the

pipeline ha[d] been a problem for Energy Transfer before." Namely, in a consent agreement and

order from summer 2018, Energy Transfer "was fined and cited for a series of erosion events that

took place about a mile from the explosion site."[5]

95.     ETC itself admitted that the area of the Revolution Explosion site was a cause for

serious concern. Media outlets reported that according to Energy Transfer's permit documents,

"the area where the pipeline burst is on a slope of more than 20 degrees, with even steeper areas

nearby," "[t]he type of soil on the site is considered to have 'high' potential for erosion, and a

field survey of a wetland a few hundred feet down the pipeline's path was *categorized by the

company* as having a 'slip landslide area' and 'dangerous and unstable hillslope terrain.'"[6]

96.     As a result of ETC's conduct, the DEP has suspended all reviews of clean water

permit applications and other pending approvals for Energy Transfer and its subsidiaries due to

ETC's failure to comply with the October 2018 DEP Order. In announcing the suspension, the

DEP Secretary stated that DEP inspections following the Revolution Explosion discovered

violations including "unreported landslides, impacts to aquatic resources, construction activities

---

[5] Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*, PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

[6] *Id.*

18

occurring in unpermitted areas, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."[7]

97.      Public information, government statements, and media coverage make abundantly clear that the Revolution Explosion is a classic case of history repeating itself.   For example, upon information and belief, the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) has issued 106 violations to Energy Transfer and its Sunoco subsidiary since 2002, resulting in over $5.6 million in fines.   These safety violations included, among others, "[f]ailure to repair unsafe pipe for 5 years," "[f]ailures to maintain pipeline integrity in high consequence areas," "[f]ailure to report unsafe conditions," and "[f]ailure to do corrosion inspection."   Upon information and belief, Energy Transfer and its subsidiaries and joint ventures reported 527 hazardous liquids pipeline incidents to federal regulators between 2002 and 2017, or once every 11 days on average for 16 years.[8]

98.      A Reuters analysis of government data and regulatory records showed that Energy Transfer and its Sunoco subsidiary have racked up "more than 800 state and federal permit violations" in a race to build Rover and Mariner East 2, two large pipelines that carry natural gas from Pennsylvania, Ohio, and West Virginia.   These violations included "spills of drilling fluid, . . . sinkholes in backyards[,] and improper disposal of hazardous waste and other trash."[9]

---

[7] Press Release, Commonwealth of Pennsylvania Department of Environmental Protection, Department of Environmental Protection Issues Hold on All Energy Transfer Clean Water Permit Approvals and Modifications Due to Non-Compliance (Feb. 8, 2019), http://www.ahs.dep.pa.gov/NewsRoomPublic/ articleviewer.aspx?id=21634&typeid=1.

[8] U.S. Pipeline and Hazardous Materials Safety Administration data, as summarized by Greenpeace USA & Waterkeeper Alliance, Oil and Water: ETP & Sunoco's History of Pipeline Spills 3, 4, 6 (2018), https://www.greenpeace.org/usa/wp-content/uploads/2018/04/oil-water-04.17-MECH.pdf.

[9] Scott DiSavino, Stephanie Kelly, *Two U.S. pipelines rack up violations, threaten industry growth*, REUTERS (Nov. 28, 2018), https://www.reuters.com/article/us-usa-pipelines-etp-violations-insight-idUSKCN1NX1E3.

99.     The direct consequence of this pattern of conduct by ETC was the September 10,

2018 Revolution Explosion.  Despite ETC's deliberate efforts to mischaracterize this explosion

as an act of God, all available information makes clear that the explosion and its causes were

within ETC's reasonable control.

## PARTIES

100.    Counterclaim Plaintiff EdgeMarc is a Delaware limited liability company, with its

principal office in Canonsburg, Pennsylvania.  EdgeMarc is an oil and gas exploration and

production company operating in, among other places, Pennsylvania.

101.    Counterclaim Defendant ETC is a Delaware limited liability company with an

office located at 6051 Wallace Road Ext, Suite 300, Wexford, Pennsylvania.  ETC constructs

and operates natural gas gathering and processing systems in Pennsylvania.

