**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| EDGEMARC ENERGY HOLDINGS, LLC, *et al.*, | Case No. 19-11104-JTD |
| *Debtors*. | |
| GSCP VI EDGEMARC HOLDINGS, L.L.C., GSCP VI PARALLEL EDGEMARC HOLDINGS, L.L.C., WSEP AND BRIDGE 2012 EDGEMARC HOLDINGS, L.L.C., and EM HOLDCO LLC, | Adv. Pro. No. 19-50269-JTD |
| *Plaintiffs*, | |
| v. | **Re: Adv. D.I. 9** |
| ETC NORTHEAST PIPELINE, LLC, | |
| *Defendant*. | |

**EQUITY OWNERS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>ENERGY TRANSFER'S MOTION TO DISMISS</u>**

Emil A. Kleinhaus (*admitted pro hac vice*)
Carrie M. Reilly (*pro hac vice pending*)
S. Christopher Szczerban (*pro hac vice pending*)
Corey J. Banks (*pro hac vice pending*)
Michael H. Cassel (*admitted pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
EAKleinhaus@wlrk.com
CMReilly@wlrk.com
SCSzczerban@wlrk.com
CJBanks@wlrk.com
MHCassel@wlrk.com

Dated: July 30, 2019

Patrick A. Jackson (Del. Bar No. 4976)
DRINKER BIDDLE & REATH LLP
222 Delaware Ave., Suite 1410
Wilmington, Delaware 19801-1621
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Email: Patrick.Jackson@dbr.com

*Attorneys for Plaintiffs GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C., and EM Holdco LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ...............................................3

SUMMARY OF ARGUMENT ................................................................................3

STATEMENT OF THE CASE..................................................................................3

      A.    The parties' relationships. ..................................................................3

      B.    Energy Transfer induces the Equity Owners to invest in EdgeMarc PA...........................................................................4

      C.    The 2017 agreements. ........................................................................5

      D.    Energy Transfer certifies that there are no Project Delays and the Equity Owners invest $100 million more in EdgeMarc...........................................................................6

      E.    Energy Transfer's Gathering System ruptures and explodes. ...................................................................7

ARGUMENT .............................................................................................................7

    I.    THE EQUITY OWNERS HAVE STANDING TO ASSERT THEIR CLAIMS. .....................................................7

      A.    The Equity Owners have direct standing under state law.............................7

      B.    Contrary to Energy Transfer's assertion, federal case law confirms that the Equity Owners have direct standing. ..............................11

    II.    THE COURT SHOULD ABSTAIN FROM CONSIDERING THE BALANCE OF ENERGY TRANSFER'S MOTION. ...................................................14

    III.    THE "SOLE AND EXCLUSIVE REMEDY FOR THE FAILURE OF ANY OF THE CONDITIONS" PROVISION DOES NOT BAR THE EQUITY OWNERS' BREACH OF CONTRACT CLAIMS.........................................................15

      A.    New York contract principles .................................................15

B.  Energy Transfer's interpretation is inconsistent with the language and structure of the agreements. ...................................................16

C.  Energy Transfer's interpretation is commercially unreasonable and inconsistent with the purpose of the contract. ..................................................................................................20

D.  Even if Energy Transfer's interpretation were correct, the remedy provision would not be enforceable. ......................................22

IV.  THE EQUITY OWNERS PLEAD A VIABLE UNJUST ENRICHMENT CLAIM.........................................................................23

A.  The Equity Owners' unjust enrichment claim may be pursued alongside the breach of contract claim. ........................................24

B.  The Complaint pleads that Energy Transfer was unjustly enriched. ..............................................................................................25

V.  THE EQUITY OWNERS PLEAD A VIABLE NEGLIGENT MISREPRESENTATION CLAIM...........................................................................................................26

A.  The negligent misrepresentation claim is governed by Pennsylvania law. ......................................................................27

B.  The Equity Owners state a negligent misrepresentation claim under Pennsylvania law. ................................................27

C.  The Equity Owners state a negligent misrepresentation claim to the extent New York law applies. ................................29

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

Page

**Cases**

*101123 LLC* v. *Solis Realty LLC*,
   23 A.D.3d 107 (1st Dep't 2005) ................................................................. 17 n.7

*Abacus Fed. Sav. Bank* v. *ADT Sec. Servs., Inc.*,
   967 N.E.2d 666 (N.Y, 2012) ..................................................................... 23

*ACE Sec. Corp.* v. *DB Structured Prods., Inc.*,
   36 N.E.3d 623 (N.Y. 2015) ...................................................................... 19

*Adams* v. *Suozzi*,
   433 F.3d 220 (2d Cir. 2005) .................................................................... 21

*Allstate Ins. Co.* v. *Lyons*,
   843 F. Supp. 2d 358 (E.D.N.Y. 2012) ........................................................ 24

*Almah LLC* v. *AIG Emp. Servs., Inc.*,
   157 A.D.3d 416 (1st Dep't 2018) ............................................................ 15-16

*Am. Tel. & Util. Consultants, Inc.* v. *Beth Israel Med. Ctr.*,
   307 A.D.2d 834 (1st Dep't 2003) .............................................................. 25

*Ambac Assurance Corp.* v. *EMC Mortg. LLC*,
   121 A.D.3d 514 (1st Dep't 2014) .............................................................. 20

*Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB*,
   920 F. Supp. 2d 475 (S.D.N.Y. 2013) ........................................................ 22

*Baxter Diagnostics, Inc.* v. *Novatek Med., Inc.*,
   1998 WL 665138 (S.D.N.Y. Sept. 25, 1998) ............................................... 18

*Bayerische Landesbank, N.Y. Branch* v. *Aladdin Capital Mgmt. LLC*,
   692 F.3d 42 (2d Cir. 2012) ...................................................................... 15

*Bear Stearns Mortg. Funding Tr. 2006-SL1* v. *EMG Mortg. LLC*,
   2015 WL 139731 (Del. Ch. Jan. 12, 2015) ................................................. 22

*Bilt-Rite Contractors, Inc.* v. *The Architectural Studio*,
   866 A.2d 270 (Pa. 2005) ........................................................................ 28

*Blue Cross of Cent. N.Y., Inc.* v. *Wheeler*,
   93 A.D.2d 995 (4th Dep't 1983) .............................................................. 24, 25

*Burton* v. *Iyogi, Inc.*,
  2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015)........................................................ 24

*Butner* v. *United States*,
  440 U.S. 48 (1979) ................................................................................................ 8

*Chevron Corp.* v. *Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012) .................................................................. 26

*Citigroup Inc.* v. *AHW Investment P'ship*,
  140 A.3d 1125 (Del. 2016)....................................................................... 8, 10, 11

*Cooney* v. *Osgood Mach., Inc.*,
  612 N.E.2d 277 (N.Y. 1993) ................................................................................ 27

*Debussy LLC* v. *Deutsche Bank AG*,
  242 F. App'x 735 (2d Cir. 2007)........................................................................... 11

*Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1* v. *DB Structured Prods., Inc.*,
  958 F. Supp. 2d 488 (S.D.N.Y. 2013) .................................................................. 18

*Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1* v. *Morgan Stanley
  Mortg. Capital Holdings LLC*,
  289 F. Supp. 3d 484 (S.D.N.Y. 2018) ............................................................ 22, 23

*Deutsche Lufthansa AG* v. *The Boeing Co.*,
  2006 WL 3155273 (S.D.N.Y. Oct. 30, 2006) ...................................................... 20

*Durkey* v. *Pac. Life Ins. Co.*,
  2017 WL 8941225 (W.D. Pa. Aug. 4, 2017)........................................................ 28

*Empire Props. Corp.* v. *Mfrs. Tr. Co.*,
  343 N.E.2d 25 (N.Y. 1942) .................................................................................. 21

*Eternity Glob. Master Fund* v. *Morgan Guar. Tr. Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ................................................................................. 16

*Glencore Ltd.* v. *Degussa Engineered Carbons L.P.*,
  848 F. Supp. 2d 410 (S.D.N.Y. 2012) .................................................................. 21

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V.* v. *AT & T Commc'ns, Inc.*,
  1996 WL 312535 (S.D.N.Y. June 10, 1996) ........................................................ 30

*HB Gen. Corp.* v. *Manchester Partners, L.P.*,
  95 F.3d 1185 (3d Cir. 1996) ........................................................................... 11 n.3

*Hercules Mgmts. Ltd.* v. *Ernst & Young*,
  [1997] 2 S.C.R. 165 (Can.)............................................................................ 30 n.10

*Hoover* v. *HSBC Mortg. Corp. (USA)*,
   9 F. Supp. 3d 223 (N.D.N.Y. 2014) ................................................................. 24

*In re Bernard L. Madoff Inv. Sec. LLC*,
   721 F.3d 54 (2d Cir. 2013) .......................................................................... 12

*In re Bernard L. Madoff Inv. Sec., LLC*,
   2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013) ......................................... 14

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014) ...................................................................... 13 n.5

*In re CD Liquidation Co.*,
   462 B.R. 124 (Bankr. D. Del. 2011) ................................................................. 8

*In re G-I Holdings, Inc.*,
   755 F.3d 195 (3d Cir. 2014) ......................................................................... 13

*In re Granite Partners, L.P.*,
   194 B.R. 318 (Bankr. S.D.N.Y. 1996) ...................................................... 12-13

