## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EDGEMARC ENERGY HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11104 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| GSCP VI EDGEMARC HOLDINGS, L.L.C., | ) | Adv. Pro. No. 19-50269-JTD |
| GSCP VI PARALLEL EDGEMARC | ) | |
| HOLDINGS, L.L.C., WSEP AND BRIDGE 2012 | ) | |
| EDGEMARC HOLDINGS, L.L.C., and EM | ) | |
| HOLDCO LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ETC NORTHEAST PIPELINE, LLC, | ) | |
| | ) | |
| Defendant. | ) | **Relates to Docket Nos. 35, 36** |
| | ) | |
| | ) | |

## ETC NORTHEAST PIPELINE LLC'S OPPOSITION TO EQUITY OWNERS' MOTION
## FOR ABSTENTION AND REMAND

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: EdgeMarc Energy Holdings, LLC (6900), EM Energy Manager, LLC (5334), EM Energy Employer, LLC (8026), EM Energy Ohio, LLC (6935), EM Energy Pennsylvania, LLC (1541), EM Energy West Virginia, LLC (3771), EM Energy Keystone, LLC (7506), EM Energy Midstream Ohio, LLC (1268), EM Energy Midstream Pennsylvania, LLC (3963). The Debtors' corporate headquarters and mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

## Table of Contents

Page

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF RELEVANT FACTS ...................................................................... 4

    A.    The Force Majeure Event.................................................................................. 5

    B.    The Pennsylvania State Court Complaint Against Debtor EM Energy (PA) ..................... 7

    C.    The Equity Owners' New York State Court Complaint Against ETC .............................. 7

    D.    The Bankruptcy Cases .................................................................................... 10

ARGUMENT .......................................................................................................... 11

    A.    The Court Has "Related To" Jurisdiction ....................................................... 12

    B.    Mandatory Abstention Is Not Appropriate ...................................................... 15

CONCLUSION........................................................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*Celotex Corp. v. Edwards,*
    514 U.S. 300 (1995)................................................................................................ 12

*Copelin v. Spirco, Inc.,*
    182 F.3d 174 (3d Cir. 1999)................................................................................... 11

*ETC Northeast Pipeline, LLC, v. EM Energy Pennsylvania, LLC,*
    Case No. 19-002052................................................................................................ 6

*In re Dow Corning Corp.,*
    86 F.3d 482 (6th Cir. 1996) ................................................................................... 12

*In re Epi-Scan, Inc.,*
    71 B.R. 975 (Bankr. D. N.J. 1987) ....................................................................... 13

*Nuveen Mun. Tr. v. Withumsmith Brown, P.C.,*
    692 F.3d 283 (3d Cir. 2012)............................................................................ 11, 12

*Pacor, Inc. v. Higgins,*
    743 F.2d 984 (3d Cir. 1984)................................................................................... 11

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.,*
    639 F.3d 572 (2d Cir. 2011)................................................................................... 14

*Picard v. HSBC Bank PLC (In re Bernard L. Madoff Inv. Sec. LLC),*
    561 B.R. 334  (Bankr. S.D.N.Y. 2016)................................................................. 11

*SPV OSUS, Ltd. v. UBS AG,*
    882 F.3d 333 (2d Cir. 2018)................................................................................... 12

*Stoe v. Flaherty,*
    436 F.3d 209 (3d Cir. 2006)............................................................................ 10, 14

## STATUTES

§ 1334(c)(2) ................................................................................................................. 11, 16
§ 157(b)(2)(C) .................................................................................................................... 15
28 U.S.C. § 1334(c)(2)........................................................................................................ 11
28 U.S.C. § 157(b)(2)(B) and (C)....................................................................................... 11