## JURISDICTION AND VENUE

102.    This action arises under the laws of the Commonwealth of Pennsylvania and is

within the subject matter jurisdiction of this Court, pursuant to 42 Pa. Cons. Stat. § 931.

103.    Subject matter jurisdiction exists in this case pursuant to the Declaratory

Judgments Act, 42 Pa. Cons. Stat. § 7531 *et seq*.

104.    An award of declaratory relief would remove uncertainty and lead to resolution of

the dispute. 42 Pa. Cons. Stat. § 7537.

105.    This Court has personal jurisdiction over ETC because ETC's principal place of

business is in the Commonwealth of Pennsylvania.  42 Pa. Cons. Stat. § 5301(a)(2).

106.    This Court also has personal jurisdiction over ETC because this action arises

directly out of ETC's agreement to build the Revolution System in the Commonwealth of

Pennsylvania and carry EdgeMarc's gas on the Revolution System. 42 Pa. Cons. Stat. § 5308.

107. Venue for this action is proper in this Court pursuant to Pennsylvania Rules of Civil Procedure 1006 & 2179 because ETC regularly conducts business in Allegheny County.

## FACTUAL BACKGROUND

**I.     The Gathering and Processing Agreement, ITC-101, and ITC-102**

108. On November 13, 2017, the parties entered into the amended and restated Gathering and Processing Agreement, which provides that "[ETC] agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of [EdgeMarc's] Gas as set forth in any Individual Transaction Confirmation." (Gathering and Processing Agreement at § 6.3).

109. Under the Gathering and Processing Agreement, ETC must reserve capacity for EdgeMarc's natural gas. That amount is defined as the "Shipper's Reserved Capacity," or "SRC," which is "the portion of the aggregate daily gathering and processing capacity reserved for [EdgeMarc] for Firm Service in the Gathering System and the Plant." (Gathering and Processing Agreement at § 1.1).

110. On the same day that they entered into the Gathering and Processing Agreement, the parties also entered into two "Individual Transaction Confirmations," or "ITCs," which "evidenc[e] the specific terms of a Transaction . . . but which shall be subject to the terms and conditions of th[e] [Gathering and Processing Agreement]." (Gathering and Processing Agreement at § 1.1). These two ITCs are ITC-101 and ITC-102, and ITC-101 governs the pipeline where the Revolution Explosion took place in Beaver County on September 10, 2018.

111. Under ITC-101, ETC agreed to "construct[], own[] and operate[]" a "Gathering System" to receive EdgeMarc's natural gas from certain "Receipt Points" in Butler County and deliver that gas to the "Delivery Point." Specifically, the "Gathering System" that ETC would build under ITC-101 had to "be capable of (i) gathering the SRC from the Receipt Points . . . for

21

delivery to the Galaxy Compressor Station ('LP-Galaxy Gathering'), (ii) compressing and dehydrating the SRC at the Galaxy Compressor Station ('Galaxy Compression'), (iii) gathering, via [ETC's] high pressure gas pipeline ('HPGP'), the SRC from the Galaxy Compressor Station to [ETC's Revolution I cryogenic processing] Plant ('HP Gathering') and (iv) gathering Residue Gas from the Plant for delivery to the Delivery Point." (ITC-101 at 2).

112.   ITC-101 defines "Delivery Point" as "inlet flange of the measurement facilities of Rover Pipeline, LLC, located at or near the tailgate of the [ETC Revolution I cryogenic processing] Plant" in Washington County. (ITC-101 at 6).

113.   ITC-102 is "coterminous with" ITC-101. (ITC-102 at 2).

## II.   ITC-101 and the Revolution Explosion

114.   Under ITC-101, the "In-Service Date" is defined as "[t]he first Day of the Month following the Day on which the LP-Galaxy Gathering . . . , Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are <u>completed and placed in commercial service . . . .</u>" (ITC-101 at 3) (emphasis added).