*In re Hawker Beechcraft, Inc.*,
   486 B.R. 264 (Bankr. S.D.N.Y. 2013)……………………………………… ................ 17 n.8

*In re JMO Wind Down, Inc.*,
   2018 WL 1792185 (Bankr. D. Del. Apr. 13, 2018) ........................................... 2 n.1

*In re REFCO Inc. Sec. Litig.*,
   2010 WL 1375946 (S.D.N.Y. Feb. 3, 2010) ................................................ 13, 14

*In re Reliance Sec. Litig.*,
   135 F. Supp. 2d 480 (D. Del. 2001) ................................................................. 13

*In re Ressler*,
   597 F. App'x 131 (3d Cir. 2015) ...................................................................... 8

*In re SemCrude, L.P.*,
   796 F.3d 310 (3d Cir. 2015) ......................................................................... 7-8

*In re Seven Seas Petroleum, Inc.*,
   522 F.3d 575 (5th Cir. 2008) .................................................................... 12, 14

*In re Soundview Elite Ltd.*,
   565 B.R. 534 (Bankr. S.D.N.Y. 2017) ............................................................. 12

*In re Touch Am. Holdings, Inc.*,
   401 B.R. 107 (Bankr. D. Del. 2009) ............................................................ 2 n.1

*In re Vivendi Universal, S.A.*,
  2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) .......................................................................... 30

*Integrated Sols., Inc.* v. *Serv. Support Specialties, Inc.*,
  124 F.3d 487 (3d Cir. 1997)…………………………………………….................... 12 n.4

*JA Apparel Corp.* v. *Abboud*,
  568 F.3d 390 (2d Cir. 2009) ................................................................................................. 15

*Joseph* v. *Mobileye N.V.*,
  225 F. Supp. 3d 210 (S.D.N.Y. 2016) ...............................................................................29-30

*Joseph Sternberg, Inc.* v. *Walber 36th St. Assocs.*,
  187 A.D.2d 225 (1st Dep't 1993) ......................................................................................... 24

*Kaye* v. *Grossman*,
  202 F.3d 611 (2d Cir. 2000) ................................................................................................. 26

*Kemi, Inc.* v. *Berlitz Int'l, Inc.*,
  228 A.D.2d 281 (1st Dep't 1996) ......................................................................................... 18

*Kimmell* v. *Schaefer*,
  675 N.E.2d 450 (N.Y. 1996) ................................................................................................. 29

*Landmark Ventures, Inc.* v. *Wave Sys. Corp.*,
  2012 WL 3822624 (S.D.N.Y. Sept. 4, 2012) ........................................................................ 21

*LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005) ................................................................................................. 21

*LBBW Luxemburg S.A.* v. *Wells Fargo Securities LLC*,
  10 F. Supp. 3d 504 (S.D.N.Y. 2014) .................................................................................... 29

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
  739 F.3d 45 (2d Cir. 2013) ................................................................................................... 27

*Lockheed Martin Corp.* v. *Retail Holdings, N.V.*,
  639 F.3d 63 (2d Cir. 2011) ................................................................................................... 15

*Mandarin Trading Ltd.* v. *Wildenstein*,
  944 N.E.2d 1104 (N.Y. 2011) ............................................................................................... 23

*McElwee Grp., LLC* v. *Mun. Auth. of Borough of Elverson*,
  476 F. Supp. 2d 472 (E.D. Pa. 2007) .................................................................................... 28

*Moran* v. *Standard Oil Co. of N.Y.*,
  105 N.E. 217 (N.Y. 1914) ..................................................................................................... 21

*NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*,
    118 A.3d 175 (Del. 2015)................................................................... passim

*NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*,
    772 F.3d 740 (2d Cir. 2014) ........................................................... 8

*Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*,
    273 F. Supp. 2d 436 (S.D.N.Y. 2003) ...........................................24-25

*Padula* v. *Lilarn Props. Corp.*,
    644 N.E.2d 1001 (N.Y. 1994) ........................................................ 27

*Perfect Dental, PLLC* v. *Allstate Ins. Co.*,
    2006 WL 2552171 (E.D.N.Y. Aug. 31, 2006) ................................ 25

*Phillips* v. *Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)........................................................... 23

*Plavin* v. *Grp. Health Inc.*,
    323 F. Supp. 3d 684 (M.D. Pa. 2018) ........................................... 26 n.9

*R.* v. *Imperial Tobacco Can. Ltd.*,
    [2011] 3 S.C.R. 45 (Can.).............................................................. 30 n.10

*Sanford* v. *Brown Bros. Co.*,
    134 A.D. 652 (2d Dep't 1909) ....................................................... 18

*Sehoy Energy LP* v. *Haven Real Estate Grp., LLC*,
    2017 WL 1380619 (Del. Ch. Apr. 17, 2017) ................................ 10-11

*S.E.S. Imps., Inc.* v. *Pappalardo*,
    425 N.E.2d 841 (N.Y. 1981)…………………………………… ................... 17 n.7

*Sommer* v. *Fed. Signal Corp.*,
    593 N.E.2d 1365 (N.Y. 1992) ........................................................ 23

*St. Paul Fire & Marine Ins. Co.* v. *PepsiCo, Inc.*,
    884 F.2d 688 (2d Cir. 1989)........................................................... 12

*Stanford* v. *Brown Bros.*,
    101 N.E. 797 (N.Y. 1913) .............................................................. 22

*Starr Found.* v. *Am. Int'l Grp., Inc.*,
    476 A.D.3d 25 (1st Dep't 2010),.................................................... 10

*Steinbeck* v. *Steinbeck Heritage Found.*,
    400 F. App'x 572 (2d Cir. 2010)................................................... 26

*Stendig Inc.* v. *Thom Rock Realty Co.*,
    163 A.D.2d 46 (1st Dep't 1990)………………………………………… .......................... 17

*Telerep, LLC* v. *U.S. Int'l Media, LLC*,
    74 A.D.3d 401 (1st Dep't 2010) ...................................................................................... 16

*Tomoka Re Holdings, Inc.* v. *Loughlin*,
    2004 WL 1118178 (S.D.N.Y. May 19, 2004) .......................................................... 29

*Tooley* v. *Donaldson, Lufkin & Jenrette*, *Inc.*,
    845 A.2d 1031 (Del. 2004) ........................................................................................... 8-9

*Town of Tonawanda* v. *Stapell, Mumm & Beals Corp.*,
    240 A.D. 472 (4th Dep't 1934) ...................................................................................... 18

*Tran* v. *Metro. Life Ins. Co.*,
    408 F.3d 130 (3d Cir. 2005) .......................................................................................... 28

*Van Dusen* v. *Barrack*,
    376 U.S. 612 (1964) ....................................................................................................... 27

## Statutes

28 U.S.C. § 1334(c) ............................................................................................................... 14

## Other Authorities

13 Williston on Contracts § 38:15 (4th ed. 1990) ................................................................ 17 n.8

Restatement (Second) of Contracts § 225 cmt. d (1981) ...................................................... 17 n.8

Restatement (Second) of Torts § 552(1) (1977) ..................................................................... 28

## PRELIMINARY STATEMENT

This is a state-law contract and tort dispute between non-debtors. The plaintiffs — investment companies affiliated with Goldman Sachs & Co. LLC or the Ontario Teachers' Pension Plan Board (the "Equity Owners") — are equity owners of the debtor, EdgeMarc Energy Holdings, LLC ("EdgeMarc"). The defendant — ETC Northeast Pipeline, LLC ("Energy Transfer") — is an energy company that designs, builds and operates pipelines. Energy Transfer made contractual certifications and other representations *directly* to the Equity Owners relating to a gathering system (the "Gathering System") that Energy Transfer committed to build in Pennsylvania. This lawsuit is predicated on those *direct* representations, and seeks redress — under theories of breach of contract, unjust enrichment and negligent misrepresentation — for the harms that Energy Transfer caused to the Equity Owners.

The crux of the Complaint is that Energy Transfer, through numerous representations, induced the Equity Owners to commit new capital to EdgeMarc so that EdgeMarc would be able to transport gas through Energy Transfer's pipeline. Specifically, in Equity Commitment Agreements (the "Commitment Agreements"), Energy Transfer agreed to certify to the Equity Owners that there was no delay in the development, construction, or completion of Energy Transfer's Gathering System. In reliance on three separate certifications, the Equity Owners funded $100 million of new equity financing. The Equity Owners also funded an additional $50 million based on separate direct assurances from Energy Transfer that the system would be ready and operational by July 1, 2018. It is now clear, however, that *none* of the certifications — and *none* of the direct assurances — were true and accurate. As a result, the Equity Owners have suffered significant damages, including the $150 million and additional losses resulting from their decision to deploy capital in Pennsylvania rather than in Ohio, where EdgeMarc has a separate subsidiary with other properties and operations.

In its motion to dismiss, Energy Transfer argues that the Equity Owners lack standing to bring this suit because their claims are derivative of injuries suffered by EdgeMarc. Energy Transfer is wrong. Under Delaware law, equity investors are entitled to assert *direct* claims against a defendant that breached a contract with them or made misrepresentations to them, even if the investors seek damages for (among other things) the depreciation in their equity value.