## RULES

Bankruptcy Rule 7042 ......................................................................................................... 13
Fed. R. Civ. Pro. 42(a) ....................................................................................................... 13

ii

ETC Northeast Pipeline LLC ("ETC"), by and through undersigned counsel, hereby files its opposition to the *Motion for Abstention and Remand* ("Motion") [Docket No. 35] filed by the above-captioned plaintiffs (collectively, the "Equity Owners" or "Plaintiffs"), equity interest holders in EdgeMarc Energy Holdings, LLC ("EdgeMarc" and together with its chapter 11 debtor-affiliates, the "Debtors"). In support of its opposition, ETC states as follows:

## PRELIMINARY STATEMENT

1. In the Motion, as well as in their opposition to ETC's motion to dismiss, the Equity Owners give the impression that they were fraudulently induced by ETC to enter into contracts with ETC that committed them to invest $150 million in the Debtors based solely upon ETC's representations that construction of a pipeline was proceeding as expected. Later, when the pipeline was destroyed in a landslide following an unprecedented rain event—according to the Equity Owners, an event for which ETC was not just responsible, but one which ETC knew would occur and needed to disclose to the Equity Owners before it happened—the Equity Owners were harmed because they could have invested more profitably in another geographic area that did not suffer a catastrophic geologic event.

2. In fact, the Equity Owners entered into commitment contracts with the Debtors under which they provided $150 million to the Debtors, money that they lost when the Debtors went bankrupt, as a result of losses sustained by the Debtors because they could not utilize the pipeline to transport the Debtors' gas under the Debtors' contract with ETC. ETC is a mid-stream provider whose contractual role with respect to the Equity Owners was simply to provide "Project Status Notices" concerning the pipeline. Like their controlling (99%) Equity Owners, the Debtors claim that ETC bears responsibility for the landslide and the losses, which ETC

denies; their claims and counterclaims in their removed litigation on these issues comprise a core proceeding in this bankruptcy case.

3.    The obvious reason that the Equity Owners' portrait of the facts is so comically skewed – they do not attach the contracts and barely mention the Debtors in describing them – is that when the facts alleged in their complaint in this removed action are accurately portrayed, it is manifestly clear that the Equity Owners' claims against ETC to recover the same damages based on the same facts and issues are paradigmatic derivative claims that belong to the Debtors, as presented by the pleadings in the removed Pennsylvania state court action between the Debtors and ETC. The Equity Owners cannot gin up an independent claim for unique damages simply by articulating a theory that the damages they seek are the money they would have made elsewhere if they hadn't lost this money: it's the same derivative injury and derivative loss no matter how it's articulated. The Equity Owners' claims represent a clear effort to move themselves to the front of the line with respect to any recovery on the (flawed) claims against ETC, in stark contrast to the treatment they would be afforded pursuant to the priorities of the Bankruptcy Code.

4.    Derivative claims, of course, are property of the bankruptcy estate. Accordingly, the Equity Owners condition their motion to abstain on a determination that their claims are not derivative. But even if the claims are not derivative, they should remain in this Court. At minimum, there is "related to" jurisdiction over the action due to the risk of collateral estoppel being used against the Debtors due to the outcome of the Equity Owners' litigation against ETC. And whether or not collateral estoppel would bind the Debtor to rulings in this action for or

2

against its 99% owners, certain rulings against ETC in this action would certainly have the effect

of reducing ETC's claims against the estate. The potential for collateral estoppel alone disposes

of the issue. Conversely, the damages asserted by the Equity Owners overlap the Debtors'

claims, and inasmuch as there can only be one satisfaction, a recovery by the Equity Owners

would diminish the Debtors' recovery. Likewise, as a practical matter, a recovery by the Equity

Owners from ETC of the magnitude they seek will likely reduce or eliminate the prospect of a

full recovery by the Debtors if they prevail. Further yet, given the overlapping facts and issues,

consolidating the Debtors' claims with those of their Equity Owners may conceivably, if not

probably, save estate resources. In short, this proceeding has a "conceivable effect" on the

estates.