115.   ETC also agreed to an outside date by which the Revolution System would be completed and placed "in commercial service." That "Guaranteed In-Service Date" was January 1, 2019. (ITC-101 at 2). If ETC failed to meet the "Guaranteed In-Service Date," EdgeMarc had an express right to "terminate this ITC upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5).

22

116.   ETC's buildout of the Revolution System was marked by delays and problems. For example:

a.   In a consent agreement and order from summer 2018, Energy Transfer "was fined and cited for a series of erosion events" that took place about a mile from the site of the Revolution Explosion;[10]

b.   Between September 2018 and January 2019, DEP inspections of pipeline on the Revolution System revealed that ETC had committed approximately 200 "erosion and sediment control" violations, "site stabilization-temporary stabilization" violations, and "general requirements" violations related to failure to meet erosion and sediment best management practices;[11]

c.   In October 2018, the DEP concluded that ETC had "[f]ail[ed] to implement or maintain effective erosion and sediment control best management practices, as required by [Pennsylvania Code], that minimize the potential for accelerated erosion and sedimentation . . . ."  (Exhibit C (October 2018 DEP Order).)

117.   On September 10, 2018, because of ETC's continued and well-documented failure to implement necessary erosion and sedimentation control measures, a segment of pipeline on the Revolution System in Beaver County slipped down a hill, ruptured, and exploded.

---

[10] Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast*, PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

[11] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleSite.aspx?SiteID=817832) (emphasis added) (last visited February 17, 2019).

118.     Rather than working to remediate the problems and bring the Revolution System into "commercial service," ETC contrived two notices on the day of the Revolution Explosion: the first notice asserted that the Revolution System had been placed "in commercial service" on September 9, 2018, while the second notice asserted that the Revolution Explosion constituted a "Force Majeure" under Section 16.1 of the Gathering and Processing Agreement.  (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

119.     In support of its factually inaccurate position that the Revolution System had been placed "in commercial service" mere hours before it exploded, ETC later issued invoices to EdgeMarc under ITC-101 – as if the Revolution Explosion never happened – for certain natural gas that was never gathered, processed, or delivered under ITC-101.  More to the point, prior to the Revolution Explosion, ETC had issued such invoices under a separate billing arrangement.

120.     Notwithstanding ETC's post-explosion efforts to assert that the Revolution System was in "commercial service" as of September 9, 2018 for purposes of ITC-101, the system was not "in commercial service" as of that date (nor has it ever been "in commercial service") for at least three reasons.

121.     First, for the Revolution System to be in commercial service, all portions of it – including the "Delivery Point" – needed to be in commercial service.  However, ETC needed to receive authorization from the Federal Energy Regulatory Commission ("FERC") to place the Revolution Delivery Point in commercial service, and ETC had not received that authorization on September 9 or September 10, 2018.  In fact, publicly available information from FERC makes clear that the Revolution Delivery Point was not in service until October 12, 2018, a full five weeks after the September 10, 2018 Revolution Explosion and ETC's purported "in

24

commercial service" date of September 9, 2018.  (Exhibit E (Letter from Rover Pipeline LLC to FERC, dated October 15, 2018).)

122.    Second, the Revolution System also could not be in commercial service until it underwent a multi-step commissioning process, which can take weeks to complete.  As of September 9, 2018, ETC and EdgeMarc had only just begun this commissioning process.  As part of this commissioning process, ETC agreed to purchase limited volumes of natural gas to "purge and pack" the Revolution System.  Upon information and belief, the purge and pack process was not complete at the time of the Revolution Explosion, and even if that step were complete, it *by definition did not involve the gathering, processing, and delivering of EdgeMarc's gas*.

123.    Third, and relatedly, the Revolution System could not have been in commercial service as of September 9, 2018 because none of EdgeMarc's natural gas was ever commercially available to its customers.