Assuming the Court decides, as it should, that the causes of action in the Complaint are *not* property of the EdgeMarc estate, the Court should abstain from adjudicating the balance of Energy Transfer's motion and remand this action to New York state court, for the reasons set forth in the motion for abstention and remand filed concurrently with this brief.[1]

If the Court retains this matter rather than remanding, it should deny the balance of Energy Transfer's motion. As shown below, there is no basis to dismiss the Equity Owners' contract claims based on the contractual provision stating that the Equity Owners' sole remedy for "failure of any of the conditions" to funding was to delay that funding or to terminate the agreement. Energy Transfer appears to be arguing that, as soon as the Equity Owners funded their commitments based on Energy Transfer's certifications, they were deprived of any contract claim against Energy Transfer — even though the certifications were *false*. This absurd result is not supported by the contractual language or by principles of contract construction. Energy Transfer's arguments for dismissal of the tort claims also fail. The Equity Owners have pleaded valid claims for unjust enrichment and negligent misrepresentation, which are not duplicative of the contract claims and in any event may be pursued as alternatives to the contract claims.

---

[1]     As Judge Shannon explained in *In re JMO Wind Down, Inc.*, this Court has jurisdiction to decide whether causes of action are "property of the estate," including whether claims are direct or derivative in nature. 2018 WL 1792185, at *5-6 (Bankr. D. Del. Apr. 13, 2018); *accord, e.g.*, *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 117 (Bankr. D. Del. 2009). However, after that decision is made, abstention and remand should follow.

## NATURE AND STAGE OF THE PROCEEDINGS

On May 14, 2019, the Equity Owners commenced this action against Energy Transfer in the Commercial Division of the Supreme Court of the State of New York, New York County. On May 15, 2019, EdgeMarc and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.  On June 4, 2019, Energy Transfer removed this action to the Bankruptcy Court for the Southern District of New York.  D.I. 1.  On June 11, 2019, Energy Transfer moved to transfer the action to this Court and to dismiss the action.  D.I. 5, 9.  On July 1, 2019, this action was transferred to this Court pursuant to a stipulation.  D.I. 26, 27.

## SUMMARY OF ARGUMENT

1.      The Equity Owners have standing to pursue their direct claims.  *See* Point I, *infra*.

2.      Upon determining that the Equity Owners have standing, the Court should abstain from adjudicating the balance of Energy Transfer's motion and remand this action to New York state court.  *See* Point II, *infra*.

3.      The Commitment Agreements do not prevent the Equity Owners from pursuing a damages claim based on Energy Transfer's breaches of contract.  *See* Point III, *infra*.

4.       The Equity Owners have properly pled an unjust enrichment claim.  *See* Point IV, *infra*.

5.      The Equity Owners have properly pled a negligent misrepresentation claim.  *See* Point V, *infra*.

## STATEMENT OF THE CASE

**A.      The parties' relationships.**

The Equity Owners collectively invested approximately $850 million in debtor EdgeMarc.  Compl. ¶¶ 1, 26, D.I. 1, Ex. A.  Three of the Equity Owners are affiliated with

investment funds managed by Goldman Sachs & Co. LLC.  *Id.* ¶ 18.  The fourth Equity Owner is owned by the Ontario Teachers' Pension Plan Board.  *Id.* ¶ 19.

Since its founding, EdgeMarc has acquired lease interests in over 39,000 acres in Pennsylvania and Ohio for the purpose of extracting natural gas.  *Id.* ¶ 27.  To deliver its natural gas to purchasers outside those areas, EdgeMarc entered into long-haul "take or pay" delivery contracts with pipeline operators.  *Id.* ¶¶ 29-30.  These long-haul contracts obligate EdgeMarc to pay millions of dollars every month to reserve pipeline capacity, regardless of whether it actually delivers any gas to those pipelines.  *Id.* ¶¶ 30-31.

On April 17, 2015, Energy Transfer and EdgeMarc's Pennsylvania subsidiary, debtor EM Energy Pennsylvania, LLC ("EdgeMarc PA"), entered into three contracts:  a Gathering and Processing Agreement and two Individual Transaction Confirmations (collectively, the "2015 Agreements").  *Id.* ¶¶ 28, 33.  In those agreements, Energy Transfer agreed to gather, process and transport EdgeMarc PA's natural gas located in Butler County, Pennsylvania, using a gathering system that it was to construct, own and operate.  *Id.* ¶ 33.

**B.**    **Energy Transfer induces the Equity Owners to invest in EdgeMarc PA.**

Although the 2015 Agreements had a scheduled term of at least 20 years, by 2016, a sustained downturn in the oil and gas market rendered the agreements unprofitable.  *Id.* ¶¶ 33-34. EdgeMarc and the Equity Owners had two options:  abandon EdgeMarc's Pennsylvania assets in favor of those in Ohio, or renegotiate EdgeMarc's rate and volume commitments with Energy Transfer in Pennsylvania.  *Id.* ¶ 35.

Although development in Ohio was financially promising, the Equity Owners pursued the Pennsylvania option based on Energy Transfer's assurances that it would be able to construct and complete the Gathering System and place it into commercial service by July 1, 2018.  *Id.* ¶¶ 37-38.  These assurances included representations by one of Energy Transfer's lead negotiators to

representatives of the Equity Owners in August 2017 that the Gathering System would be completed by January 2018 and be ready to be put in service by July 1, 2018. *Id.* ¶ 38. Timely completion of the Gathering System was a principal point of focus during the negotiations. *Id.* ¶ 39. Based on Energy Transfer's assurances, the Equity Owners invested $50 million in EdgeMarc right away to fund development of the Pennsylvania wells. *Id.* ¶¶ 2-3, 49.

**C.    The 2017 agreements.**

On November 13, 2017, Energy Transfer and EdgeMarc PA entered into an amended Gathering and Processing Agreement (the "GPA") and two amended Individual Transaction Confirmations (the "ITCs"). *Id.* ¶ 40. Under those agreements, Energy Transfer committed to build the Gathering System and to gather, process, and ship EdgeMarc's natural gas. *Id.* ¶ 41. The GPA included a Force Majeure provision and obligated Energy Transfer to "'act in accordance with' any and all 'laws, rules, regulations'" with respect to its Gathering System. *Id.* ¶¶ 46, 47. *See* Jackson Decl., Ex. A (GPA), Exs. B, C (ITCs).

At the same time the GPA and ITCs were executed, the Equity Owners entered into Commitment Agreements with Energy Transfer and EdgeMarc to commit a total of $100 million of new equity to EdgeMarc to support its operations in Butler County and drill new wells there to ensure that gas (and revenues) would flow through Energy Transfer's system. Compl. ¶¶ 49-50; Metz Decl. Exs. N, O (Commitment Agreements), D.I. 11-1. A key Energy Transfer negotiator stated at the time that Energy Transfer's "number one priority" was to ensure "that the [Equity Owners] invest an additional $100 million and [EdgeMarc] invests an additional $50 million in Butler." Compl. ¶ 49.

The parties' primary obligations were set forth in Section 2 of the Commitment Agreements. Section 2(a) provided that the Equity Owners would make three equal payments (each, a "Commitment") totaling $100 million on specified "Commitment Date[s]," which would

be extended under the contract if there was any Project Delay (defined below) or if any of the conditions to funding were not satisfied. *Id.* ¶ 51.  Section 2(b) obligated Energy Transfer to provide the Equity Owners and EdgeMarc PA with a "Project Status Notice" prior to each "Commitment Date" certifying whether there had occurred a "Project Delay," defined to mean "any delay in the development, construction, or completion of the Gathering System described in ITC-101 that will delay the In-Service Date beyond July 1, 2018."  Metz Decl., Exs. N, O § 2.  It also required Energy Transfer to provide prompt notice of any event reasonably likely to cause a delay in the "In-Service Date" of the Gathering System.  Compl. ¶¶ 52, 53.  The "In-Service Date" was defined as the "first Day of the Month following the Day on which" the Gathering System was "completed and placed in commercial service." *Id.* ¶ 44.

Section 3 of the Commitment Agreements set out the conditions precedent to the Equity Owners' funding obligations as of each Commitment Date: *first*, that no notices of Force Majeure had been issued and not withdrawn; and *second*, that Energy Transfer had not committed any uncured material breach of the Commitment Agreements, the GPA, or the ITCs. *Id.* ¶ 54.  If either condition was not satisfied, the relevant Commitment Date would be "extended until the date that is 10 business days following the date on which all such conditions are satisfied" and "each subsequent Commitment Date [would be] extended by a corresponding number of days," until January 1, 2019, the drop-dead date in the contract. *Id.* ¶¶ 55-56.

**D.    Energy Transfer certifies that there are no Project Delays and the Equity Owners invest $100 million more in EdgeMarc.**

Energy Transfer delivered Project Status Notices to the Equity Owners on January 18, 2018; March 2, 2018; and April 16, 2018. *Id.* ¶¶ 57-58.  In each instance, Energy Transfer certified that there was no Project Delay. *Id.*  During this time, Energy Transfer also never notified the Equity Owners of any event reasonably likely to cause a delay in the July 1, 2018 In-

6

Service Date.  *Id.* ¶¶ 59, 61.  Relying on Energy Transfer's certifications, the Equity Owners funded three Commitments, each for $33.33 million.  *Id.* ¶¶ 57-58, 60.