5.      Perhaps the obvious efficiencies of consolidating these cases are why the Equity

Owners rely solely on mandatory abstention, and not discretionary abstention or remand, but

consolidation of this proceeding with the core proceeding between ETC and the Debtors would

render mandatory abstention inapplicable. Furthermore, the Equity Owners have not met their

burden of establishing the "timely adjudication" requirement for mandatory abstention. That is

not done simply by referring to past instances of abstention in favor of proceedings in the same

court, which is all the Equity Owners have done. "Timely adjudication" has to do with the

interplay with the administration of the bankruptcy cases. The Debtors' claims against ETC are

among their most significant assets (at least from the Debtors' perspective), and ETC's claims

against the Debtors are a large liability. Even if the cases are not consolidated, discovery and

pretrial proceedings and trial in one case will affect the other, and the Debtors may require a

3

more expeditious resolution than is available in state court. Accordingly, mandatory abstention

should be denied even if the Equity Owners' claims are not derivative (which they are).

## STATEMENT OF RELEVANT FACTS

6.      Edgemarc and its subsidiary, EM Energy Pennsylvania, LLC ("EM Energy

(PA)"), entered into a gathering and processing agreement (the "Base Agreement") with ETC on

November 13, 2017.[2] Pursuant to the Base Agreement, ETC agreed to "accept or cause to be

accepted on a Firm basis those daily quantities of [EM Energy (PA)'s] Gas as set forth in any

Individual Transaction Confirmation."[3]

7.      At the same time that EM Energy (PA) and ETC entered into the Base

Agreement, the parties also executed two Amended and Restated Individual Transaction

Confirmations (individually, "ITC 101" and "ITC 102" and collectively, the "ITCs").[4] The ITCs,

*inter alia*, (i) confirmed transactions "for the gathering and processing of Gas or provision of

other services to be performed" under the Base Agreement; and (ii) established the "gathering

and processing fee(s) . . . for the quantities of Gas . . . gathered and processed" under the Base

Agreement.[5] Together, the Base Agreement and the ITCs constitute a single integrated

agreement (the "Gathering and Processing Agreement").[6]

8.      The Gathering and Processing Agreement required ETC to place specific based

pipeline and gathering facilities identified in ITC 101 (the "Revolution System") in commercial

---

[2] *See* New York Complaint [Dkt. 1, Ex. A, ¶ 40]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 19].
[3] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶ 23].
[4] *See* New York Complaint [Dkt. 1, Ex. A, ¶ 40]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 25].
[5] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 21-22].
[6] *See* New York Complaint [Dkt. 1, Ex. A, ¶ 40]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 24].

service by January 1, 2019.[7] The Revolution System "enabled the Debtors to gather, process, and—ultimately—sell, gas from several newly drilled wells in Pennsylvania."[8] ETC completed primary construction of the Revolution System in the spring of 2018, and the Revolution System was mechanically complete and ready to be placed in commercial service on or about June 1, 2018.[9] In an act of good faith and in the spirit of accommodation, ETC deferred its contractual right to significant sums under the agreements and instead waited until EM Energy (PA) affirmed that it was ready to deliver gas, ultimately placing the Revolution System in commercial service on or before September 9, 2018.[10] Notwithstanding the foregoing, EM Energy (PA), EdgeMarc, and Equity Owners now claim that the Revolution System was never in commercial service.[11]

## A.    The Force Majeure Event

9.    On September 10, 2018, due to factors entirely outside of all parties' control including an unprecedented rain event, a landslide occurred (the "Revolution Event") along the Revolution System.[12] Despite the Revolution Event, ETC continued to provide gas gathering and processing services, albeit on a reduced basis.[13] ETC incurred significant expense to install a bypass of the affected portion of the system, allowing EM Energy (PA) to connect into another of its nearby gathering pipelines, which, in turn, permitted ETC to continue to provide EM

---

[7] See New York Complaint [Dkt. 1, Ex. A, ¶ 45]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 27]; First Day Declaration [BKC Dec. Ex. B, ¶ 7].

[8] See New York Complaint [Dkt. 1, Ex. A, ¶ 41]; First Day Declaration [BKC Dec. Ex. B, ¶ 6].