124.    ETC has asserted that the Revolution Explosion constituted an act of God, and that ETC's failure to perform under ITC-101 and the Gathering and Processing Agreement is cured by section 16.1 of the Gathering and Processing Agreement.  That provision provides that "[u]nless expressly provided otherwise in this Agreement, no Party shall be liable to any other Party for failure to perform any of its obligations under this Agreement, other than to make payments due, to the extent that and for the period during which such performance is hindered, delayed or prevented by Force Majeure." (Gathering and Processing Agreement at § 16.1).

125.    The Gathering and Processing Agreement defines a "Force Majeure" as one of a series of events "beyond the reasonable control" of the party seeking to invoke the provision:

> [C]auses, conditions, events or circumstances which are ***beyond the reasonable control of the party claiming Force Majeure*** [and] shall include, without limitation, ***to the extent beyond the reasonable control of the Party claiming Force Majeure***, acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, acts of nature, industrial disturbances, acts of the public enemy, acts of terrorism, sabotage, blockades, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, or blockages of lines of pipe not due to lack of maintenance, extraordinary operating conditions on [ETC's], [EdgeMarc's] or [EdgeMarc's] facilities or on those of any Downstream Transporter or NGL pipeline, Force Majeure events on any Downstream Transporter or NGL pipeline, inability of any Party to obtain necessary machinery, materials, permits, refusal of one or more landowners to provide necessary easements or rights-of-way, freezing of any well or delivery facility, well blowout, cratering, the partial or entire failure of a well and the act, order, rule or regulation of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement, ***and any other causes whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension***.

(Gathering and Processing Agreement at § 16.1) (emphasis added).

126.    ETC implemented inadequate erosion and sediment control measures while constructing the Revolution System, had been cited for an unusually high number of permit violations, and had knowingly failed to report to state regulators that there had been landslides and erosion from the pipeline's construction.  Under these circumstances, the Revolution Explosion was not "beyond the reasonable control" of ETC and thus did not constitute a Force Majeure.

127.    Section 16.1 of the Gathering and Processing Agreement also provides that "no Party shall be entitled to the benefits of this Section 16.1 to the extent the event of Force Majeure

is caused or affected by any or all of the following circumstances . . . *the Party claiming excuse failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch.*" (Gathering and Processing Agreement at § 16.1) (emphasis added). ETC was not entitled to rely on the Force Majeure provision because it failed to "remedy the condition" and failed to resume performance "with reasonable dispatch."

128. The Gathering and Processing Agreement also required that "[a] Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure . . . ." (Gathering and Processing Agreement at § 16.3). However, ETC's efforts have been anything but commercially reasonable; the restoration period for the affected pipeline could exceed twelve months, even though ETC's initial estimate was six to eight weeks.

### III. Shipping and Processing Requirements Under ITC-101

129. ETC was obligated to "accept . . . on a Firm basis those daily quantities" of natural gas set forth in ITC-101. (Gathering and Processing Agreement at § 6.3). For example, for the period between November 1, 2018 and April 30, 2019, ETC was obligated to accept 65,000 Mcfd of natural gas from EdgeMarc. (ITC-101 at 4).

130. ETC's obligation to accept the required quantities of natural gas from EdgeMarc under ITC-101 until the January 29, 2019 termination of ITC-101 was not excused by the Revolution Explosion because that was not a Force Majeure event.

### IV. Termination of ITC-101

131. Because ETC failed to meet the "Guaranteed In-Service Date" of January 1, 2019, EdgeMarc was entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5).

132.    Accordingly, on January 29, 2019, EdgeMarc provided written notice to ETC that it was terminating ITC-101 "effective January 29, 2019" under ITC-101's provision for "Failure to Meet Guaranteed In-Service Date." (Exhibit F (notice terminating ITC-101 and ITC-102).) Likewise, ITC-102 "terminated by operation of contract because it is expressly coterminous with ITC-101." *Id.*

133.    Despite the termination of ITC-101 and ITC-102 on January 29, 2019, the Gathering and Processing Agreement remained fully effective. Under the Gathering and Processing Agreement, EdgeMarc is entitled to "submit Nominations . . . for the gathering of Gas hereunder to [ETC]." (Gathering and Processing Agreement at § 6.4).