> **E.**    **Energy Transfer's Gathering System ruptures and explodes.**

On the morning of September 10, 2018, following a heavy rainstorm, a slope failed in a landslide, and a portion of Energy Transfer's Gathering System ruptured.  *Id.* ¶ 62.  The resulting gas leak caused an explosion and flash fire that destroyed property, damaged power lines and displaced residents.  *Id.*  The same day, Energy Transfer notified EdgeMarc PA that an event of Force Majeure had occurred.  *Id.* ¶ 79.  Also on that day, Energy Transfer provided a separate notice to EdgeMarc PA stating that it had supposedly placed the Gathering System "into commercial service" on September 9, 2018 — *one day* before the explosion.  *Id.*

Both notices were false.  *Id.* ¶ 80.  It is now apparent that Energy Transfer's Gathering System had material design and/or construction flaws, was not compliant with applicable law, and was never ready for commercial service.  *Id.* ¶¶ 63-65, 76.  It is also now apparent that the certifications Energy Transfer provided to the Equity Owners regarding the Gathering System were not true or complete.  *Id.* ¶ 76.  Since the explosion, Pennsylvania regulators have cited Energy Transfer for hundreds of violations concerning the Gathering System, including problems with the project's design and construction.  *Id.* ¶¶ 66-71.  The violations were so egregious that the Governor of Pennsylvania publicly rebuked the company:  "There has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities."  *Id.* ¶ 72.

## ARGUMENT

**I.**    **THE EQUITY OWNERS HAVE STANDING TO ASSERT THEIR CLAIMS.**

> **A.**    **The Equity Owners have direct standing under state law.**

State law controls whether the claims alleged in the Complaint are derivative (and thus owned by EdgeMarc) or direct (and thus owned by the Equity Owners).  *See In re SemCrude,*

*L.P.*, 796 F.3d 310, 316 (3d Cir. 2015) ("[w]hether a claim is derivative or direct is a question of (state) law"); *see also Butner* v. *United States*, 440 U.S. 48, 55 (1979) ("[p]roperty interests are created and defined by state law" within bankruptcy). "To determine the derivative status of claims," the Court must "apply the law of the state of incorporation." *In re Ressler*, 597 F. App'x 131, 135 n.5 (3d Cir. 2015); *accord, e.g.*, *In re CD Liquidation Co.*, 462 B.R. 124, 131 (Bankr. D. Del. 2011). Here, therefore, Delaware law applies, because each of the debtors is a Delaware limited liability company. *See* D.I. 7-1 at 14.

Under Delaware law, the Equity Owners have direct standing to assert the claims alleged in the Complaint. Under controlling decisions of the Delaware Supreme Court — *NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015), and *Citigroup Inc.* v. *AHW Inv. P'ship*, 140 A.3d 1125, 1139 (Del. 2016) — the question of a claim's directness turns on whether the plaintiff has asserted "a claim belonging to her personally" under the law of the jurisdiction that created the claim. *NAF Holdings*, 118 A.3d at 180. Applying that standard, the Delaware Supreme Court has twice held that claims brought under New York law "belong" to equity investors where a defendant breached a contract with them or made misrepresentations to them — even if the damages sought include depreciation in the value of their equity.

In *NAF Holdings*, the plaintiff NAF had entered into a contract with the defendant Li & Fung to provide services to two of NAF's wholly owned subsidiaries. Li & Fung breached, causing the value of the subsidiaries to drop by $30 million. NAF sued for breach of contract under New York law, seeking that $30 million diminution as damages. *See NAF Holdings, LLC* v. *Li & Fung (Trading) Ltd.*, 772 F.3d 740, 742-43 & n.2 (2d Cir. 2014). Li & Fung claimed the plaintiff was asserting a derivative claim owned by the subsidiaries, citing the Delaware Supreme Court's prior decision in *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, which stated that a

shareholder's claim is direct rather than the derivative if the shareholder can show that "the duty breached was owed to the stockholder *and* that he or she [could] prevail without showing an injury to the corporation." 845 A.2d 1031, 1039 (Del. 2004).[2]

The Delaware Supreme Court concluded that NAF's claim was direct — and thus that NAF had standing to assert it — because "a promisee-plaintiff [may] bring a direct suit against the promisor for damages suffered by the plaintiff resulting from the promisor's breach, *notwithstanding that* . . . the promisee-plaintiff's loss derives indirectly from the loss suffered by the [plaintiff's subsidiary] corporation." *NAF Holdings*, 118 A.3d at 176. "In other words," the Court explained, "a party to a commercial contract who sues to enforce its contractual rights can bring a direct contract action under Delaware law." *Id.* This is because "parties to a contract are bound by its terms, and have a corresponding right to enforce them." *Id.* at 181.

Addressing the defendant's reliance on *Tooley*, the Court held that *Tooley* "has *no bearing* on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights." *Id.* at 176. Rather, the injury-focused *Tooley* standard was designed with the limited purpose of analyzing claims for breach of fiduciary duty. *Id.* at 179. It does not "convert direct claims belonging to a plaintiff into something belonging to another party." *Id.* at 180.

The result in *NAF Holdings* was confirmed and extended in *AHW*, which involved negligent misrepresentation claims brought by Citigroup stockholders who claimed that the bank and its directors had made misstatements to induce them to delay the sale of their investments. The plaintiff stockholders sought damages equal to the depreciation in the value of their shares. As in *NAF Holdings*, the Delaware Supreme Court in *AHW* focused on whether the claims

---

[2]        Unless otherwise noted, emphasis is added.

"belong[ed]" to the investors under applicable state law (New York and Florida), and it concluded that the claims were direct. 140 A.3d at 1138. The negligent misrepresentation claim "belonged" to the plaintiffs under New York law, because it involved "specific allegations of reliance" as well as "direct communication between the plaintiff and the defendant." *Id.* at 1138 & n. 65 (citing *Starr Found.* v. *Am. Int'l Grp., Inc.*, 76 A.D.3d 25, 40-41 (1st Dep't 2010)).

 *NAF Holdings* and *AHW* compel the same result here. The Equity Owners have asserted direct claims that "belong" to them "based on [their] own right[s]" under New York law. *AHW*, 140 A.3d at 1139-40. The Equity Owners' contract claims are foursquare with *NAF Holdings*: the Equity Owners entered into contracts with Energy Transfer governed by New York law, and are suing to enforce those contracts. As the Delaware Supreme Court held, the Equity Owners may "bring a direct suit against the promisor [Energy Transfer] for damages suffered by the plaintiff[s] resulting from the promisor's breach." *NAF Holdings*, 118 A.3d at 176.

 The Equity Owners' negligent misrepresentation claim is likewise indistinguishable from the claim in *AHW*. In both cases, defendants made direct misrepresentations to plaintiffs to induce them to make an investment decision. In *AHW*, the plaintiffs advanced a "holder claim" under New York law, alleging that the defendants induced them to refrain from selling equity. *AHW*, 140 A.3d at 1127-28. Here, Energy Transfer induced the Equity Owners to commit or purchase equity. As the Delaware Supreme Court recognized in *AHW*, "holder claims are analytically indistinct from seller and purchaser claims, which are direct claims that are personal to the holder." *Id.* at 1140. Accordingly, the *AHW* decision applies equally to the Equity Owners' negligent misrepresentation claim. Such induced-investment claims are "quintessential examples of personal claims, and not potential derivative claims." *Sehoy Energy LP* v. *Haven*

*Real Estate Grp., LLC*, 2017 WL 1380619, at *11 (Del. Ch. Apr. 17, 2017) (induced-investment claims not subject to automatic stay in bankruptcy).

The same result holds for the Equity Owners' unjust enrichment claim, which alleges that they provided an unjust benefit to Energy Transfer without receiving a benefit in return. Compl. ¶ 96. As alleged in the Complaint, the Equity Owners conferred upon Energy Transfer "benefits from the additional funding ultimately provided to [EdgeMarc PA], which ensured that gas (and revenues) would flow through Energy Transfer's Gathering System." *Id*. Because the Equity Owners are the parties that conferred this benefit, they have a direct claim based upon their "own right" to recover restitution. *AHW*, 140 A.3d at 1139-40.[3]

**B.    Contrary to Energy Transfer's assertion, federal case law confirms that the Equity Owners have direct standing.**

Rather than addressing the controlling Delaware case law, Energy Transfer purports to rely on federal precedent to support its assertion that the claims at issue are derivative. Citing a summary order from the Second Circuit, Energy Transfer argues that the Court's standing inquiry should turn on two questions: "(1) who was injured?; and (2) who is entitled to the benefit of any recovery?" MTD at 8 (citing *Debussy LLC* v. *Deutsche Bank AG*, 242 F. App'x 735, 736-37 (2d Cir. 2007) (summary order)). That test, however, is a verbatim recitation of the Delaware Supreme Court's rule in *Tooley*. *See Debussy*, 242 F. App'x at 736 (citing and quoting *Tooley*). Yet, as explained by the Delaware Supreme Court, *Tooley* does not apply to claims like those asserted by the Equity Owners, because *Tooley* has no relevance to "claim[s] based on [a] plaintiff's own right[s]." *AHW*, 140 A.3d at 1139-40. If credited, Energy Transfer's reliance on the *Tooley* standard here would accomplish exactly what the Delaware Supreme Court has

---

[3]    Delaware law likewise disposes of the cursory suggestion that the Complaint should be dismissed for failure to join EdgeMarc as an "indispensable party." *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 7 n.4, D.I. 10 ("MTD"). State law dictates the interests of potential parties for purposes of Rule 19. *HB Gen. Corp.* v. *Manchester Partners, L.P.*, 95 F.3d 1185, 1192 (3d Cir. 1996). Under Delaware law, the claims belong to the Equity Owners.

forbidden: "convert[ing] direct claims belonging to a plaintiff into something belonging to another party." *NAF Holdings*, 118 A.3d at 180.