[9] See Pennsylvania Complaint [PA Dec. Ex. A, ¶ 32].

[10] See New York Complaint [Dkt. 1, Ex. A, ¶ 6]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 32-37].

[11] See New York Complaint [Dkt. 1, Ex. A, ¶¶ 7, 76, and 80]; Pennsylvania Answer, New Matter, and Counterclaims [PA Dec. Ex. B, ¶ 132]; First Day Declaration [BKC Dec. Ex. A, ¶ 7-10].

[12] See New York Complaint [Dkt. 1, Ex. A, ¶ 62]; Pennsylvania Complaint [PA Dec. Ex. A, ¶ 41]; First Day Declaration [BKC Dec. Ex. A, ¶ 6].

[13] See Pennsylvania Complaint [PA Dec. Ex. A, ¶ 43-46].

Energy (PA) with gathering services to a third party's processing facility.[14] Therefore, the Revolution Pipeline remained partially operational, and EM Energy (PA) continued to deliver gas under ITC 101.[15] Service under ITC 102 was not affected by the Revolution Event and continued without interruption.[16]

10.    Between September 9, 2018 and January 31, 2019, EM Energy (PA) delivered significant volumes of gas to ETC on the Revolution System, following the terms of ITC 101 and ITC 102.[17] However EM Energy (PA) failed to remit payment due and owing for services rendered by ETC under ITC 101, from September of 2018 through and including December of 2018.[18] It was only on January 29, 2019, after months of continued service under the ITCs and its own acknowledgement of the ITCs enforceability, that EM Energy (PA) wrote ETC alleging that ITC 101 and ITC 102 "shall be and hereby [are] terminated effective January 29, 2019."[19]

11.    Despite its contention that the ITCs are unenforceable, EM Energy (PA) continued to seek to deliver gas to ETC under the Base Agreement.[20] EM Energy (PA) contends that it has "nominated" to deliver gas under the Base Agreement alone.[21] But the Base Agreement cannot operate alone, and without an enforceable ITC, ETC has the right to shut off Defendant's gas services.[22]

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 47-48].
[19] *See* New York Complaint [Dkt. 1, Ex. A, ¶ 82]; Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 52-55]; First Day Declaration [BKC Dec. Ex. A, ¶ 6].
[20] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 56].
[21] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 57].
[22] *See* Pennsylvania Complaint [PA Dec. Ex. A, ¶¶ 58].

6

**B.**   **The Pennsylvania State Court Complaint Against Debtor EM Energy (PA)**

12.    Shortly thereafter, on February 7, 2019, ETC commenced litigation by the filing

of a complaint (the "Pennsylvania Complaint") against EM Energy (PA), in the Court of

Common Pleas of Allegheny County, Pennsylvania, in a matter styled *ETC Northeast Pipeline,*

*LLC, v. EM Energy Pennsylvania, LLC,* Case No. 19-002052 (the "Pennsylvania State Court

Action").[23] Through the Pennsylvania Complaint, ETC seeks (i) a declaratory judgment that the

Base Agreement, together with ITCs 101 and 102 are valid and enforceable contracts, and (ii) an

award of damages resulting from EM Energy (PA)'s breach of contract and unjust enrichment.[24]

13.    EM Energy (PA) responded to the Pennsylvania Complaint on February 27, 2019,

filing an answer, new matter, and counterclaims.[25] In its response, EM Energy (PA) alleges,

among other things, that (i) the Revolution System never was placed in commercial service, (ii)

ETC failed to comply with "pertinent environmental regulations and prudent pipeline

construction guidelines" and (iii) the landslide and resulting explosion to the Revolution System

was not a *force majeure* event.[26] .