134.    Accordingly, on January 30, 2019, EdgeMarc submitted Nominations for the quantity of natural gas that it expected to deliver to ETC for the month of February 2019. Despite its obligation to gather and process that gas pursuant to the Gathering and Processing Agreement, ETC refused to do so. (Exhibit G (January 30, 2019 Nomination); Exhibit H (January 30, 2019 refusal to accept Nomination).)

**FIRST COUNTERCLAIM**
**Breach of Contract – ITC-101 and Gathering and Processing Agreement**

135.    EdgeMarc incorporates Paragraphs 85 through 134 as though fully set forth herein.

136.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

137.    EdgeMarc and ETC were parties to ITC-101, which was part of and subject to the Gathering and Processing Agreement, and which was validly terminated by EdgeMarc on January 29, 2019.

138.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019.

139.    ETC also breached its obligations under ITC-101 and the Gathering and Processing Agreement by failing to gather and deliver EdgeMarc's gas. The Gathering and Processing Agreement provides that "[ETC] agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of [EdgeMarc]'s Gas as set forth in any [ITC] . . . ." (Gathering and Processing Agreement at § 6.3). ETC failed to accept the required quantities of EdgeMarc's natural gas and its performance was not excused by Force Majeure.

140.    As a result of the breaches by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

### SECOND COUNTERCLAIM
**Breach of Contract – Gathering and Processing Agreement**

141.    EdgeMarc incorporates Paragraphs 85 through 140 as though fully set forth herein.

142.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

143.    ETC breached its obligations under the Gathering and Processing Agreement by failing to accept EdgeMarc's Nominations for natural gas for February 2019 and for subsequent periods.

144.    As a result of the breach by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

29

## THIRD COUNTERCLAIM
### Declaratory Judgment

145.    EdgeMarc incorporates Paragraphs 85 through 144 as though fully set forth herein.

146.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

147.    EdgeMarc and ETC were parties to ITC-101 and ITC-102, which were part of and subject to the Gathering and Processing Agreement.

148.    EdgeMarc and ETC have a dispute regarding their rights and obligations under the Agreements.

149.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019. EdgeMarc was therefore entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5). On January 29, 2019, EdgeMarc validly terminated ITC-101 and ITC-102 by written notice to ETC.

150.    ETC has expressly asserted that ITC-101 and ITC-102 remain in force.

151.    On various dates through and including February 22, 2019, ETC issued invoices to EdgeMarc under ITC-101 for certain natural gas that was never gathered, processed, or delivered under ITC-101.

152.    EdgeMarc has expressly disputed such invoices.

WHEREFORE, EdgeMarc seeks a judgment: (1) declaring that EdgeMarc validly terminated ITC-101 and ITC-102 effective January 29, 2019; and (2) declaring that the invoices issued by ETC on various dates through and including February 22, 2019 – including those purportedly issued under ITC-101 – were not properly issued and/or that EdgeMarc rightfully withheld payment on such invoices following ETC's nonperformance under the Agreements.

### PRAYER FOR RELIEF

**WHEREFORE**, EdgeMarc demands judgment against ETC as follows:

a) Dismissing the Complaint against it with prejudice;

b) Awarding EdgeMarc damages in excess of the arbitration jurisdictional limits of the Court, in an amount to be determined;

c) Pre-judgment and post-judgment interest;

d) Equitable relief, including a preliminary and permanent injunction;

e) Declaratory relief;

f) Awarding attorneys' fees and costs; and

g) Granting such other legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 27, 2019

*/s/ Megan S. Haines*
Megan S. Haines
McGuireWoods, LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
Phone: 412.667.6000
Fax: 412.667.6050
mhaines@mcguirewoods.com

31

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4351
lara.buchwald@davispolk.com
(Motion for Admission *Pro Hac Vice*
forthcoming)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer, New Matter and Counterclaim has been served on counsel of record for Plaintiff by e-mail and first class mail delivery on this 27th day of February 2019, addressed as follows:

Stuart H. Sostmann, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

*/s/ Megan S. Haines*