Energy Transfer also relies on the Second Circuit's decision in *St. Paul Fire & Marine Ins. Co.* v. *PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989), characterizing it as holding that only the debtor estate has standing to pursue "general claim[s]" that lack "particularized injury" running to individual creditors.  MTD at 10.  To the extent *St. Paul* is inconsistent with *NAF Holdings* and *AHW*, Delaware law and precedent controls.  But *St. Paul* does not lead to a different result than Delaware law.  In *St. Paul*, the Second Circuit held that a cause of action belonging to *the debtor* prior to its bankruptcy — in that case, an Ohio law alter ego claim — "becomes *property of the estate*" and individual creditors lack standing to pursue such actions.  *St. Paul*, 884 F.2d at 703-04.  The Second Circuit itself has rejected the contention that *St. Paul* prevents creditors from asserting their own direct claims, confirming that the case merely stands for the proposition "that only a trustee, not creditors, may assert claims that belong to the bankrupt estate."  *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 70 (2d Cir. 2013).

Consistent with the basic principle that bankruptcy does not expand a bankrupt debtor's property interests,[4] a long line of federal cases hold that an investor in a debtor has *direct* standing to sue defendants whose misrepresentations induced the plaintiff to invest.  *See, e.g.*, *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 586 (5th Cir. 2008) (bondholders had direct claims against creditor that made misrepresentations to induce them to purchase unsecured notes issued by the debtor); *In re Soundview Elite Ltd.*, 565 B.R. 534, 553 (Bankr. S.D.N.Y. 2017) (plaintiffs had direct claims against service provider to debtor where "they allegedly would not have been invested in the Debtors but for the inducement" by the service provider); *In re Granite Partners,*

---

[4]    *See, e.g.*, *Integrated Sols., Inc.* v. *Serv. Support Specialties, Inc.*, 124 F.3d 487, 495 (3d Cir. 1997) ("the estate succeeds only to the . . . rights of the property interest[s] that the debtor possessed pre-petition").

*L.P.*, 194 B.R. 318, 327 (Bankr. S.D.N.Y. 1996) (plaintiff had direct claims against controllers of bankrupt partnership for fraudulently inducing investment).[5]

Energy Transfer further asserts that the Equity Owners should be divested of their claims because they are "seeking the same recovery" as EdgeMarc.  MTD at 7-8 (quoting *In re REFCO Inc. Sec. Litig.*, 2010 WL 1375946, at *9 (S.D.N.Y. Feb. 3, 2010)).  But this argument goes nowhere.  As an initial matter, EdgeMarc and the Equity Owners are *not* seeking the "same recovery."  EdgeMarc *benefited* from the $150 million in investments that the Equity Owners made in reliance on Energy Transfer; thus, the Equity Owners alone are entitled to recover those damages.[6]  In addition, Energy Transfer's "same recovery" theory defies *both* Delaware law, which holds that a promisee is entitled to "recover the full value of the promised performance from the promisor," even where the "loss derives indirectly from the loss suffered by" a subsidiary corporation (*NAF Holdings*, 118 A.3d at 176, 181 n.15), *and* decisions of the Third Circuit, which hold that "the issue of 'impermissible double recovery' goes to apportionment of liability, not to [plaintiffs'] right to bring a cause of action" (*In re G-I Holdings, Inc.*, 755 F.3d 195, 209 (3d Cir. 2014); *accord In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 521 (D. Del. 2001)).  And, in any event, Energy Transfer's own authority confirms that a plaintiff has

---

[5]    Energy Transfer has itself acknowledged this line of authority.  At page 10 of its motion to dismiss, Energy Transfer cites *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014), a case in which the Second Circuit considered whether investors had standing to assert claims against defendants who allegedly participated in the theft of funds by Bernard Madoff's bankrupt securities firm.  In holding that the investors lacked standing, the court explained that this result followed from the plaintiffs' *failure* to "allege[] that the . . . defendants took any . . . 'particularized' actions aimed at [them]," flagging the absence of any allegation that "defendants made any misrepresentations to" them.  *Id.* at 93.  In short, what was missing in the *Madoff* case were precisely the allegations of direct representations that the Equity Owners have advanced here.

[6]    The Equity Owners also seek additional damages for Energy Transfer's wrongful conduct, such as causing them to divert investments away from EdgeMarc's Ohio subsidiary.  Compl. ¶¶ 35-39, 89, 106.  Energy Transfer has itself argued that EdgeMarc is contractually barred from seeking those types of damages.  *See* Jackson Decl., Ex. A § 13.2; Tel. Status Conf. Tr. 16:12-15, *In re EdgeMarc Energy Holdings, LLC*, 19-11104 (JTD) (July 9, 2019) ("[T]he contract here is clear and unambiguous.  And it provides that they [EdgeMarc] do not have damages.  It specifically excludes lost profits or any kind of business interruption.").

standing to sue for a "direct loss as a result of a violation of duties . . . owed directly to it." *In re REFCO*, 2010 WL 1375946, at *13.

At bottom, Energy Transfer's position is that the Equity Owners lack standing because EdgeMarc may *also* have damages claims arising out of Energy Transfer's failures relating to the Gathering System. *See* MTD at 10. But that is not the law. "It is well established that a debtor estate's claims against a third party and an estate creditor's claims against the same party are not duplicative or derivative merely because they are based on the same facts." *In re Bernard L. Madoff Inv. Sec., LLC*, 2013 WL 5511027, at *4, *9 (S.D.N.Y. Sept. 30, 2013), *aff'd*, 740 F.3d 81 (2d Cir. 2014) (investors not divested of standing merely because the bankrupt debtor "might also have suffered an identical injury"). Rather, "there is nothing illogical or contradictory about saying that [the defendant] might have inflicted direct injuries on both the [investors] and [the debtor] during the course of dealings that form the backdrop of both sets of claims." *Seven Seas*, 522 F.3d at 587. The motion to dismiss for lack of standing should be denied.

## II.    THE COURT SHOULD ABSTAIN FROM CONSIDERING THE BALANCE OF ENERGY TRANSFER'S MOTION.

To the extent the Court determines that the Equity Owners have standing to pursue their claims, as it should, no core bankruptcy jurisdiction exists. As a result, this Court's jurisdiction to adjudicate anything beyond the threshold question of claim ownership depends on this proceeding being "related to" EdgeMarc's chapter 11 case. As set forth in the accompanying motion to remand, this action is therefore subject to mandatory abstention under 28 U.S.C. § 1334(c). Accordingly, this Court should refrain from deciding the balance of the motion to dismiss and remand this action to New York state court.

**III.    THE "SOLE AND EXCLUSIVE REMEDY FOR THE FAILURE OF ANY OF THE CONDITIONS" PROVISION DOES NOT BAR THE EQUITY OWNERS' BREACH OF CONTRACT CLAIMS.**

In its motion to dismiss, Energy Transfer does not challenge the sufficiency of the factual allegations showing that it breached its obligations under Section 2(b) of the Commitment Agreements by providing false certifications to the Equity Owners stating that there had been "no Project Delay" and failing to "promptly notify" the Equity Owners "as soon as it knows of any event reasonably likely to cause a delay in the In-Service Date." Compl. ¶¶ 52, 86-88. Instead, Energy Transfer claims that the exclusive remedy provision in Section 3 of the Commitment Agreements, the "Conditions" section, should be read to prevent the Equity Owners from suing Energy Transfer for damages based on breaches of other sections of the agreement. MTD at 4-7. As shown below, Energy Transfer's construction of the contract is wrong and provides no basis to dismiss the breach of contract claims.

**A.    New York contract principles**

New York law applies to the Equity Owners' breach of contract claims, because the Commitment Agreements contain a New York choice-of-law provision. Metz Decl., Exs. N, O § 8. Under New York law, "[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). A court must consider a contract's "'[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *JA Apparel Corp.* v. *Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

Energy Transfer's motion must be denied if the Court agrees with the Equity Owners' construction of the contract *or* if it concludes that "the contract is ambiguous as applied to [the] particular set of facts" at issue. *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012); *accord Almah LLC* v. *AIG Emp. Servs., Inc.*, 157 A.D.3d

416, 416 (1st Dep't 2018).  "A contract is ambiguous if 'on its face [it] is reasonably susceptible

of more than one interpretation.'"  *Telerep, LLC* v. *U.S. Int'l Media, LLC*, 74 A.D.3d 401, 402

(1st Dep't 2010).  Thus, even if Energy Transfer offered a plausible alternative interpretation of

the contracts (which it has not), its motion would still have to be denied because that would, at

best, raise fact issues to be resolved at trial.

**B.    Energy Transfer's interpretation is inconsistent with the language and structure of the agreements.**

According to Energy Transfer, one sentence included within Section 3 of the

Commitment Agreements — which limits the remedies available to the Equity Owners "for the

failure of any of the conditions set forth in this Section 3 to be satisfied prior to the applicable

Commitment Date" — should be broadly construed to limit the remedies available to the Equity

Owners for any and all breaches of the agreement.  MTD at 4-7.  This interpretation is not

supported by the language of Section 3 or the structure of the agreements.