**C.**   **The Equity Owners' New York State Court Complaint Against ETC**

14.    On May 14, 2019—the day before EdgeMarc and the eight affiliated debtors filed

voluntary chapter 11 petitions in this Court—GSCP VI EdgeMarc Holdings, L.L.C., GSCP VI

Parallel EdgeMarc Holdings, L.L.C., WSEP and Bridge 2012 EdgeMarc Holdings, L.L.C., and

---

[23] *See* Pennsylvania Complaint [PA Dec. Ex. A].
[24] *Id.*
[25] *See* Pennsylvania Answer, New Matter, Counterclaims [PA Dec. Ex. B].
[26] *Id.*

DOCS_DE:224942.6 23761/001

EM Holdco LLC (collectively, the "Equity Owners")[27], filed a three count complaint against

ETC (the "New York Complaint") in the Supreme Court of the State of New York, County of

New York, Index No. 652906/2019 (the "New York State Court Action").[28]

15.    The New York Complaint alleges that the Equity Owners have invested

approximately $850 million in EdgeMarc, and that ETC committed to construct a pipeline

system that would allow EdgeMarc to bring its product, natural gas, to market.[29] The New York

Complaint further alleges that EdgeMarc's natural gas is now "trapped in wells and not flowing

to purchasers", that ETC is at fault, and that Equity Owners "have thus suffered hundreds of

millions of dollars in losses and may lose their entire investment" in EdgeMarc.[30] The crux of the

claims encompassed by the New York Complaint hinge on the Equity Owner's allegations that

the Revolution System was not in commercial service prior to January 1, 2019, and that the

landslide that damaged the Revolution System was not a *force majeure* event.

16.    Notably, the New York Complaint pleads damages based upon alleged breaches

by ETC of the Gathering and Processing Agreement (i.e. the Base Agreement and the ITCs)

entered into by and between EM Energy (PA) and ETC.  Although the Equity Owners are not

party to the Base Agreement and ITCs,[31] the New York Complaint seeks adjudication of, among

other things, ETC's compliance with the terms of its respective agreements with EM Energy

(PA), namely whether ETC constructed the Revolution System pipeline according to required

---

[27] The Equity Owners represent that they own approximately 99% of the equity in EdgeMarc. *See* New York Complaint [Dkt. 1, Ex. A, ¶ 20].

[28] *See* New York Complaint [Dkt. 1, Ex. A].

[29] *Id.* at 1.

[30] *Id.*

[31] *Id.* at ¶ 40.

standards.[32] Accordingly, and as the following illustrations instruct, the facts and legal issues raised in the New York State Court Action are entirely duplicative and inextricably intertwined with those facts and legal matters at issue in the Pennsylvania State Court Action:

i.    The New York Complaint pleads damages based upon alleged breaches by ETC of the Base Agreement and ITCs, all being contracts by and between Debtor EM Energy (PA) and ETC, *not Equity Owners*. [Dkt. 1, Ex. A, ¶¶ 92-95] Nevertheless, by the New York Complaint, Equity Owners seek to adjudicate important and material rights, claims and liabilities of Debtor EM Energy (PA) under the Base Agreement and the ITCs.

ii.   The New York Complaint seeks adjudication of, among other things, ETC's compliance with the terms of its agreements with Debtor EM Energy (PA) namely whether ETC constructed the Revolution System pipeline according to required standards. [Dkt. 1, Ex. A, ¶ 47]

iii.  The New York Complaint hinges on Equity Owners' allegations that the landslide that damaged the Revolution System was not a *force majeure* event, a critical—if not dispositive—issue in Debtor EM Energy (PA)'s litigation with ETC. [Dkt. 1, Ex. A, ¶ 63]

iv.   The New York Complaint seeks a determination of whether statements and representations made to Debtor EM Energy (PA) (the same statements made to Equity Owners) were negligent.   Therefore, the New York Complaint seeks to adjudicate potential claims by estate of Debtor EM Energy (PA) against ETC.   [Dkt. 1, Ex. A, ¶ 38] ("The Equity Owners *and EdgeMarc* pursued the Pennsylvania option after receiving assurances from Energy Transfer…") (emphasis added).   *See also* [Dkt. 1, Ex. A, ¶ 52] ("Gatherer shall deliver a notice…to Sponsors *and Shipper* [Debtor EM Energy (PA)]…") (emphasis added).