Section 3 of the Commitment Agreements, titled "Conditions," sets forth the conditions

precedent to the Equity Owners' obligations to fund and confers a benefit on the Equity Owners

by allowing them to delay funding until the conditions precedent are met.  It states:

> Conditions. The obligation of each Sponsor to fund each Commitment on a
> Commitment Date shall be subject to the satisfaction of each of the following
> conditions as of such Commitment Date: (i) in respect of any Commitment, no
> notices of Force Majeure have been issued and not withdrawn and (ii) Gatherer
> shall not have committed any material breach of this letter agreement (including,
> for the avoidance of doubt, with respect to Gatherer's obligation to timely deliver
> a Project Status Notice in advance of each Commitment Date pursuant to Section
> 2(b)) or any of the GPA, ITC-101 or ITC-102 or if Gatherer shall have committed
> any such material breach, such material breach shall have been cured in all
> respects on or prior to the applicable Commitment Date. Notwithstanding
> anything herein to the contrary, each Sponsor's sole and exclusive remedy for the
> failure of any of the conditions set forth in this Section 3 to be satisfied prior to
> the applicable Commitment Date shall be limited to the delay in making the
> applicable Commitment(s) described in Section 2 and the termination rights set
> forth in Section 12.

Compl. ¶ 54; Metz Decl., Exs. N, O § 3.  The exclusive remedies clause within Section 3 defines

the set of remedies available to the Equity Owners by virtue of the conditions precedent to

funding not being satisfied.[7]  It makes clear that while the Equity Owners do not have to fund the

Commitments if the conditions precedent are not met, the conditions alone do not confer on the

Equity Owners an independent right to compel Energy Transfer to bring about the conditions,

many of which go beyond any direct obligations to the Equity Owners (*e.g.*, to build the

Gathering System).  Absent the remedy limitation within Section 3, a court could have implied a

duty on Energy Transfer to use good faith efforts to bring about the conditions exclusively within

its control (*e.g.*, not materially breaching the GPA or the ITCs), entitling the Equity Owners to a

damages remedy for any breach of those implied duties in the event the conditions were not

satisfied.  *See, e.g.*, *Stendig, Inc.* v. *Thom Rock Realty Co.*, 163 A.D.2d 46, 48 (1st Dep't 1990).[8]

Section 3, however, does not purport to impose any limit on the remedies available to the

Equity Owners for a *breach* of the Commitment Agreements, as opposed to the non-occurrence

of a condition.  Rather, the only reference in Section 3 to breaches of the agreements is to the

absence of "material breaches" as one of the conditions to funding — including failure to deliver

the Project Status Notices.  That reference precludes any possible assertion by Energy Transfer

that the Equity Owners' funding obligation was not contingent on Energy Transfer's delivery of

Project Status Notices.  It does not, however, transform the exclusive remedy provision

---

[7]    There is nothing unusual about a contract including an exclusive remedy provision applicable to the non-occurrence of conditions.  For example, such provisions are routinely found in contracts for the sale of real property. *See, e.g.*, *S.E.S. Importers, Inc.* v. *Pappalardo*, 425 N.E.2d 841, 843 (N.Y. 1981); *101123 LLC* v. *Solis Realty LLC*, 23 A.D.3d 107, 108-09 (1st Dep't 2005).

[8]    *See also In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013) ("[A] contract party may impliedly promise to use reasonable efforts to cause the condition to occur when its occurrence is within the control of that party."); Restatement (Second) of Contracts § 225 cmt. d (1981); 13 Williston on Contracts § 38:15 (4th ed. 1990).

applicable to the "failure to satisfy conditions" provision into an exclusive remedy applicable to the contract as a whole, including the certification requirement in Section 2(b).

Energy Transfer's contrary interpretation — that *Section 3* should limit the remedies available under all provisions of the contract, including for breach of contract under *Section 2* — runs afoul of the principle that, "[u]nder New York law, exclusive remedy clauses are narrowly construed." *Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1* v. *DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 498 (S.D.N.Y. 2013); *see also Town of Tonawanda* v. *Stapell, Mumm & Beals Corp.*, 240 A.D. 472, 473 (4th Dep't), *aff'd*, 193 N.E. 419 (N.Y. 1934) (limitation of remedy must be "clear and unequivocal"); *Sanford* v. *Brown Bros. Co.*, 134 A.D. 652, 656 (2d Dep't 1909) (limitation of remedy must be "plain and unmistakable").  As courts have made clear, "a remedy specified for breach of an individual contract term is not necessarily a remedy for breach of other terms in the contract."  *Kemi, Inc.* v. *Berlitz Int'l, Inc.*, 228 A.D.2d 281, 281 (1st Dep't 1996); *see also Baxter Diagnostics, Inc.* v. *Novatek Med., Inc.*, 1998 WL 665138, at *7 (S.D.N.Y. Sept. 25, 1998) (finding it a jury question whether "sole and exclusive remedy" provision — which used language far broader than the language here — applied only to the provision within which the exclusive remedy was placed or more broadly).

Importantly, Energy Transfer knew exactly how to draft a provision that limits the exercise of remedies for *breach of contract* (as opposed to mere failures of a condition precedent).  In Section 4 of the Commitment Agreements, the section titled and addressed to "Enforceability" of the contracts, the parties agreed that, except for a grant of specific performance, "receipt from each [Equity Owner] by [EdgeMarc] of funds in an aggregate amount that is equal to such [Equity Owner's] Total Commitment shall be the sole and exclusive remedy of [EdgeMarc, Energy Transfer,] any of their respective Affiliates or any of their

18

respective directors, officers and other affiliated persons **under this letter agreement** against each [Equity Owner] or otherwise." Metz Decl., Exs. N, O § 4(b). Thus, in contrast to Section 3, Section 4 was drafted to limit remedies under the *agreement* as a whole, and not just remedies for the "failure of . . . conditions."

Contrasting Section 3 of the Commitment Agreements with other contemporaneous agreements further confirms its limited scope. In Section 5(b) of the Capital Contribution Letter, Energy Transfer used the same formulation as it used in Section 4 of the Commitment Agreements — providing for a "sole and exclusive remedy. . . **under this letter agreement**." Metz Decl., Ex. M (Capital Contribution Letter) § 5(b). And the simultaneously executed GPA (the underlying base agreement) contained a standalone section titled "Limitation of Liability," which stated in all capital letters and bold text:

> **FOR ANY BREACH OF ANY PROVISION FOR WHICH EXPRESS, SPECIFIC REMEDIES OR MEASURES OF DAMAGES ARE PROVIDED, SUCH REMEDIES OR DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDIES, THE OBLIGOR'S LIABILITY SHALL BE SO LIMITED, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED . . . IF NO REMEDY OR MEASURE OF DAMAGES IS PROVIDED AND UNLESS OTHERWISE HEREIN STATED, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES, SUCH DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED . . .**

Jackson Decl., Ex. A § 13.2.

These provisions show that Energy Transfer clearly understood how to draft an unambiguous, broadly applicable "sole and exclusive remedy" provision, but it did not bargain for one in the Commitment Agreements. Given the existence of these clearly worded provisions, the Court should be "extremely reluctant to interpret" Section 3 "as impliedly stating something which the parties have neglected to specifically include." *ACE Sec. Corp.* v. *DB Structured Prods., Inc.*, 36 N.E.3d 623, 630 (N.Y. 2015).

Energy Transfer's cited cases — *Ambac Assurance Corp.* v. *EMC Mortgage LLC*, 121 A.D.3d 514 (1st Dep't 2014), and *Deutsche Lufthansa AG* v. *The Boeing Co.*, 2006 WL 3155273 (S.D.N.Y. Oct. 30, 2006) — do not support its position.  *See* MTD at 6.  In *Ambac*, the remedy provision at issue clearly stated that it provided "'the sole and exclusive remedy' '***under this Agreement*** . . . ,'" 121 A.D.3d at 518, as in Section 4 of the Commitment Agreements but unlike in Section 3.  In *Deutsche Lufthansa*, the remedy provision was contained in a section titled "Default" that outlined the remedies available in the event that one party "fail[ed] in a material way to perform an obligation ***under this Agreement***."  2006 WL 3155273, at *1.  Unlike Section 3 of the Commitment Agreements, the provision at issue in *Deutsche Lufthansa* addressed "the fail[ure] to perform an obligation under [the] Agreement," not the remedy for the non-occurrence of a condition precedent to a party's performance.

### C.    Energy Transfer's interpretation is commercially unreasonable and inconsistent with the purpose of the contract.

Not only is Energy Transfer's proffered interpretation of Section 3 inconsistent with the language and structure of the Commitment Agreements, it must also be rejected because it yields absurd and commercially unreasonable results.

Under Energy Transfer's interpretation, if Energy Transfer delivers *false* Project Status Notices (as it did) and the Equity Owners fund their Commitments in reliance on those *false* notices (as they did), the Equity Owners have no remedy — because their only remedy in the event of a material breach is to delay their funding (which already occurred).  In other words, Energy Transfer could, *by its own misconduct*, deprive the Equity Owners of any remedy under Section 2(b).  Similarly, Energy Transfer's interpretation leaves *no* post-funding remedy for other material breaches of the Commitment Agreements on its part, such as a breach of the confidentiality provision.  *See* Metz Decl., Exs. N, O § 11.