v.    Equity Owners plead that ETC has caused harm and damages to the Equity Owners *and* Debtor EM Energy (PA).   *See* [Dkt. 1, Ex. A, ¶ 13].   Equity Owners further plead that the alleged damages occurred because "EdgeMarc has *been* unable to satisfy the volume requirements of its 'take or pay' natural gas delivery contracts." *See* [Dkt. 1, Ex. A, ¶ 13].   Lastly, Equity Owners plead that ETC "has damaged the value of the [Plaintiffs'] investment in EdgeMarc." [Dkt. 1, Ex. A, ¶ 89].   Therefore, the claims pleaded are derivative of the rights of Debtor EM Energy (PA) under the Gathering and Processing Agreement, and alleged harm to the Debtor EM Energy (PA) and thus represent assets of the Debtors' estates.

---

[32] *Id.* at 47.

9

17.     Discovery in the New York State Court Action reflects its commonality with the
Pennsylvania Action: the Equity Owners have propounded discovery seeking, among other
things, "all Documents and Communications" concerning the "design, engineering, or
construction of the Pipeline System", "the Pipeline Explosion", and "the Force Majeure Notice."

**D.      The Bankruptcy Cases**

18.     On May 15, 2019 (the "Petition Date"), EdgeMarc and the eight affiliated debtors
herein filed voluntary chapter 11 petitions in this Court. The first day affidavit of the Debtors'
CEO, Callum Streeter,[33] attributes the Debtors' need to commence bankruptcy proceedings to the
Revolution Event, the Debtors' resulting "inability to sell gas from their Pennsylvania
properties" and the resulting "substantial negative impact on their liquidity and ability to satisfy
their funded debt, contractual and other payment obligations."[34] The Debtors purportedly
exercised their business judgment in opting to "shut in" their Pennsylvania wells and pause all
remaining Pennsylvania operations, because "the Debtors could not flow through ETC's
Revolution System due to the Revolution Event and because ETC refused to gather the Debtors'
gas via other infrastructure, and because the Debtors had no other means of selling gas from the
affected wells."[35] Accordingly, their claims related to the Revolution System are critical assets of
the Debtors' estates and, furthermore, the claims and counterclaims with ETC comprise a core
proceeding under 28 U.S.C. § 157(b)(2)(B) and (C).

---

[33] See First Day Declaration [BKC Dec. Ex. B, ¶ 5]
[34] Id. at ¶ 11.
[35] Id. at ¶ 9. The business judgment of the Debtors' decision to shut in its own wells by terminating the ITCs is
questionable, at best. Rather than continuing to sell gas and generate revenue, terminating the ITCs, and shutting in
its wells appears to have served only the interests of its equity sponsors, that is, preservation of the claims brought by
the Equity Owners against ETC.

## **ARGUMENT**

19.     The Equity Owners seek abstention and remand solely under the mandatory

abstention provision of 28 U.S.C. § 1334(c)(2), and solely if their claims in the New York

Complaint are determined to be non-derivative in connection with the pending motion to dismiss.

Section 1334 provides:

> (c). . . (2) Upon timely motion of a party in a proceeding based upon a State
> law claim or State law cause of action, related to a case under title 11 but
> not arising under title 11 or arising in a case under title 11, with respect to
> which an action could not have been commenced in a court of the United
> States absent jurisdiction under this section, the district court shall abstain
> from hearing such proceeding if an action is commenced, and can be timely
> adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

20.     Thus, upon a timely motion under § 1334(c)(2), a district court must abstain if the

following five requirements are met: (1) the proceeding is based on a state law claim or cause of

action; (2) the claim or cause of action is "related to" a case under title 11, but does not "arise

under" title 11 and does not "arise in" a case under title 11, (3) federal courts would not have

jurisdiction over the claim but for its relation to a bankruptcy case; (4) an action "is commenced"

in a state forum of appropriate jurisdiction; and (5) the action can be "timely adjudicated" in a

state forum of appropriate jurisdiction. *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006).