The "Court must avoid interpreting a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" *Landmark Ventures, Inc.* v. *Wave Sys. Corp.*, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 F. App'x 109 (2d Cir. 2013); *see also Moran* v. *Standard Oil Co. of N.Y.*, 105 N.E. 217, 220 (N.Y. 1914) (Cardozo, J.) ("An intention to make so one-sided an agreement is not to be readily inferred."). Likewise, the Court must also interpret Section 3 consistently with that section's overall purpose to *expand* the Equity Owners' rights by establishing conditions in which their performance is excused, not in a manner that turns that section on its head by using it to restrict the Equity Owners' rights. *See, e.g.*, *Adams* v. *Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) (A court must "'give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract.'" (quoting *Empire Props. Corp.* v. *Mfrs. Tr. Co.*, 43 N.E.2d 25, 28 (N.Y. 1942))).

Moreover, if it were really true that the Equity Owners could not sue on a *false* certification, Energy Transfer's obligation to deliver Project Status Notices to the Equity Owners would be pointless. That Energy Transfer's interpretation would essentially nullify Section 2(b) provides an independent basis for denying this motion. *See LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."); *accord, e.g.*, *Glencore Ltd.* v. *Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 433 (S.D.N.Y. 2012). This flaw in Energy Transfer's construction applies equally to the other obligation in Section 2(b) to "promptly notify" the Equity Owners "as soon as it knows of any event reasonably likely to cause a delay." Compl. ¶ 52. It defies logic to say that the Equity Owners' only remedy for a breach of that obligation was to delay funding the

Commitments, since the Equity Owners would have no way of knowing that the breach had occurred at the time of funding.

> **D.    Even if Energy Transfer's interpretation were correct, the remedy provision would not be enforceable.**

Even if the Court were to adopt Energy Transfer's construction of Section 3's remedy provision, there are two independent reasons the provision would not be enforceable. *First*, New York courts have declined to apply such provisions where — based on intervening facts — they would yield inequitable or non-commercial results. *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1* v. *Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 503-04 (S.D.N.Y. 2018) (refusing to apply "sole and exclusive remedy" provision that "fail[ed] of [its] essential purpose" because it "was not designed or intended to remedy a breach of the nature or magnitude alleged" in the complaint); *Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 514 (S.D.N.Y. 2013) (rejecting sole remedy provision requiring repurchase of mortgage loans because the defendant's "right to cure a breach" had become "irrelevant" where it was "impossible to entirely cure any breach as to a mortgage loan that has already defaulted"); *see also Bear Stearns Mortg. Funding Tr. 2006–SL1* v. *EMC Mortg. LLC*, 2015 WL 139731, at \*17 (Del. Ch. Jan. 12, 2015) (refusing to apply exclusive remedy provision at the pleading stage in contract governed by New York law because other remedies might be warranted if plaintiff could prove that the "breaches of representations and warranties were so substantial and fundamental as to defeat the object of the parties in making the contract"). Here, the parties' course of performance — namely, Energy Transfer's false certifications and the Equity Owners' funding in reliance on them — deprived the Equity Owners of an opportunity to exercise the only remedy Energy Transfer claims they had. That result makes no sense.

22

*Second*, exclusive remedy provisions are unenforceable under New York law "against allegations of gross negligence." *E.g.*, *Abacus Fed. Sav. Bank* v. *ADT Sec. Servs., Inc.*, 967 N.E.2d 666, 669 (N.Y. 2012); *accord Sommer* v. *Fed. Signal Corp.*, 593 N.E.2d 1365, 1370-71 (N.Y. 1992). The Complaint alleges that Energy Transfer committed hundreds of regulatory violations in the design and construction of its Gathering System and knew since 2015 that the area near the explosion included a slip landslide area with dangerous and unstable hillslope terrain. Compl. ¶¶ 66-75. Given those allegations, Energy Transfer was (at least) grossly negligent in delivering Project Status Notices claiming that there was no Project Delay. *See Deutsche Bank Nat'l Tr. Co.*, 289 F. Supp. 3d at 500 (allegations that a defendant "intentionally disregarded a high likelihood" of a breach of contract or that "the required performance was impossible" are sufficient to plead gross negligence to defeat an exclusive remedy provision).

\* \* \*

While the Court has ample basis to conclude that the "sole and exclusive remedy for the failure of any of the conditions" provision does not apply to the Equity Owners' breach claims, the scope of the provision — as applied to the facts at issue — is at least ambiguous. That alone is sufficient to defeat Energy Transfer's motion. Moreover, in the event that the Court finds that additional allegations, including regarding the purpose and history of the clause at issue or gross negligence, could sustain the breach of contract or other claims, the Court should permit a "curative amendment." *Phillips* v. *Cty. of Allegheny*, 515 F.3d 224, 236, 245 (3d Cir. 2008).

## IV.    THE EQUITY OWNERS PLEAD A VIABLE UNJUST ENRICHMENT CLAIM.

To sustain an unjust enrichment claim under New York law, a plaintiff must show that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd.* v. *Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011). Unjust enrichment

encompasses a claim seeking to recover payments of "more than the contract requires," *Allstate Ins. Co.* v. *Lyons*, 843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012), or other amounts "paid by mistake," *Blue Cross of Cent. N.Y., Inc.* v. *Wheeler*, 93 A.D.2d 995, 995 (4th Dep't 1983).

The Equity Owners' unjust enrichment claim seeks recovery of the Commitments funded to EdgeMarc that benefited Energy Transfer.  *See* Compl. ¶ 93.  The Equity Owners funded those Commitments on the belief that Energy Transfer was not in breach of the GPA, the ITCs or the Commitment Agreements.  But, in fact, Energy Transfer was in breach of those agreements.  *Id.* ¶¶ 47-48, 52-53, 76-77, 94-95.  Energy Transfer is liable for the payments made at its behest.  *Id.* ¶¶ 93-96.

A.    **The Equity Owners' unjust enrichment claim may be pursued alongside the breach of contract claim.**

Energy Transfer argues first that the Equity Owners' unjust enrichment claim should be dismissed because the parties had a contract.  *See* MTD at 11-12.  Contrary to Energy Transfer's assertion, it "has never been the law in New York" that "a claim in contract and one in quasi contract are mutually exclusive in all events and under all circumstances."  *Joseph Sternberg, Inc.* v. *Walber 36th St. Assocs.*, 187 A.D.2d 225, 227-28 (1st Dep't 1993).  Breach of contract and unjust enrichment claims may be pleaded in the alternative.  *E.g.*, *Burton* v. *Iyogi, Inc.*, 2015 WL 4385665, at *11 (S.D.N.Y. Mar. 16, 2015); *Hoover* v. *HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 250 (N.D.N.Y. 2014).  Indeed, "[i]f warranted by the pleadings and proof, the case may be submitted to a jury on both theories."  *Joseph Sternberg*, 187 A.D.2d at 228.

Notwithstanding the existence of a contract, "a claim of unjust enrichment may serve as a basis for recovery should a trier of fact determine that, in fact, . . . the contractual obligations did not encompass the events underlying the asserted basis for [the] unjust enrichment claim."  *Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 466 (S.D.N.Y.

2003).   A "bona fide dispute over whether" the matters at issue "are within the scope of the parties' contracts" is itself sufficient to defeat a motion to dismiss.  *Am. Tel. & Util. Consultants, Inc.* v. *Beth Israel Med. Ctr.*, 307 A.D.2d 834, 835 (1st Dep't 2003); *accord Perfect Dental, PLLC* v. *Allstate Ins. Co.*, 2006 WL 2552171, at *2 (E.D.N.Y. Aug. 31, 2006).

In this case, the unjust enrichment claim, as pleaded in the Complaint, provides a basis for recovery that is distinct from the breach of contract claims.   While the breach of contract claims seek damages for breaches of Section 2(b) of the Commitment Agreements, the unjust enrichment claim seeks restitution for payments made by the Equity Owners based on mistakes of fact, including the mistaken belief that Energy Transfer was not in breach of the requirement under the GPA that Energy Transfer comply with all laws in the construction of the Gathering System.   Compl. ¶¶ 47-48, 77, 95.   A material breach of the GPA is only relevant to the unjust enrichment claim, not to the Equity Owners' breach of contract claims.   Moreover, there is a bona fide dispute as to whether the matters at issue are within the scope of the parties' contracts. Energy Transfer has argued (incorrectly) that, as a result of the "sole and exclusive remedy for the failure of any of the conditions" clause of the Commitment Agreements, the Equity Owners have no contractual remedy for false certifications.   If that were true, the Equity Owners are entitled to pursue a restitution theory for funding *by mistake* in reliance on those certifications.

### B.    The Complaint pleads that Energy Transfer was unjustly enriched.

Energy Transfer next argues that the Complaint fails to plead that it received any benefit that could support an unjust enrichment claim.   *See* MTD at 12.   Under New York law, "[a] person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit."   *Blue Cross of Cent. N.Y.*, 93 A.D.2d at 996.

In its motion, Energy Transfer completely ignores the allegations showing that it received a benefit from the Equity Owners' investments.   The Complaint alleges that the Equity Owners'

investments "ensured that gas (and revenues) would flow through [the] Gathering System," which in turn would generate earnings for Energy Transfer. Compl. ¶¶ 43, 49, 96. The importance of the Commitments to Energy Transfer was underscored by its negotiator's statement that Energy Transfer's "number one priority" was "ensuring that the sponsors invest an additional $100 million and [EdgeMarc] invests an additional $50 million in Butler." *Id.* ¶ 49. While Energy Transfer got what it wanted, Energy Transfer's unending delay "deprived [the Equity Owners] of the capital that they invested on the expectation that the system would be completed and in service." *Id.* ¶ 13. Those allegations are more than sufficient.