11

**A.**    **The Court Has "Related To" Jurisdiction**

21.    The Equity Owners' suggestion that this Court has no jurisdiction at all over this action is meritless. "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*" *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original). "The key inquiry no doubt is conceivability. 'Certainty, or even likelihood [of effect on the estate being administered in bankruptcy,] is not a requirement.'" *Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 293-94 (3d Cir. 2012) (quoting *Copelin v. Spirco, Inc.*, 182 F.3d 174, 179 (3d Cir. 1999) (internal citation omitted)).

22.    *Pacor* found that there was no related to jurisdiction over an action between "[a]t best, it is a mere precursor to the potential third party claim for indemnification by Pacor against Manville." *Id.* at 995. It noted in particular that the outcome "could not determine any rights, liabilities, or course of action of the debtor" because res judicata would not apply to *Manville* as a non-party to the *Higgins-Pacor* action. *Id.* The Equity Owners cite *Pacor* and *Madoff* (citing *Pacor*) for the proposition that "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of related to jurisdiction." *Picard v. HSBC Bank PLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 561 B.R. 334, 345-46 (Bankr. S.D.N.Y. 2016) (quoting *Pacor*; internal quotation omitted). Like *Pacor*, *Madoff* cites the absence of preclusive effect on the estate. *Id.*

12

23.    The issue in such cases, however, is not simply common facts, but whether there is a conceivable effect on the estate where the Debtor or other creditors would be bound by collateral estoppel. *See, e.g., Pacor*, 743 F.2d at 995; *Picard*, 561 B.R. at 346. A wholly separate trial in the New York state court considering the same facts and circumstances, and deciding liability based on the actions of parties (including the Debtors), presents a great risk of estoppel to the claims asserted by the Debtors in these cases.  For example, if the New York state court determines that ETC is not liable for the pipeline rupture due to a force majeure event, the Court may determine that collateral estoppel is appropriate, and the Debtors entire claim against ETC would be precluded. While there is no certainty that this Court would apply estoppel principles for any such ruling, the risk presented may compel the Debtors' participation in the New York litigation, thus adding further costs to the estate and compounding the danger presented by the parallel litigation.

24.    On the other hand, there is no question that certain rulings *against ETC* in this action would have the effect of reducing ETC's claims against the estate.  An outcome in third party litigation that reduces claims against the estate is sufficient for related to jurisdiction.  *See e.g., Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 297-98 (3d Cir. 2012) (citing cases).  While the reduction in claims in *Nuveen* and the cases it cites result from a plaintiff's *success* against a third party, what is relevant is the effect of reducing claims against the estate.

25.    "Related to" jurisdiction exists on the danger of collateral estoppel alone, but there are other bases. At least some of the damages asserted by the Equity Owners and the Debtors are subject to a single satisfaction, meaning that a recovery by the Equity Owners

13

reduces estate assets, as would a recovery ETC is unable to satisfy. *See, e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 309 (1995) (finding "related to" jurisdiction due to "direct and substantial impact" on estate resulting from dispute between third parties over bond proceeds). Any recovery by the Equity Owners may ultimately lead to a contribution claim by ETC against the Debtors, thus reducing the recoveries of creditors.  *See, e.g., SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 341-2 (2d Cir. 2018) (holding potential contribution claim supports "related to" jurisdiction with a "conceivable effect on the estate); *In re Dow Corning Corp.*, 86 F.3d 482, 489-94 (6th Cir. 1996) (same).  Furthermore, given the overlapping facts and issues, consolidating the Debtors' claims with those of their Equity Owners would save estate resources. For these reasons, this proceeding has a "conceivable effect" on the estates.