Energy Transfer's cited cases are not to the contrary. Two do not address pleading-stage motions, only the sufficiency of evidence at summary judgment or trial. *See Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (post-trial); *Steinbeck* v. *Steinbeck Heritage Found.*, 400 F. App'x 572, 578 (2d Cir. 2010) (summary judgment). And in *Chevron Corp.* v. *Donziger*, the plaintiff did not "have an interest in or right to the benefit thus conferred." 871 F. Supp. 2d 229, 260 (S.D.N.Y. 2012). Here, Energy Transfer does not contend that the Equity Owners lacked an interest in the benefit conferred — *i.e.*, their payments.[9]

## V.    THE EQUITY OWNERS PLEAD A VIABLE NEGLIGENT MISREPRESENTATION CLAIM.

Energy Transfer's sole ground for challenging the negligent misrepresentation claim is that the Equity Owners fail to plead that Energy Transfer owed an "independent, non-contractual duty" to them. MTD at 13. Energy Transfer is wrong.

---

[9]    For the same reasons, the Equity Owners adequately plead an unjust enrichment claim to the extent that Pennsylvania law applies. *See Plavin* v. *Grp. Health Inc.*, 323 F. Supp. 3d 684, 705 (M.D. Pa. 2018) (finding "no appreciable difference between the relevant New York and Pennsylvania law" on unjust enrichment).

### A.     The negligent misrepresentation claim is governed by Pennsylvania law.

As a threshold matter, as a tort claim whose elements took place in different jurisdictions, the negligent misrepresentation claim mandates a choice-of-law analysis.  The court must look to the choice-of-law rules of New York, the jurisdiction where the Equity Owners commenced this action.  *See Van Dusen* v. *Barrack*, 376 U.S. 612, 639 (1964) ("[T]he transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue.").  For tort claims, "New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula* v. *Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994).  The analysis rests on two factors:  "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.*

"[W]here the defendant's exercise of due care . . . is in issue, the jurisdiction in which the allegedly wrongful conduct occurred will usually have a predominant, if not exclusive, concern." *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50 (2d Cir. 2013).  Here, Energy Transfer's pre-contractual representations, and subsequent Project Status Notices, were made from Energy Transfer's offices in Pennsylvania.  Compl. ¶¶ 21, 38.  Because Energy Transfer's wrongful conduct — making false assertions and creating and sending inaccurate notices — occurred in Pennsylvania, the court should apply Pennsylvania law to the negligent misrepresentation claim.  In this instance, Pennsylvania has "the greatest interest in regulating behavior within its borders." *Cooney* v. *Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993).

### B.     The Equity Owners state a negligent misrepresentation claim under Pennsylvania law.

Under Pennsylvania law, "[n]egligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter

ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt-Rite Contractors, Inc.* v. *The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005). Pennsylvania has adopted Section 552 of the Restatement (Second) of Torts, *see id.* at 287, which provides:

> One who, in the course of his business . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). Under this standard, negligent misrepresentation claims may proceed against "any entity 'in the business of providing information'" that negligently supplies false information in the course of a business transaction to the extent the injured party justifiably relied on the supplied information. *Durkey* v. *Pac. Life Ins. Co.*, 2017 WL 8941225, at *4 (W.D. Pa. Aug. 4, 2017), *report and recommendation adopted*, 2017 WL 4155423 (W.D. Pa. Sept. 19, 2017); *McElwee Grp., LLC* v. *Mun. Auth. of Borough of Elverson*, 476 F. Supp. 2d 472, 477 (E.D. Pa. 2007) (applying *Bilt-Rite* to construction engineer). In addition, whether a party's reliance is sufficiently justifiable to support a negligent misrepresentation claim is "generally a question of fact that should be presented to the jury." *Tran* v. *Metro. Life Ins. Co.*, 408 F.3d 130, 139 (3d Cir. 2005) (reversing summary judgment).

Here, the Complaint alleges that Energy Transfer was "in the business of providing information," *Durkey*, 2017 WL 8941225, at *4, and it sets forth more than sufficient facts to show justifiable reliance. The Complaint alleges that Energy Transfer designs, builds and operates natural gas pipeline systems, and that it represented that its Gathering System would be complete by January 2018 and ready to be put in service by July 1, 2018. Compl. ¶¶ 1, 3, 38, 100. Energy Transfer was, moreover, aware that those representations would — and, in fact, did — induce the Equity Owners to make $50 million of capital available right away to develop gas

wells.  *Id.* ¶ 105.  Energy Transfer then agreed to provide certifications to induce the Equity Owners to invest another $100 million.  *Id.* ¶¶ 52-53.  The Equity Owners reasonably relied on all of Energy Transfer's assurances, because Energy Transfer had expertise and superior knowledge regarding the construction of the Gathering System.  *Id.* ¶ 105.

### C.    The Equity Owners state a negligent misrepresentation claim to the extent New York law applies.

The Complaint would also plead a negligent misrepresentation claim if New York law applied.  The standard to establish an independent tort duty under New York law is that "the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information."  *Tomoka Re Holdings, Inc.* v. *Loughlin*, 2004 WL 1118178, at *6 (S.D.N.Y. May 19, 2004).  Courts consider three factors to determine the existence of a special relationship:  "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."  *Kimmell* v. *Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996).

Applying this standard, in *LBBW Luxemburg S.A.* v. *Wells Fargo Securities LLC*, the court denied a motion to dismiss in a case involving CDOs based on allegations that "Defendants held expertise in U.S. mortgage-backed securities that rose above and beyond Plaintiff's own expertise," had "special access to data regarding the value of the underlying mortgages," and may have known that the plaintiff "was necessarily relying on its representations because it lacked the data and expertise to create its own models and analyses."  10 F. Supp. 3d 504, 526 (S.D.N.Y. 2014).  Likewise, in *Joseph* v. *Mobileye N.V.*, the court denied a motion to dismiss where the defendant company had special knowledge of facts surrounding a tender offer and

knew that the plaintiff investor, in deciding to sell, was relying on its representations that it would not go public for several years.  225 F. Supp. 3d 210, 214-15, 221 (S.D.N.Y. 2016).

The allegations here are at least as strong as those in *LBBW Luxemburg* and *Joseph*.  The Equity Owners allege that "Energy Transfer had special expertise and superior knowledge regarding the construction of the Gathering System, and . . . knew that the Equity Owners were depending and relying upon [its] engineering and pipeline expertise."  Compl. ¶ 105.  New York courts are loath to grant a motion to dismiss for lack of a special relationship because "determining whether a special relationship exists ordinarily requires a fact-intensive, case-by-case inquiry."  *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004); *accord Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V.* v. *AT & T Commc'ns, Inc.*, 1996 WL 312535, at *9 (S.D.N.Y. June 10, 1996).  The Equity Owners should be allowed to prove the elements of their claim on a complete factual record.[10]

## **CONCLUSION**

For the foregoing reasons, Energy Transfer's motion to dismiss should be denied.

---

[10]    The Complaint also pleads a negligent misrepresentation claim to the extent that Ontario law applies.  The Supreme Court of Canada has held that a "special relationship" giving rise to an independent tort duty exists where two requirements are met:  (1) "the defendant ought reasonably to have foreseen that the plaintiff would rely on his representation" and (2) "reliance by the plaintiff, in the circumstances, would be reasonable."  *Hercules Mgmts. Ltd.* v. *Ernst & Young*, [1997] 2 S.C.R. 165, 200 (Can.), Jackson Decl., Ex. D; *see also R.* v. *Imperial Tobacco Can. Ltd.*, [2011] 3 S.C.R. 45, 48-49 (Can.), Jackson Decl., Ex. E ("[T]he question is whether the facts disclose a relationship of proximity in which failure to take reasonable care might foreseeably cause loss or harm to the plaintiff.").  Energy Transfer had "special expertise and superior knowledge regarding the construction of the Gathering System," and "knew that the Equity Owners were depending and relying upon [its] engineering and pipeline expertise" when deciding whether to fund $150 million into EdgeMarc.  Compl. ¶¶ 49, 96, 99, 105.

Dated:  July 30, 2019

Respectfully submitted,

/s/ Patrick A. Jackson

Emil A. Kleinhaus (*admitted pro hac vice*)
Carrie M. Reilly (*pro hac vice pending*)
S. Christopher Szczerban (*pro hac vice pending*)
Corey J. Banks (*pro hac vice pending*)
Michael H. Cassel (*admitted pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
EAKleinhaus@wlrk.com
CMReilly@wlrk.com
SCSzczerban@wlrk.com
CJBanks@wlrk.com
MHCassel@wlrk.com

Patrick A. Jackson (Del. Bar No. 4976)
DRINKER BIDDLE & REATH LLP
222 Delaware Ave., Suite 1410
Wilmington, Delaware  19801-1621
Phone:  (302) 467-4200
Facsimile:  (302) 467-4201
Email:  Patrick.Jackson@dbr.com

*Attorneys for Plaintiffs GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI Parallel EdgeMarc Holdings, L.L.C., WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C., and EM Holdco LLC*