**B.**     **Mandatory Abstention Is Not Appropriate**

26.     The largely duplicative facts and circumstances between the Pennsylvania State

Court Action and New York State Court Action suggests that consolidation of the adversary

proceedings may be appropriate.  Consolidation under Bankruptcy Rule 7042 would not only

benefit the Debtors (and the other parties) and promote judicial economy, it would negate

mandatory abstention. The claims by ETC and counterclaims against it in the removed

Pennsylvania action are core proceedings under 28 U.S.C. § 157(b)(2)(B) (allowance or

disallowance of claims against the estate) and § 157(b)(2)(C) counterclaims by the estate against

persons filing claims against the estate.  Consolidation with a core proceeding removes that

proceeding from the scope of section 1334(c)(2). In *In re Epi-Scan, Inc.*, 71 B.R. 975 (Bankr. D.

N.J. 1987), the bankruptcy court found that procedural consolidation of two actions by different

debtors against a non-debtor, Estee Lauder, Inc., should be consolidated based on their

commonality: "Since common questions of law and fact are presented in the above actions

pending before this Court, procedural consolidation pursuant to Bankruptcy Rule 7042 and Fed.

R. Civ. Pro. 42(a) is appropriate." *Id.* at 977.  It analyzed and concluded that one of the

proceedings, involving post-petition receivables, was a core proceeding within its "arising-in"

jurisdiction, while the other, which involved prepetition receivables, was a non-core proceeding

and only within its "related-to" jurisdiction. *Id.* at 979-80. It found the requirements of

mandatory abstention had not been met: "As applied to the facts presented herein, mandatory

abstention is not warranted since this is a consolidated proceeding and the adversary suit brought

15

by the Debtor-In-Possession in the Dyson matter is an action "arising in" the title 11 case and as

such is not within the purview of § 1334(c)(2)." *Id.* at 980.

27.     Further, the Equity Owners fail to satisfy the "timely adjudication" requirement

for mandatory abstention.  Whether an action can be "timely adjudicated" in a state forum for

purposes of mandatory abstention "must be determined with respect to needs of the title 11 case

and not solely by reference to the relative alacrity with which the state and federal court can be

expected to proceed. 1 Collier on Bankruptcy § 3.05[2] at 3-72 ('The  few cases considering the

issue hold that timeliness must be referenced against the needs of the title 11 case, rather than

against an absolute time guideline.')." *Stoe*, 436 F.3d at 219-220.  "Four factors come into play

in evaluating § 1334(c)(2) timeliness: (1) the backlog of the state court's calendar relative to the

federal court's calendar; (2) the complexity of the issues presented and the respective expertise of

each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are

related; and (4) whether the state court proceeding would prolong the administration or

liquidation of the estate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 580

(2d Cir. 2011). "Whether an action can be timely adjudicated in state court is a mixed question of

law and fact. The factual inquiry focuses on how quickly a case can be adjudicated in state court;

the legal inquiry asks if this pace is sufficiently swift." *Id.*

28.     The Equity Owners have not made the requisite showing on this issue.  They

simply refer to cases involving New York state courts in which abstention was ordered, and

assert: "Nor is there any basis to assert that timely adjudication could not be had in the New

York state court, as courts have routinely abstained in favor of the New York Supreme Court."

Motion at 13.  Accordingly, this requirements for mandatory abstention has not been met.

DOCS_DE:224942.6 23761/001

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, ETC respectfully requests that the Court

enter an Order denying the Motion, and grant such other and further relief as may be appropriate.

Dated: August 16, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:      ljones@pszjlaw.com
            tcairns@pszjlaw.com

-and-

LYNN PINKER COX & HURST, L.L.P.
Michael P. Lynn (admitted *pro hac vice*)
Chris Patton (admitted *pro hac vice*)
John Adams (admitted *pro hac vice*)
2100 Ross Avenue, Suite 2700
Dallas, Texas  75201
Telephone:  (214) 981-3800
Facsimile:  (214) 981-3839
Email:      mlynn@lynnllp.com
            cpatton@lynnllp.com
            jadams@lynnllp.com

*Counsel to ETC Northeast Pipeline, LLC*